IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDIS BIOTECH, GMBH | ) | |
| | ) | C. A. No.:  22-00035-GBW |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | ██████████████████ |
| AMGEN INC., | ) | |
| | ) | **Redacted - Public Version Filed on:** |
| Defendant. | ) | **June 7, 2024** |

**DEFENDANT AMGEN INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS
FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)

1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

PERKINS COIE LLP
Michael J. Wise
Joseph P. Hamilton
Lara J. Dueppen
Courtney M. Prochnow
Alisha C. Burgin
Doris Alvarez-Reyes
1888 Century Park East
Suite 1700
Los Angeles, CA  90067-1721
(310) 788-9900

Garmai Gorlorwulu
Blake A. Winn
11452 El Camino Real, Suite 300
San Diego, CA  92130-2080
(858) 720-5700

AMGEN INC.
Brian Kao
J. Drew Diamond
Wendy A. Whiteford
One Amgen Center Drive
Thousand Oaks, CA  91320-1799
(805) 447-1000

WALSH PIZZI O'REILLY FALANGA LLP
Liza M. Walsh
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ  07102
(973) 757-1100

*Attorneys for Amgen Inc.*

Dated:  May 24, 2024

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

    A.    Overview of Amgen's Summary Judgment Motions ............................................. 1

    B.    Amgen's Motion to Exclude ................................................................................. 3

II.   LEGAL STANDARDS ....................................................................................... 4

    A.    Summary Judgment ............................................................................................... 4

    B.    Expert Witness Testimony ..................................................................................... 4

III.  AMGEN'S MOTIONS FOR SUMMARY JUDGMENT ................................... 5

    A.    Summary Judgment Motion No. 1: Amgen Does Not Induce Infringement of the '421 Patent Because the U.S. Label Does Not Encourage, Recommend, or Promote the Required Timing for Glucocorticoid Administration. ...................... 5

        1.    Factual Background ................................................................................... 6

            a.    All the '421 patent claims require glucocorticoid administration "immediately before," "immediately after," or "concurrently" with administration/treatment with the recited antibody. ................................... 6

            b.    The U.S. Label does not specify administration "immediately before," "immediately after," or "concurrently" with BLINCYTO. .......... 6

        2.    Inducement of the '421 Patent Fails as a Matter of Fact and Law. .......... 10

            a.    It is undisputed that the U.S. Label does not specify administering glucocorticoid "immediately before," "immediately after," or "concurrently" with BLINCYTO. ........................................................... 10

                i.    It is undisputed that the U.S. Label does not specify that glucocorticoid be administered "immediately before" BLINCYTO administration. ........................................................... 10

                ii.    It is undisputed that the U.S. Label does not specify that glucocorticoid be administered "immediately after" BLINCYTO administration. ........................................................... 12

                iii.    It is undisputed that the U.S. Label lacks any recommendation of administering a glucocorticoid "concurrently" with BLINCYTO administration. ........................................................... 13

            b.    That the U.S. Label's descriptions do not specify but might permit some glucocorticoid administration "immediately before" or "immediately after" BLINCYTO administration cannot establish inducement as a matter of law. ..................................................................................................... 13

    B.    Summary Judgment Motion No. 2: Amgen Does Not Contributorily Infringe the '421 Patent Because BLINCYTO Has Substantial Noninfringing Uses Not Covered by the Claimed Required Timing for Glucocorticoid Administration. .. 15

1.    Factual Background ............................................................... 16

2.    Lindis's Contributory Infringement Claim of the '421 Patent Fails as a Matter of Fact and Law...................................................... 17

C.    Summary Judgment Motion No. 3: All Asserted Claims of the '158 Patent Are Invalid for Lack of Written Description. ............................ 20

1.    Factual Background ............................................................... 22

a.    The asserted claims recite a genus of CD19 x CD3 antibodies. ... 22

b.    The '158 patent does not disclose any species that falls within the CD19 x CD3 bispecific antibody genus recited in the claims. ................ 23

c.    The '158 patent discloses no structural features common to any broad CD19 x CD3 genus. .......................................................... 25

2.    The '158 Patent Specification Lacks Adequate Written Description of the Claimed CD19 x CD3 Antibodies. ........................................ 26

a.    The '158 patent fails the *Ariad* test: There is no disclosure of a representative CD19 x CD3 species, or any species at all. ...................... 26

b.    The '158 patent fails the *Ariad* test: There is no disclosure of any structural features common to the recited genus of CD19 x CD3 antibodies. .......................................................................... 28

c.    The '158 patent also fails the "blaze marks" test: Written description requires more than "laundry list" disclosures. ...................... 30

d.    Lindis's technical expert's attempt to read the antibodies out of the claim ignores both established case law and the law of this case and does not, in any event, raise a material issue of fact. ......................................... 33

D.    Summary Judgment Motion No. 4: Amgen Does Not Induce Infringement of the Asserted Patents Because the U.S. Label for BLINCYTO Does Not Induce the Administration of a Glucocorticoid to Reduce the Non-Specific Release of a Cytokine. ........................................................................... 36

1.    Factual Background ............................................................... 37

a.    All asserted claims require administering a glucocorticoid to reduce the non-specific release of a cytokine caused by an antibody....... 37

b.    The U.S. Label does not describe administration of a glucocorticoid to reduce non-specific release of a cytokine.................... 37

2.    The U.S. Label Does Not Encourage, Recommend, or Promote Administering a Glucocorticoid to Reduce Non-Specific Release of a Cytokine. 38

IV.    AMGEN'S MOTION TO PRECLUDE LINDIS'S DAMAGES EXPERT FROM OPINING THAT LINDIS SHOULD RECEIVE REASONABLE ROYALTY DAMAGES ON AMGEN'S EX-U.S. SALES OF BLINCYTO ............................................. 40

A.    Factual Background ........................................................................ 40

B.    Argument ....................................................................................... 42

1.    Lindis's Damages Expert Improperly Included Foreign Sales in the Royalty Base ........................................................................................ 42

2.    Lindis's Expert Has Not Relied Upon the Narrow Exception Permitting Consideration of Foreign Sales to Assess Reasonable Royalty Damages for Domestic Infringement ........................................................................ 43

V.    CONCLUSION ................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allergan, Inc. v. Alcon Lab'ys, Inc.*,
    324 F.3d 1322 (Fed. Cir. 2003) .......................................................................... 39

*ArcherDX, LLC, v. QIAGEN Scis., LLC*,
    C.A. No. 18-1019 (MN), 2021 WL 3857460 (D. Del. Aug. 30, 2021) ................................. 42

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) ............................................... 20, 21, 26

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
    676 F.3d 1316 (Fed. Cir. 2012) ...................................................................... 38, 39

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) .......................................................................... 34

*Biogen Inc. v. Sandoz Inc.*,
    C.A. No. 22-1190 (GBW), 2023 WL 7130655 (D. Del. June 29, 2023) ............................... 38

*Brumfield v. IBG, LLC*,
    97 F.4th 854 (Fed. Cir. 2024) ................................................................... 42, 43, 44

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ........................................................................ 42

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015) ........................................................................ 44

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................... 4

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ...................................................................................... 4

*DSU Med. Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006) ......................................................................... 5

*Ferring Pharms. v. Lupin Inc.*,
    C.A. No. 19-913 (RGA), 2020 WL 3414750 (D. Del. June 22, 2020) .................................. 14

*Genentech, Inc. v. Sandoz, Inc.*,
    55 F.4th 1368 (Fed. Cir. 2022) ..................................................................... 14, 15

*Genentech, Inc. v. Sandoz, Inc.*,
    592 F.Supp.3d 355 (D. Del. 2022) .................................................................. 14, 15

*Grunenthal GmbH v. Alkem Lab'ys Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019) ........................................................ 13, 14, 15, 17, 18, 19, 20

*H. Lundbeck A/S v. Lupin Ltd.*,
  87 F.4th 1361 (Fed. Cir. 2023) ........................................................................................ 15, 19

*Hebert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ................................................................................................. 43

*HZNP Meds. LLC v. Actavis Lab'ys UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019) ................................................................................................... 5

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) ......................................................................................... 21, 26

*In re Ruschig*,
  379 F.2d 990 (C.C.P.A. 1967) ................................................................................................. 33

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
  10 F.4th 1330 (Fed. Cir. 2021) .......................................................................................... 29, 30

*Koninklijke Philips N.V. v. Telit IoT Sols., Inc.*,
  C.A. No. 20-1703 (CFC), 2023 WL 8600662 (D. Del. Dec. 12, 2023) ............................. 40, 43

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................................................... 4

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ................................................................................................ 43

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
  723 F.3d 1336 (Fed. Cir. 2013) ......................................................................................... 31, 32

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) ................................................................................................ 42

*PureCircle USA Inc. v. SweeGen, Inc.*,
  No. 2022-1946, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024) ................................................. 29, 31

*Schneider ex rel. Est. of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003) ....................................................................................................... 4

*SodexoMAGIC, LLC v. Drexel Univ.*,
  24 F.4th 183 (3d Cir. 2022) ........................................................................................................ 4

*Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*,
  785 F.3d 625 (Fed. Cir. 2015) ........................................................................................... 15, 38

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
    No. 18-cv-12029, 2023 WL 6282898 (D. Mass. Sept. 26, 2023) .......................................... 29

*Warner–Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003) ................................................................................................. 5

*Williams v. Borough of W. Chester, Pa.*,
    891 F.2d 458 (3d Cir. 1989) ...................................................................................................... 4

## **Statutes**

35 U.S.C. § 112 ..................................................................................................................... 1, 20, 45

35 U.S.C. § 271(b) ................................................................................................................ 5, 39, 45

35 U.S.C. § 271(c) .................................................................................................................. 15, 45

35 U.S.C. § 271(e)(2) .................................................................................................................. 39

**TABLE OF ABBREVIATIONS**

| Document/Item | Abbreviation |
|---|---|
| U.S. Patent No. 8,709,421 | '421 patent |
| U.S. Patent No. 10,071,158 | '158 patent |
| Plaintiff Lindis Biotech GmbH's Final Infringement Contentions, dated August 28, 2023 | Final Infringement Contentions |
| Joint Claim Construction Brief (D.I. 86) | Joint Claim Construction Brief |
| Joint Technology Tutorial (D.I. 76-1) | Joint Technology Tutorial |
| *Markman* Hearing Transcript | *Markman* Hrg. Tr. |
| *Markman* Opinion (D.I. 94) | *Markman* Opinion |
| *Markman* Order (D.I. 95) | *Markman* Order |
| FDA-Approved Labeling for BLINCYTO® (Prescribing Information and Medication Guide), June 2023 | U.S. Label |
| 09/28/2023 Transcript of Deposition of Markus Maria Heiss | Heiss Tr. |
| 9/20/2023 Transcript of Deposition of Horst Lindhofer, Ph.D. | Lindhofer Tr. |
| Lindis Response to Amgen's Interrogatory No. 7 | Response to Amgen's Interrogatory No. 7 |
| Lindis's Supplemental Disclosure Pursuant to Paragraph 6(b) of the Scheduling Order | Lindis's Suppl. ¶6(b) Disc. |
| Opening Expert Report of Wayne A. Marasco, M.D., Ph.D., Regarding Invalidity of U.S. Patent Nos. 8,709,421 and 10,071,158, dated November 13, 2023 | Marasco Op. |
| Rebuttal Expert Report of Dr. Wayne A. Marasco Regarding Noninfringement of U.S. Patent Nos. 8,709,421 and 10,071,158 | Marasco Rebuttal |
| Reply Expert Report of Wayne A. Marasco, M.D., Ph.D., Regarding Invalidity of U.S. Patent Nos. 8,709,421 and 10,071,158, dated March 15, 2024 | Marasco Reply |
| 4/17/24 Transcript of Deposition of Dr. Wayne A Marasco | Marasco Tr. |
| Expert Report of Leslie Oleksowicz, M.D., on Infringement, dated November 13, 2023 | Oleksowicz Op. |
| Opening Expert Report of Leslie Oleksowicz, M.D. in Rebuttal to Opening Expert Report of Wayne A. Marasco, M.D., Ph.D., Regarding Invalidity of U.S. Patent Nos. 8,709,421 and 10,071,158, dated February 16, 2024 | Oleksowicz Rebuttal |
| Reply Expert Report of Leslie Oleksowicz, M.D., on Infringement, dated Mar. 15, 2024 | Oleksowicz Reply |
| 4/12/2024 Transcript of Deposition of Dr. Leslie Oleksowicz, Lindis's Expert on Infringement and Validity | Oleksowicz Tr. |

| Document/Item | Abbreviation |
|---|---|
| Rebuttal Expert Report of Dr. Robert J. Soiffer Regarding Non-Infringement of U.S. Patent Nos. 8,709,421 and 10,071,158 | Soiffer Rebuttal |
| Expert Report of W. Todd Schoettelkotte Relating to Lindis Biotech's Damages, dated December 15, 2023 | Schoettelkotte Op. |
| Reply Expert Report of W. Todd Schoettelkotte Relating to Lindis Biotech's Damages, dated March 15, 2024 | Schoettelkotte Reply |
| 3/28/2024 Transcript of Deposition of W. Todd Schoettelkotte, Lindis's Damages Expert | Schoettelkotte Tr. |
| Concise Statement of Uncontested Facts for Amgen's Motion for Summary Judgment No. 1 | SUF-A |
| Concise Statement of Uncontested Facts for Amgen's Motion for Summary Judgment No. 2 | SUF-B |
| Concise Statement of Uncontested Facts for Amgen's Motion for Summary Judgment No. 3 | SUF-C |
| Concise Statement of Uncontested Facts for Amgen's Motion for Summary Judgment No. 4 | SUF-D |

## I.    INTRODUCTION

Plaintiff Lindis Biotech GmbH ("Lindis") asserts that Defendant Amgen Inc. ("Amgen") indirectly infringes two method patents, the '421 patent and the '158 patent (collectively, the "Asserted Patents"), by inducing or contributing to a medical practitioner's administration of a glucocorticoid with the life-saving cancer therapeutic drug BLINCYTO® in a manner that directly infringes the Asserted Patents.  As explained in more detail below, Amgen presents four summary judgment motions that, taken together, are case dispositive.  Motions 1 and 2 collectively request judgment of no indirect infringement of all the asserted claims of the '421 patent because the U.S. BLINCYTO Label ("the U.S. Label") does not describe the claims' recited step of administering a glucocorticoid "immediately before," "immediately after," or "concurrently" with BLINCYTO administration.  Motion 3 requests judgment that all the asserted claims of the '158 patent are invalid under 35 U.S.C. §112 because the '158 patent specification lacks any written description of the claims' recited genus of bispecific antibodies that binds CD marker CD3 and tumor antigen CD19.  And Motion 4 requests judgment of no induced infringement of both Asserted Patents because the U.S. Label does not describe the claims' recited step of administering a glucocorticoid to reduce non-specific release of a cytokine.  Amgen also submits a Motion to Exclude Lindis's damages expert from opining that Lindis should receive reasonable royalty damages on sales that are not even alleged to infringe the Asserted Patents: Amgen's ex-U.S. sales of BLINCYTO.

### A.    Overview of Amgen's Summary Judgment Motions

**Summary Judgment Motion 1** requests a judgment of no induced infringement of all asserted claims of the '421 patent because the U.S. Label does not encourage, recommend, or promote administering glucocorticoids "immediately before," "immediately after," or "concurrently" with the recited antibody administration (as required by the asserted claims of the '421 patent).  The Court construed "immediately" to mean "without any intervening time."  In

contrast, the U.S. Label provides either generic descriptions of when to administer a glucocorticoid relative to BLINCYTO administration (*e.g.*, "premedicate," "prior to," "treat," "administer," "before," "when restarting")—leaving the timing of glucocorticoid administration to the discretion of healthcare professionals—or a specific description of administering a glucocorticoid 1 hour prior to BLINCYTO administration.  None of these amount to encouraging, recommending, or promoting administration of glucocorticoid "immediately before," "immediately after," or "concurrently" with BLINCYTO.  Thus, summary judgement of no induced infringement of the '421 patent is proper.

**Summary Judgment Motion 2** requests judgment of no contributory infringement of all asserted claims of the '421 patent because, in addition to all the other noninfringing ways that healthcare professionals may use their discretion as per the generic descriptions in the U.S. Label to administer glucocorticoid relative to BLINCYTO, and the U.S. Label's express description of administering glucocorticoid 1 hour prior to BLINCYTO administration represents a substantial noninfringing use of BLINCYTO.  Because there can be no genuine dispute that the U.S. Label describes substantial noninfringing use of BLINCYTO, the Court should grant summary judgment of no contributory infringement of the '421 patent.

**Summary Judgment Motion 3** requests a judgment that all asserted claims of the '158 patent are invalid for lack of written description.  There is no factual dispute that the '158 patent specification does not disclose (1) a single species of antibody falling within the scope of the genus of bispecific CD19 x CD3 antibodies recited in the claims; (2) any structural features common to members of that claimed genus of antibodies; or (3) any "blaze marks" that would lead a person of ordinary skill in the art ("POSA") to the recited bispecific CD19 x CD3 antibodies.  That is unsurprising, as the '158 patent claims were drafted years after the specification (and only after a

named inventor met with Amgen) in an attempt to capture Amgen's successful BLINCYTO product.  Lindis's technical expert makes no attempt to rebut these facts, instead taking the incorrect legal position that the genus of antibodies—which are recited in the claims—are not claimed "per se" and thus need not have written description support.  As that argument is legally unsupported, and as the material facts are not contested, summary judgment is proper.

**Summary Judgment Motion 4** requests a judgment of no induced infringement of all asserted claims of both the '421 and '158 patents.  All asserted claims require administering a glucocorticoid to reduce non-specific release of a cytokine caused by the claimed antibody, and Lindis relies solely on the U.S. Label to show Amgen is encouraging, recommending, or promoting others to infringe.  But there is no dispute that the U.S. Label contains no disclosure of non-specific release of a cytokine.  Without this, the U.S. Label cannot as a matter of law induce the administration of a glucocorticoid to reduce non-specific release of a cytokine and summary judgment is proper.

### B.    Amgen's Motion to Exclude

Amgen also submits a **Motion to Exclude** to preclude Lindis's damages expert from opining that Lindis should receive reasonable royalty damages on Amgen's ex-U.S. sales of BLINCYTO—sales that Lindis does not even allege infringe its patents.  As explained below, Lindis's damages expert's inclusion of foreign sales in his alternative royalty base is contrary to law and would thus be unreliable and unhelpful to the jury at trial.

*              *              *

For the reasons set forth herein, Amgen respectfully requests summary judgment in its favor, and that Lindis's improper expert opinions be excluded from trial.

3

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a moving party has met its initial responsibility to demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-moving party to demonstrate the existence of a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see also Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).

A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).  "[T]he burden on the moving party may be discharged by . . . pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

### B.    Expert Witness Testimony

The requirements for expert witness testimony are set forth in Federal Rule of Evidence 702, under which the trial court is tasked with ensuring that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  As the Third Circuit has explained, "the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury."  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003).

III.    **AMGEN'S MOTIONS FOR SUMMARY JUDGMENT**

   A.    **Summary Judgment Motion No. 1: Amgen Does Not Induce Infringement of the '421 Patent Because the U.S. Label Does Not Encourage, Recommend, or Promote the Required Timing for Glucocorticoid Administration.**

Lindis's contention that Amgen induces infringement of the '421 patent hinges on the premise that the U.S. Label for BLINCYTO encourages, recommends, or promotes the allegedly infringing conduct.  But, as Lindis's own expert has admitted, the U.S. Label does not specify administering a glucocorticoid at any of the three times required by the claims because the U.S. Label either describes administering glucocorticoids outside of the required times or leaves the timing of administration to the discretion of healthcare professionals, neither of which induce infringement under the law.  Summary judgment of no induced infringement of the '421 patent is warranted.

A patentee may only establish inducement under 35 U.S.C. § 271(b) if it can prove the accused "actively and knowingly aid[ed] and abett[ed] another's direct infringement." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (emphasis and citation omitted). Where (as here) specific intent is based on a drug label, courts must determine whether the label "encourage[s], recommend[s], or promote[s] infringement." *HZNP Meds. LLC v. Actavis Lab'ys UT, Inc.*, 940 F.3d 680, 701–02 (Fed. Cir. 2019) (citation omitted).  "Merely describing the infringing use, or knowing of the possibility of infringement, will not suffice; specific intent and action to induce infringement must be shown." *Id.* at 702 (citation omitted) (affirming summary judgment of no induced infringement where the drug label did not describe performing the patented method, even where plaintiffs otherwise showed that some users may infringe); *see also Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) (citation omitted).

The asserted '421 patent claims require administration of a glucocorticoid at one of three narrowly-defined times—specifically, "immediately before," "immediately after," or

"concurrently" with the recited antibody administration/treatment.  SUF-A ¶¶1–2.  In its Final Infringement Contentions, Lindis relies solely on statements in the U.S. Label to support its contention that Amgen induces infringement.  SUF-A ¶5.  But, as shown below, even if BLINCYTO otherwise meets the limitation of the recited antibody and the administration of a glucocorticoid were demonstrated to reduce the non-specific release of a cytokine (both of which Amgen disputes), the U.S. Label does not encourage, recommend, or promote administration of a glucocorticoid at any of those three recited times relative to BLINCYTO administration.  For this reason, Lindis's inducement claim fails, and summary judgment on this issue is proper.

### 1. Factual Background

#### a. All the '421 patent claims require glucocorticoid administration "immediately before," "immediately after," or "concurrently" with administration/treatment with the recited antibody.

Independent claim 1 of the '421 patent, and, by extension, its dependent claims, require "administering to the subject at least one glucocorticoid *immediately before* or *immediately after* administering at least one trifunctional, bispecific immunostimulating antibody."  SUF-A ¶2.[1] Independent claim 15 of the '421 patent requires "administering to the subject at least one glucocorticoid *immediately before*, *concurrently* or *immediately after* treatment with at least one trifunctional, bispecific immunostimulating antibody."  SUF-A ¶2.

These timing limitations were construed by the Court.  "Immediately" means "without any intervening time," and "concurrently with" means "at the same time as."  SUF-A ¶¶3–4.

#### b. The U.S. Label does not specify administration "immediately before," "immediately after," or "concurrently" with BLINCYTO.

The U.S. Label provides BLINCYTO administration information to healthcare professionals.  BLINCYTO is only approved for two indications: the treatment in adult and

---

[1]      Unless indicated, all emphasis in the brief is added.

pediatric patients with (1) CD19-positive B-cell precursor acute lymphoblastic leukemia (ALL) in first or second complete remission with minimal residual disease (MRD) greater than or equal to 0.1% or (2) relapsed or refractory CD19-positive B-cell precursor ALL.  SUF-A ¶7.

For the first approved indication, the U.S. Label describes premedicating patients with glucocorticoids (*e.g.*, dexamethasone or prednisone).  SUF-A ¶8.  The U.S. Label does not describe premedication "immediately before" (*i.e.*, "without any intervening time before" BLINCYTO administration):

---

==Premedicate== with prednisone or equivalent for MRD-positive B-cell Precursor ALL

   o   For adult patients, ==premedicate== with prednisone 100 mg intravenously or equivalent (e.g., dexamethasone 16 mg) ==1 hour prior== to the first dose of BLINCYTO in each cycle.

   o   For pediatric patients, ==premedicate== with 5 mg/m$^2$ of dexamethasone, to a maximum dose of 20 mg, ==prior to== the first dose of BLINCYTO in the first cycle and ==when restarting== an infusion after an interruption of 4 or more hours in the first cycle.

---

SUF-A ¶¶6, 8–10.

For the second approved indication, the U.S. Label similarly describes premedicating patients with the glucocorticoid dexamethasone, again without requiring that such premedication be "immediately before" BLINCYTO administration:

---

==Premedicate== with dexamethasone:

   o   For adult patients, ==premedicate== with 20 mg of dexamethasone ==1 hour prior to== the first dose of BLINCYTO of each cycle, ==prior to== a step dose (such as Cycle 1 Day 8), and ==when restarting== an infusion after an interruption of 4 or more hours.

   o   For pediatric patients, ==premedicate== with 5 mg/m$^2$ of dexamethasone, to a maximum dose of 20 mg, ==prior to== the first dose of BLINCYTO in the first cycle, ==prior to== a step dose (such as Cycle 1 Day 8), and ==when restarting== an infusion after an interruption of 4 or more hours in the first cycle.

---

SUF-A ¶¶6, 8–10.

The U.S. Label also states, "[b]efore you receive BLINCYTO, you will be given a corticosteroid medicine to help reduce infusion reactions."  SUF-A ¶11.  It does not specify that such corticosteroid administration will be "immediately before" BLINCYTO administration.

SUF-A ¶6.

The U.S. Label further includes a Black Box Warning about Cytokine Release Syndrome (CRS), simply stating "treat with corticosteroids as recommended" following interruption or discontinuation of BLINCYTO and referencing U.S. Label Section 2.3 and 5.1:

> **WARNING: CYTOKINE RELEASE SYNDROME and NEUROLOGICAL TOXICITIES**
> ***See full prescribing information for complete boxed warning.***
>
> - **Cytokine Release Syndrome (CRS), which may be life-threatening or fatal, occurred in patients receiving BLINCYTO. Interrupt or discontinue BLINCYTO and treat with corticosteroids as recommended. (2.3, 5.1)**
> - **Neurological toxicities, which may be severe, life-threatening, or fatal, occurred in patients receiving BLINCYTO. Interrupt or discontinue BLINCYTO as recommended. (2.3, 5.2)**

SUF-A ¶12.

Section 2.3 of the U.S. Label is titled "Dosage Modifications for Adverse Reactions." Concerning CRS, it describes, depending on the grade of severity, "Interrupt[ing] BLINCYTO" or "Discontinu[ing] BLINCYTO permanently" and "administer[ing] dexamethasone." SUF-A ¶13. It does not specify that such glucocorticoid administration be "immediately after" (*i.e.*, "without any intervening time after" BLINCYTO administration):

8

| Table 3. Dosage Modifications for Adverse Reactions | | | |
|---|---|---|---|
| Adverse Reaction | Grade* | Patients Weighing 45 kg or More | Patients Weighing Less Than 45 kg |
| Cytokine Release Syndrome (CRS) | Grade 3 | • Interrupt BLINCYTO.<br>• Administer dexamethasone 8 mg every 8 hours intravenously or orally for up to 3 days and taper thereafter over 4 days.<br>• When CRS is resolved, restart BLINCYTO at 9 mcg/day, and escalate to 28 mcg/day after 7 days if the adverse reaction does not recur. | • Interrupt BLINCYTO.<br>• Administer dexamethasone 5 mg/m² (maximum 8 mg) every 8 hours intravenously or orally for up to 3 days and taper thereafter over 4 days.<br>• When CRS is resolved, restart BLINCYTO at 5 mcg/m²/day, and escalate to 15 mcg/m²/day after 7 days if the adverse reaction does not recur. |
| | Grade 4 | Discontinue BLINCYTO permanently. Administer dexamethasone as instructed for Grade 3 CRS. | |

SUF-A ¶6.

Section 5.1 of the U.S. Label is the portion of the "WARNINGS AND PRECAUTIONS" section addressing CRS. SUF-A ¶14. It describes CRS as having occurred in some patients who received BLINCYTO. *Id.* It notes that, for those patients, the median onset of CRS was "2 days after the start of infusion." *Id.* The U.S. Label further notes that CRS can occur in *outpatients* and cautions that outpatients be advised "to contact their healthcare professional for signs and symptoms associated with CRS." *Id.* As with the Black Box Warning, this section then simply describes "administer[ing] corticosteroids for severe or life-threatening CRS" without any timeframe for administration, again referencing U.S. Label Section 2.3:

---

**5.1     Cytokine Release Syndrome**

Cytokine Release Syndrome (CRS), which may be life-threatening or fatal, occurred in patients receiving BLINCYTO. The median time to onset of CRS was 2 days after the start of infusion and the median time to resolution of CRS was 5 days among cases that resolved. Manifestations of CRS include fever, headache, nausea, asthenia, hypotension, increased alanine aminotransferase (ALT), increased aspartate aminotransferase (AST), increased total bilirubin, and disseminated intravascular coagulation (DIC). The manifestations of CRS after treatment with BLINCYTO overlap with those of infusion reactions, capillary leak syndrome (CLS), and hemophagocytic histiocytosis/macrophage activation syndrome (MAS). Using all of these terms to define CRS in clinical trials of BLINCYTO, CRS was reported in 15% of patients with relapsed or refractory ALL and in 7% of patients with MRD-positive ALL *[see Adverse Reactions (6.1)]*.

Monitor patients for signs or symptoms of these events. Advise outpatients on BLINCYTO to contact their healthcare professional for signs and symptoms associated with CRS. If severe CRS occurs, interrupt BLINCYTO until CRS resolves. Discontinue BLINCYTO permanently if life-threatening CRS occurs. Administer corticosteroids for severe or life-threatening CRS *[see Dosage and Administration (2.3)]*.

---

SUF-A ¶14.

As set forth below, these U.S. Label descriptions do not encourage, recommend, or promote infringement according to any of the specific, narrow glucocorticoid timing limitations of the asserted claims of the '421 patent.

## 2.     Inducement of the '421 Patent Fails as a Matter of Fact and Law.

a.     It is undisputed that the U.S. Label does not specify administering glucocorticoid "immediately before," "immediately after," or "concurrently" with BLINCYTO.

i.     It is undisputed that the U.S. Label does not specify that glucocorticoid be administered "immediately before" BLINCYTO administration.

Lindis's infringement expert admitted that the U.S. Label does not specify premedicating adult patients with glucocorticoids "immediately before" BLINCYTO, but instead describes premedication of those patients with glucocorticoids "1 hour prior to" the first dose of BLINCYTO.  SUF-A ¶15.  *See* Oleksowicz Tr. (Ex. 21) at 51:12 ("Amgen states one hour."); 53:6–8 ("The recommendation as written on page 5 of 40 is to give the dexamethasone one hour

prior to the first dose of Blincyto.").[2]  She further acknowledged that the phrase "an hour before the first dose of Blincyto" in the U.S. Label provides "leeway in when exactly dexamethasone is stopped and Blincyto is begun."  SUF-A ¶16.

Lindis's expert also admitted that the U.S. Label does not specify premedicating pediatric patients with glucocorticoids "immediately before" BLINCYTO, but instead describes premedicating those patients with glucocorticoids "prior to" BLINCYTO administration without specifying any particular interval of time between them.  SUF-A ¶17.  In such cases where the U.S. Label provides a generic description of premedicating with a glucocorticoid, such as "before," "prior to," and "when restarting" the BLINCYTO infusion, there is no dispute that healthcare professionals are free to use their own judgment as to when to administer a glucocorticoid relative to BLINCYTO administration:

- Q: The question is if the timing of the glucocorticoid administration is not specified in the prescribing information, the healthcare providers can then use their own judgment in the timing of administration; is that correct?

  A: The *healthcare provider can use their own judgment* and they will – they will say premedications, we want these infused prior to the treatment and they will be infused prior to the treatment, yes.  Oleksowicz Tr. (Ex. 21) at 64:8–18.

- Q: Now, my next question is the next portion of the recommendation says "Prior to a step dose (such as cycle 1 day 8)."  Do you interpret that recommendation to be administering an hour before consistent with the language before it for the first cycle?

  A: Again, this would be left up to the physician and, again, there's no instruction given.  Amgen doesn't say – I believe if Amgen wanted one hour before for the – for the second dose, they would have said one hour prior to the first dose and one hour prior to the – to the step dose.  They didn't – they didn't say that and, frankly, *perhaps they're leaving it up to the discretion of the physician*.  *Id*. at 53:13–54:5.

---

[2]    All exhibits cited herein and in Amgen's Statements of Uncontested Facts are attached to the Declaration of James L. Higgins In Support of Amgen's Summary Judgment Motions and Motion to Exclude.

- Q. Is your answer the same for the next portion of the recommendation that talks about restarting an infusion?

  A. *Amgen does not give an exact time*. I'm going to read the last part of that paragraph, which says – it says "And when restarting an infusion after an interruption of four or more hours." Again, they don't say. When restarting an infusion after four or more hours give – give dexamethasone one hours before starting Blincyto. They don't say that. *So my interpretation here would be that it's sort of left up to the physician*. *Id.* at 54:6–18.

SUF-A ¶¶18–19.

Accordingly, there is no material dispute that the U.S. Label contains nothing that encourages, recommends, or promotes the administration of a glucocorticoid "immediately before" the BLINCYTO administration.

> ii.    It is undisputed that the U.S. Label does not specify that glucocorticoid be administered "immediately after" BLINCYTO administration.

Lindis's infringement expert admitted that the U.S. Label's description regarding glucocorticoid administration to a patient with severe CRS does not specify that a glucocorticoid be administered "immediately after" BLINCYTO administration, but instead that "if *at any time* during the administration or after the administration, the patients' experiences [sic] CRS, the package insert recommends that treatment with steroids is recommended." SUF-A ¶20. She elaborated with examples that included treatment with glucocorticoids "in between bags" and "during the 2 weeks of rest" after a cycle has already been completed, neither of which is "immediately after" BLINCYTO administration. Oleksowicz Op. (Ex. 18) ¶148. Again, the U.S. Label generically refers to "administer[ing]" a glucocorticoid without any mention of a particular time interval relative to the administration of BLINCYTO. SUF-A ¶¶13–14. Such language indisputably does not encourage, recommend, or promote the administration of a glucocorticoid "immediately after" the BLINCYTO administration.

iii. It is undisputed that the U.S. Label lacks any recommendation of administering a glucocorticoid "concurrently" with BLINCYTO administration.

Lindis's infringement expert admitted that the U.S. Label does not describe administering a glucocorticoid "concurrently" with BLINCYTO. SUF-A ¶21; *see, e.g.*, Oleksowicz Tr. (Ex. 21) at 253:7–12 ("The package insert recommends that the steroid be given prior to the antibody and not concurrently.").

  b. <u>That the U.S. Label's descriptions do not specify but might permit some glucocorticoid administration "immediately before" or "immediately after" BLINCYTO administration cannot establish inducement as a matter of law.</u>

To the extent Lindis attempts to salvage its induced infringement claim by arguing the U.S. Label's generic descriptions (*e.g.,* "premedicate," "prior to," "treat," "administer," "before," "when restarting") encompass administering a glucocorticoid "immediately before" or "immediately after" BLINCYTO administration, that fails as a matter of law. The Federal Circuit and courts in this district have held that a drug label simply describing both infringing and noninfringing treatments does not induce infringement of an unspecified subset of those treatments. In *Grunenthal GmbH v. Alkem Laboratories Ltd.*, the Federal Circuit affirmed a finding of no induced infringement of claims reciting a method of treating "polyneuropathic pain" where the labels indicated treatment of "severe chronic pain" because, "even if severe chronic pain includes polyneuropathic pain, it also includes mononeuropathic pain and nociceptive pain," and thus the labels neither "specifically encourage[d] use of [the drug] for treatment of polyneuropathic pain" nor "implicitly or explicitly encourage[d] or instruct[ed] users to take action that would inevitably lead to use of [the drug] for treatment of polyneuropathic pain." 919 F.3d 1333, 1339–40 (Fed. Cir. 2019).

Similarly, in *Ferring Pharms. v. Lupin Inc.*, the court granted defendants' motion for judgment on the pleadings that defendants' label does not induce infringement where claims required a colonoscopy procedure be performed "from about 3 hours to about 1 hour after the administration" of a colon cleansing solution and the accused label described that the dose of colon cleansing solution should be taken the "next day, during the morning of the colonoscopy." C.A. No. 19-913 (RGA), 2020 WL 3414750, at *1, 4 (D. Del. June 22, 2020). Notwithstanding that the label's description could incidentally permit activity that might fall within the scope of the claims, the court held that the label did not "encourage, recommend, or promote that the solution should be administered during the infringing timeframe, nor [did] it even require or contemplate the infringing timeframe." *Id.* "The mere fact that the label may permit an infringing use is insufficient to show inducement, regardless of whether that fact is alleged in the complaint or stated later by an expert." *Id.*; *see also Genentech, Inc. v. Sandoz, Inc.*, 592 F.Supp.3d 355, 368 (D. Del. 2022) (no induced infringement where the "label merely provides physicians with multiple dose modification options, some covered by the Asserted Patents and some not, and leaves it to the physician's clinical judgment to determine how to modify the patient's dosage"), *aff'd on other grounds*, 55 F.4th 1368 (Fed. Cir. 2022).

As in *Grunenthal*, *Ferring*, and *Genentech*, even if certain language in the U.S. Label (*e.g.*, "premedicate," "prior to," "treat," "administer," "before," "when restarting") might arguably *permit* administration of a glucocorticoid "immediately before" or "immediately after" BLINCYTO administration, that language is indisputably broader. SUF-A ¶18. And as in Lindis's expert admitted in her deposition, healthcare professionals will simply use their own medical judgment as to an appropriate time interval. SUF-A ¶19; *see, e.g.,* Oleksowicz Tr. (Ex. 21) at 64:8–18 ("Q: The question is if the timing of the glucocorticoid administration is not specified in

14

the prescribing information, the healthcare providers can then use their own judgment in the timing of administration; is that correct? A. The *healthcare provider can use their own judgment* and they will – they will say premedications, we want these infused prior to the treatment and they will be infused prior to the treatment, yes.").  That Amgen leaves the glucocorticoid administration to the discretion of healthcare professionals cannot as a matter of law or fact amount to encouraging, recommending, or promoting any allegedly infringing conduct.

Accordingly, because the U.S. Label neither specifies nor otherwise "encourages, recommends, or promotes" the administration of glucocorticoid at any of the three times recited in the asserted '421 patent claims, Amgen cannot be liable for inducing infringement of this patent. *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630–31 (Fed. Cir. 2015); *Genentech, Inc.*, 592 F. Supp. 3d at 368, *aff'd on other grounds*, 55 F.4th 1368.  The Court should thus grant summary judgment of no induced infringement of the '421 patent.

**B.    Summary Judgment Motion No. 2: Amgen Does Not Contributorily Infringe the '421 Patent Because BLINCYTO Has Substantial Noninfringing Uses Not Covered by the Claimed Required Timing for Glucocorticoid Administration.**

"Under 35 U.S.C. § 271(c), there is no liability for contributory infringement for selling an article that is 'suitable for substantial noninfringing use." *H. Lundbeck A/S v. Lupin Ltd.*, 87 F.4th 1361, 1372 (Fed. Cir. 2023).  "A noninfringing use is substantial when it is 'not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'"  *Grunenthal*, 919 F.3d at 1340 (citations omitted).

Amgen sells BLINCYTO for the treatment of specific types of acute lymphoblastic leukemia (ALL).  SUF-B ¶7.  As described in the U.S. Label, BLINCYTO is suitable for substantial, noninfringing uses because it can be administered to treat ALL by noninfringing

methods, *i.e.*, without administering a glucocorticoid "immediately before," "immediately after," or "concurrently" with BLINCYTO.

There is no dispute that the U.S. Label states to administer the glucocorticoid "1 hour prior to" administration of BLINCYTO, which is not "immediately before," *i.e.*, "without any intervening time" as the Court has construed that claim term. SUF-B ¶4. The U.S. Label also includes generic descriptions concerning the administration of a glucocorticoid, but they do not specify timing and, as Lindis's expert concedes, while they may encompass "immediately before" or "immediately after," they also include administration outside of those strict timeframes. SUF-B ¶¶14–15. Thus, there can be no material issue of fact that the U.S. Label describes administering BLINCYTO with some intervening time between glucocorticoid administration, and that such administration does not infringe the "immediately before" and "immediately after" limitations of the asserted claims.

There can also be no material issue of fact that the U.S. Label does not infringe the "concurrently" limitations of the asserted claims because, as noted above in Section III.A.2.a.iii, Lindis's infringement expert admitted that the U.S. Label does not describe administering a glucocorticoid "concurrently" with BLINCYTO. Summary judgment of no contributory infringement of the '421 patent is warranted.

### 1. Factual Background

As discussed above in Section III.A.1.a, all asserted '421 patent claims recite the limitation that the glucocorticoid be administered either "immediately before," "immediately after," or "concurrently" with the administration of the claimed antibody. SUF-B ¶¶1–2. "Immediately" was construed by the Court to mean "without any intervening time" and "concurrently with" was construed to mean "at the same time as." SUF-B ¶¶3–4.

As discussed above in Section III.A.1.b, the U.S. Label does not specify administration of glucocorticoid "immediately before," "immediately after," or "concurrently with" administration of BLINCYTO.  SUF-B ¶6.  In particular, for both approved indications, the U.S. Label describes "premedicat[ing]" patients with glucocorticoids (*e.g.*, dexamethasone or prednisone).  SUF-B ¶8. For adult patients, the U.S. Label states that premedication should occur "1 hour prior to the first dose of BLINCYTO in each cycle."  SUF-B ¶9.  For both adult and pediatric patients, the U.S. Label describes premedicating with a glucocorticoid "prior to" and "when restarting an infusion after an interruption" of BLINCYTO, but the U.S. Label does not specify a timeframe for administration.  SUF-B ¶¶10, 15.

And, for only those patients experiencing Cytokine Release Syndrome (CRS), the U.S. Label describes (depending on CRS Grade) "Interrupt[ing] BLINCYTO" or "Discontinu[ing] BLINCYTO permanently" and "administer[ing] dexamethasone."  SUF-B ¶11.

### 2.    Lindis's Contributory Infringement Claim of the '421 Patent Fails as a Matter of Fact and Law.

The use of BLINCYTO according to the U.S. Label results in substantial noninfringing uses that are not covered by any of the specific glucocorticoid timing limitations of the '421 patent.

As discussed above in Section III.A.2.a.iii., Lindis's infringement expert admitted that the Label does not describe administering a glucocorticoid "concurrently" with BLINCYTO.  SUF-B ¶5; *see, e.g.*, Oleksowicz Tr. (Ex. 21) at 253:7–12 ("Q. Does the package insert recommend administering glucocorticoid concurrently with Blincyto? A. The package insert recommends that the steroid be given prior to the antibody and not concurrently.").  Thus, glucocorticoids administered with BLINCYTO according to the Label constitutes a substantial noninfringing use of BLINCYTO not covered by the claimed "concurrently" limitation.  *Grunenthal*, 919 F.3d at 1340.

17

As discussed above in Section III.A.2.a.i, Lindis's expert admitted that the U.S. Label does not specify premedicating adult patients with glucocorticoids "immediately before" BLINCYTO, but instead describes premedication of those patients with glucocorticoids "1 hour prior to" the first dose of BLINCYTO. SUF-B ¶¶9, 12–13; *see, e.g.,* Oleksowicz Tr. (Ex. 21) at 51:12 ("Amgen states one hour."); 53:6–8 ("The recommendation as written on page 5 of 40 is to give the dexamethasone one hour prior to the first dose of Blincyto."). Thus, patients administered glucocorticoids "1 hour prior to" BLINCYTO according to the U.S. Label is not unusual and constitutes a substantial noninfringing use of BLINCYTO not covered by the claimed "immediately before" limitation. *See Grunenthal*, 919 F.3d at 1340–41 (affirming no contributory infringement based on experts' testimony that treating noninfringing (nociceptive or mononeuropathic) conditions with the drug would not be unusual).

Lindis's expert further concedes that the U.S. Label's generic description of administering "prior to" is broader than just "immediately before," "it means before, and encompasses the meaning of the phrase 'immediately before' (as in administration of a glucocorticoid *immediately before* treatment with Blincyto®) but does not have the same temporal limitation." SUF-B ¶¶10, 14. As such, it would include the noninfringing administration of a glucocorticoid with some intervening time before BLINCYTO administration. The same holds true for other generic descriptions in the U.S. Label that do not specify administration "immediately before" (*e.g.,* "premedicate," "before," "when restarting") where the exact timing, according to Lindis's expert, is left to the medical judgment of healthcare professionals. SUF-B ¶¶15–16. These are substantial noninfringing uses that are not unusual, far-fetched, or illusory. Indeed, for all pediatric patients under both approved indications, the U.S. Label exclusively describes the timing of glucocorticoid administration using these generic terms – "premedicate" with a glucocorticoid, administer a

glucocorticoid "prior to" BLINCYTO administration, and "when restarting" an infusion after an interruption – all broad timeframes that include the administration of a glucocorticoid without infringing the asserted claims of the '421 patent.  SUF-B ¶¶10, 15.

Finally, as discussed above in Section III.A.2.a.ii, Lindis's infringement expert admitted that the U.S. Label's description regarding glucocorticoid administration to a patient with severe CRS does not specify that a glucocorticoid be administered "immediately after" BLINCYTO treatment, but instead that "if *at any time* during the administration or after the administration, the patients' experiences [sic] CRS, the package insert recommends that treatment with steroids is recommended."  SUF-B ¶17.  That the U.S. Label generically refers to "administer[ing]" a glucocorticoid would include the noninfringing administration of a glucocorticoid with some intervening time after BLINCYTO administration.  *See* SUF-B ¶15.  There is nothing unusual or far-fetched about this use; the U.S. Label includes a Black Box Warning to administer glucocorticoids in this manner because CRS "may be life-threatening or fatal."  SUF-B ¶18. *Grunenthal*, 919 F.3d at 1340.

These admissions are fatal to Lindis's contributory infringement claim because they establish that the U.S. Label permits, for all approved indications of treating CD19-positive B-cell ALL and relapsed or refractory CD19-positive B-cell precursor ALL, noninfringing administration of glucocorticoid with some intervening time either before or after BLINCYTO administration. *H. Lundbeck A/S,* 87 F.4th at 1372–73 (affirming finding of no contributory infringement where the scope of the FDA approved labelling permits substantial noninfringing uses); SUF-B ¶¶19–21.  Because there can be no genuine dispute that the U.S. Label describes substantial noninfringing uses of BLINCYTO, the Court should grant summary judgment of no contributory inducement of the '421 patent.

**C.**    **Summary Judgment Motion No. 3: All Asserted Claims of the '158 Patent Are Invalid for Lack of Written Description.**

The written description requirement of 35 U.S.C. § 112 requires that a patent specification "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date" of the patent. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Id.* The purpose of the requirement is to "ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Id.* at 1353–54 (quotation omitted). Section 112 thus "limits patent protection to those who actually perform the difficult work of 'invention'—that is, conceive of the complete and final invention with all its claimed limitations—and disclose the fruits of that effort to the public." *Id.* at 1353.

In the '158 patent, the Lindis patentees claimed as their invention a method for reducing the non-specific release of cytokines (associated with a treatment of cancer) by administering dexamethasone and a particular genus of bispecific antibodies. Specifically, the claims of the '158 patent require administration of bispecific antibodies (or bispecific scFv antibodies) that bind tumor antigen CD19 and CD marker CD3 ("CD19 x CD3" antibodies) and have the other functions necessary for the claims, *e.g.*, being immunostimulating and causing non-specific release of cytokines.

Where, as here, the claims recite a genus, sufficient description requires disclosure of "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad*, 598 F.3d at 1350. That inquiry has alternatively

been described as "looking for blaze marks which single out particular trees in a forest," rather than simply "pointing to trees." *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019) (internal quotations omitted). Applied here, that second inquiry assesses whether there are sufficient "blaze marks" singling out the recited subset of CD19 x CD3 antibodies from a broader genus of bispecific antibodies. Regardless of which test the Court applies, the *Ariad* test or the "blaze marks" test, the '158 patent specification lacks adequate written description to support the claims.

As discussed below, the '158 patent specification ***does not disclose even a single antibody species*** falling within the scope of the claimed genus of bispecific CD19 x CD3 antibodies, much less a representative number of species. Nor does the specification disclose *any* structural features common to members of the claimed CD19 x CD3 genus that would allow one of ordinary skill to visualize or recognize its members. The specification likewise provides no "blaze marks" that would guide a POSA to select the tumor antigen CD19 and the CD marker CD3 from two *separate* lengthy lists of potential targets or to connect the two different targets.

Indeed, there is no disclosure in the '158 patent reflecting that the inventors actually invented or were in possession of the claimed genus of bispecific antibodies. The specification only disclosed results of experiments involving co-administering dexamethasone with a single species of a bispecific antibody, one that binds an altogether different tumor antigen (EpCAM) and CD marker CD3. There is no disclosure of a *CD19 x CD3* antibody, much less one that is immunostimulating and causes non-specific release of cytokines.

It is no surprise that the specification's disclosure does not support the claimed CD19 x CD3 antibodies because Dr. Lindhofer, the first named inventor and principal of Lindis, admitted that he thought of claiming "CD19 x CD3" antibodies only after meeting with Amgen in 2013,

***nearly a decade after the original 2005 patent disclosure was filed***.  This is a clear case of Lindis overreaching the scope of its invention disclosure in an after-the-fact effort to capture Amgen's successful BLINCYTO product.  But the law prevents it.

As the specification does not disclose that the inventors were in possession of the claimed genus of CD19 x CD3 antibodies, Amgen respectfully requests that the Court grant summary judgment of invalidity of the asserted '158 patent claims for lack of written description.

### 1.    Factual Background

#### a.    The asserted claims recite a genus of CD19 x CD3 antibodies.

The asserted claims of the '158 patent recite antibodies that bind to the tumor antigen CD19 and the CD marker CD3.  SUF-C ¶¶2–3.  Independent claim 1 of the '158 patent requires "the administration to the subject of [] at least one bispecific immunostimulating antibody directed against a tumor antigen and a CD marker" wherein "the tumor antigen is CD19, and the CD marker is CD3."  SUF-C ¶2.  Independent claims 12 and 20 (as well as claim 12's asserted dependent claims 15 and 16) require "the administration to the subject of at least one recombinant bispecific immunostimulating scFv antibody exhibiting a first specificity against the tumor antigen CD19 and a second specificity against the T-cell marker CD3."  SUF-C ¶3.[3]

Each of the asserted claims of the '158 patent therefore recites a ***functionally-defined*** genus of bispecific antibodies (*i.e.*, antibodies defined not by their structure, but by their functional properties).  In particular, the claims recite at least one bispecific <u>immunostimulating</u> antibody or at least one recombinant bispecific <u>immunostimulatory</u> scFv antibody that <u>binds the tumor antigen CD19 and the CD marker CD3</u>.  SUF-C ¶¶2–3.  The claimed antibodies therefore must have the

---

[3]    A single-chain fragment variable ("scFv") antibody has a structure in which there are variable regions of heavy and light chains (protein subunits) joined by a linker.  *See* Joint Technology Tutorial (Ex. 5) at 9.

functions of being immunostimulating/immunostimulatory and binding to CD19 and CD3.  SUF-C ¶¶4–5; *see, e.g., Markman* Opinion (Ex. 7) at 7 ("The parties agree that the antibody is 'bispecific' and performs the two specific functions of binding to the target antigen and to the CD marker.")].  Per the Court's claim construction, the claimed bispecific antibodies must also cause non-specific release of cytokines.  SUF-C ¶6; *see, e.g., Markman* Opinion (Ex. 7) at 5 (construing "non-specific release of … cytokine[s]" and "cytokine release" terms as the release of certain cytokines "caused by [a/the trifunctional, bispecific immunostimulating antibody/bispecific antibody/bispecific immunostimulating antibody] binding to the CD marker on a cell but independent of the antibody binding to the target antigen on a cell").  These are functional requirements, and the '158 patent specification does not articulate any common structural features corresponding to those biological functions for the recited bispecific CD19 x CD3 antibodies (or scFv antibodies).  SUF-C ¶8.

> b.  The '158 patent does not disclose any species that falls within the CD19 x CD3 bispecific antibody genus recited in the claims.

The '158 patent does not disclose even a *single* species from the recited genus of bispecific antibodies (or scFv antibodies) that binds CD19 and CD3.  SUF-C ¶9. As Lindis's technical expert testified in her deposition, "there's no discussion of a CD3 times CD19 antibody" in the '158 patent specification.  Oleksowicz Tr. (Ex. 21) 167:4–11.

In the '158 patent specification, there are only two references to CD19, each of which appears in a lengthy list of exemplary tumor antigens (blue highlighting), whereas CD3 appears in a separate list of eight exemplary CD markers (yellow highlighting):

The immunostimulating antibody of the invention can be a monoclonal antibody, a chimeric antibody, humanised antibody, human antibody, trifunctional antibody, multispecific antibody, multifunctional antibody and/or a variant or derivative thereof. The immunostimulating antibody can specifically recognize a tumour antigen and/or a CD marker. Tumor antigens recognized by the immunostimulating antibody include, but is not limited to, EpCAM, HER2/neu, HER3/neu, G250, CEA, MAGE, VEGF, GD3, EGFR, αVβ3-integrin, HLA, HLA-DR, ASC, CD1, CD7, CD11, CD13, CD14, CD19, CD20, CD21, CD22, CD23, CD24, CD33, CD40, CD41, CD52, c-erb-2, CALLA, MHCII, CD44v3, CD44v6, CD117, p97, ganglioside GD2, GD3, C215, antigen of the antibody 9.2.27, antigen of the antibody NE150 and antigen of the antibody CA125. CD markers recognized by the immunostimulating antibody include, but is not limited to, CD2, CD3, CD4, CD5, CD6, CD8, CD28, or CD44.

Preferred bispecific immunostimulatory antibodies are, in accordance with the invention, those which exhibit at least one specificity against an antigen on a cell to be killed, for example a tumour cell, and against a CD marker. The CD marker of a bispecific, immunostimulating antibody of such a type is preferably expressed on T-lymphocytes and is therefore selected from the group consisting of CD2, CD3, CD4, CD5, CD6, CD8, CD28 and CD44. The T-cell specificity of the bispecific antibody consequently recruits T-cells, on the one hand, in specific manner. The second specificity of the preferred, immunostimulatory active antibody is directed against an antigen that is expressed as specifically as possible on the cell to be eliminated by the immune system. In the case of cancer cells, this is preferentially a so-called tumour antigen, i.e. a peptide or polypeptide expressed on the surface of the cells of a tumour. Preferred tumour antigens of antibodies that are active in immunostimulatory manner against cancer cells are, for example, EpCAM, HER2/neu, HER3/neu, G250, CEA, MAGE, VEGF, GD3, EGFR, αVβ3-integrin, HLA, HLA-DR, ASC, CD1, CD2, CD4, CD6, CD7, CD8, CD11, CD13, CD14, CD19, CD20, CD21, CD22, CD23, CD24, CD33, CD40, CD41, CD52, c-erb-2, CALLA (CD10), MHCII, CD44v3, CD44v6, CD117, p97, ganglioside GD2, GD3, C215, antigen of the Ab 9.2.27, antigen of the Ab NE150 and antigen of the Ab CA125 (cf. also Jager (2001) J. Clin. Pathol. 54(9): 669-674; Jager (2002) Curr. Opin. Immunol. 14 (2): 178-182).

SUF-C ¶12.  There is no disclosure in the specification connecting tumor antigen CD19 and CD marker CD3.  SUF-C ¶13.

The patent in fact discloses only two bispecific antibody species of any type: EpCAM x CD3 and HER2/neu x CD3.[4]  SUF-C ¶18.  Neither of these antibodies binds both CD19 and CD3. SUF-C ¶20.  They are described as "intact trifunctional bispecific antibod[ies]" ('158 patent at 22:59–62), with no additional accompanying disclosure of amino acid sequence, structure, or size, and no guidance as to how they might be representative of the CD19 x CD3 bispecific antibodies recited in the claims.  SUF-C ¶22.

---

[4]      No data is provided with respect to whether the HER2/neu x CD3 antibody causes non-specific release of cytokines.  SUF-C ¶19; *see, e.g.*, Marasco Tr. (Ex. 11) 100:14–15 ("There's zero data on the patent on it [HER2/neu x CD3].").

c.    The '158 patent discloses no structural features common to any broad CD19 x CD3 genus.

The '158 patent specification does not disclose the amino acid sequence of any antibody,[5] much less a bispecific antibody that binds CD19 and CD3.  SUF-C ¶25; *see, e.g.*, Oleksowicz Tr. (Ex. 21) 189:6–10 ("The specification of these two patents do not disclose any amino acid sequences."); *id.* at 189:14–20 ("The two patents in question do not disclose nucleotide sequence[.]"); *see also* SUF-C ¶9.  The specification in fact lacks any disclosure regarding any common structural features that might make up the claimed genus of bispecific antibodies that bind both tumor antigen CD19 and CD marker CD3.  SUF-C ¶8; *see, e.g.,* Marasco Op. (Ex. 15) ¶254 ("Because of the complete lack of disclosure of a bispecific antibody that binds CD19 and CD3, the specification fails to disclose any structural features common to the members of the diverse genus of bispecific antibodies that bind CD19 and CD3 so that a POSA can 'visualize or recognize' members of the claimed, functionally defined genus of bispecific antibodies."); *see also id.* ¶¶258, 277–90.  The specification accordingly lacks any information about how structural features of such antibodies might affect the recited (and necessary) biological functions of binding tumor antigen CD19, binding CD marker CD3, being immunostimulatory, and causing non-specific release of cytokines.  SUF-C ¶10.

The foregoing factual points are undisputed, as Lindis's technical expert provided no opinions related to whether or how the specification discloses structural features common to the members of the claimed genus of bispecific CD19 x CD3 antibodies.  Indeed, she posited that "Dr. Marasco's discussions of written description and enablement as they relate to antibody 'structure' and to methods for making and using antibodies to treat cancer are immaterial and should be

---

[5]    Antibodies are proteins made up of sequences of amino acids.  SUF-C ¶23.  An antibody's biological properties are determined largely by the specific sequences that make up the antibody. SUF-C ¶24.

disregarded."  Oleksowicz Rebuttal (Ex. 19) ¶61; *see also* Oleksowicz Tr. (Ex. 21) 27:12–16 ("If Dr. Marasco provided material that is irrelevant due to claims of the patent, I don't understand why I should offer an opinion other than saying that these issues are irrelevant because they are not discussed in the claims of the patent.").

### 2. The '158 Patent Specification Lacks Adequate Written Description of the Claimed CD19 x CD3 Antibodies.

The Federal Circuit has explained that for genus claims using functional language (like the binding function of the antibodies recited in the asserted claims) the specification "must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus." *Ariad*, 598 F.3d at 1349.  "The written description requirement [] ensures that when a patent claims a genus by its function or result, the specification recites sufficient materials to accomplish that function." *Id.* at 1352.  To justify claims to a genus under the *Ariad* test, the specification must disclose "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Id.* at 1350. Alternatively, the specification must provide sufficient "blaze marks" to single out the recited subset from a broader genus. *Idenix*, 941 F.3d at 1164.  There is no material factual dispute that the '158 patent claims fail under both of these tests, and therefore the asserted claims are invalid for lack of written description.

### a. The '158 patent fails the *Ariad* test: There is no disclosure of a representative CD19 x CD3 species, or any species at all.

There is no factual dispute that the '158 patent specification does not disclose *a single* species of an antibody (whether scFv or otherwise) that binds to both CD19 and CD3.  SUF-C ¶9. As discussed above, Lindis cannot rely on either of the two examples of bispecific antibodies

26

described in the specification (EpCAM x CD3 and HER2/neu x CD3) for written description support, because neither binds *both* CD19 and CD3.  SUF-C ¶20.  Without a disclosure of a single bispecific antibody that binds CD19 and CD3 (much less one that meets the other requirements of the claims), the '158 patent cannot disclose a representative number of species falling within the scope of the claimed genus of antibodies.

It is unsurprising that the specification provides no examples of antibodies capable of binding both CD19 and CD3, because the inventors never developed such an antibody.  SUF-C ¶27; *see, e.g.*, Lindhofer Tr. (Ex. 13) 142:17–143:10 (testimony of named inventor that he has never made a CD19 x CD3 bispecific antibody); *see also* Heiss Tr. (Ex. 12) 82:15–83:12 (testimony of named inventor that he has never performed any studies or experiments and has never treated a patient with a CD19 x CD3 bispecific antibody).  Named inventor Lindhofer testified that he did not come up with the idea for claim 1 of the '158 patent (requiring a CD19 x CD3 antibody) until after meeting with Amgen in 2013 (SUF-C ¶28), which is eight years after the April 26, 2005 filing date of the earliest priority application and one year before the April 7, 2014 filing of the application for the '158 patent (SUF-C ¶26).  Thus, the specification could not have disclosed the bispecific antibodies recited in the claims.

In addition, the '158 patent specification lacks any disclosure of a single example of scFv antibodies, much less the specific recombinant bispecific immunostimulatory scFv antibodies recited in asserted independent claims 12 and 20.  SUF-C ¶9.  The only disclosure of scFv antibodies in the specification is as follows: "In the case of bispecific antibodies in particular, recombinant antibody molecules are to be mentioned, which are produced by recombinant techniques, for example scFv molecules (so-called single-chain antibodies), diabodies etc."  SUF-

C ¶17.  For this reason, too, '158 patent does not disclose a representative number of species falling within the scope of the claimed genus of antibodies.

> b.    The '158 patent fails the *Ariad* test: There is no disclosure of any structural features common to the recited genus of CD19 x CD3 antibodies.

There is no factual dispute that the '158 patent specification fails to disclose structural features common to the members of the genus so that a POSA could "visualize or recognize" members of the genus.  The specification lacks any disclosure of an amino acid sequence, which dictates the structure and function of an antibody.  SUF-C ¶25.  The specification lacks any description of any structural features corresponding to the recited biological functions of binding CD19 or CD3, being immunostimulatory, or causing non-specific release of cytokines, much less any commonalities in such structural features that might tie together a genus of such molecules. SUF-C ¶¶8, 10.

That the specification recites that the antibodies are bispecific antibodies or bispecific scFv antibodies is not sufficient to allow a POSA to "visualize or recognize" members of the claimed genus.  That is because not all bispecific antibodies or bispecific scFv antibodies bind to both CD19 and CD3 and meet the other functional features of the claims.  For example, Lindis's technical expert acknowledged that some bispecific antibodies that bind T-cells may not cause non-specific release of cytokines.  SUF-C ¶11; *see, e.g.*, Oleksowicz Tr. (Ex. 21) 140:15–141:3 ("There may be T-cell-stimulating antibodies that are nonfunctional, have extremely low binding affinity, and these antibodies just don't work."); *see also* Marasco Reply (Ex. 17) ¶104 ("not all bispecific antibodies will necessarily cause non-specific cytokine release").

Testing of countless bispecific antibodies and scFv bispecific antibodies would therefore have been necessary to determine which antibodies bind both tumor antigen CD19 and CD marker CD3 and perform the other functions required by the claims.  SUF-C ¶16.  As the Federal Circuit

has explained, "[i]n general the need for extensive trial and error testing argues against a finding of adequate written description." *PureCircle USA Inc. v. SweeGen, Inc.*, No. 2022-1946, 2024 WL 20567, at *3 (Fed. Cir. Jan. 2, 2024) (claims lacked written description where "extensive trial and error testing . . . would be required to identify potential active candidates"). Here, the specification proposes nothing more than an impermissible "research plan, leaving it to others to explore the unknown contours of the claimed genus." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, No. 18-cv-12029, 2023 WL 6282898, at *11, 19 (D. Mass. Sept. 26, 2023) (method claims lacked written description where "a very large number of antibodies . . . would need to be screened in order to identify those that could" perform the claimed function, but the patents disclosed only one antibody falling within the claims).

Thus, in addition to lacking a disclosure of structural features corresponding to the recited functions that are common to members of the claimed genus, the specification fails to provide a POSA a way to distinguish antibodies capable of binding to both CD19 and CD3 (and satisfying the other required functions) from antibodies incapable of doing so.[6] On similar facts, courts have found the written description inadequate. For example, in *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, the Federal Circuit found written description inadequate where the patent at issue "not only fails to disclose structural features common to scFvs capable of binding specific targets, it also fails to disclose a way to distinguish those scFvs capable of binding from scFvs *in*capable of

---

[6]    The specification simply lacks any details (e.g., characteristics, sequences, or structures) about bispecific antibodies that bind to both CD19 and CD3 and meet the other functional features of the claims that distinguish them from bispecific antibodies that do not. For example, there is no disclosure of the affinity characteristics of the claimed antibodies, which experts from both parties agree is a characteristic that affects whether the bispecific antibody causes non-specific release of cytokines. Oleksowicz Tr. (Ex. 21) 140:15–141:3; Marasco Rebuttal (Ex. 16) ¶37. While disclosure of this property would not cure the inadequate written description, it would provide a POSA a means of identifying at least one way to distinguish some of the bispecific antibodies that fall within the claims, from those that do not.

binding those targets." 10 F.4th 1330, 1339 (Fed. Cir. 2021).[7]  As in *Juno*, the claims here lack adequate written description support, as the patent "provides no details regarding the characteristics, sequences, or structures that would allow a [POSA] to determine which scFvs will bind to which target" and "provides no details about which scFvs bind to CD19 in a way that distinguishes them from scFvs that do not bind to CD19."  *See id*. at 1339, 1342; *see also Univ. of Rochester*, 358 F.3d at 926 ("the inventor cannot lay claim to that subject matter unless he can provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds").

c.    The '158 patent also fails the "blaze marks" test: Written description requires more than "laundry list" disclosures.

The '158 patent specification includes only two references to CD19, each of which appears in a lengthy list of exemplary tumor antigens, whereas CD3 appears in a *separate* list of eight exemplary CD markers.  SUF-C ¶12; *see, e.g.*, Marasco Tr. (Ex. 11) 69:12–18 ("And . . . when you have a list of eight CD molecules and a list of 41 cancer targets, it is unfathomable to me that you can actually know from the description what exactly the investors are proposing.  I mean, it is vast.")].  Lindis's technical expert agreed that one has to select CD19 and CD3 from separate lists to identify an CD19 x CD3 antibody:

> Q. Right. So you have to . . . pick CD3 from one list and CD19 from another list, but there's no specific CD3 by CD19 example, agreed?
>
> A. The examples that were given in this patent, this patent were examples using catumaxomab – (indecipherable) to catumaxomab, *that is correct*.

---

[7]    In *Juno*, the Federal Circuit characterized the field of possible CD19-specific scFvs as "vast."  10 F.4th at 1338, 1340–42 (referring to the "vast field of possible CD19-specific scFvs with so few of them known"; further noting "the genus of possibilities [of CD19-specific scFvs] is expansive" and "the realm of possible CD19-specific scFvs was vast").

Oleksowicz Tr. (Ex. 21) 170:2–9; *see also id.* at 168:4–11 ("Q. But the actual construct, the connection of the two is not put together in the patent. You're going from one list to the other, right? A. Yeah. I mean, the – the claims include such an antibody. I mean, if I put together all of the possible tumor markers – tumor antigen markers with all the possible T-cell activators, CD3 times CD19 would fall in that list.").

Thus, the only way to derive from the specification antibodies that bind both tumor antigen CD19 and CD marker CD3 is to select CD19 from one list of more than 40 exemplary tumor antigens and—separately—to select CD3 from another list of eight exemplary CD markers. SUF-C ¶14. The specification, however, does not teach a connection between CD19 and CD3 to guide a POSA towards such a specific selection. SUF-C ¶13. Further, even if the lists were deemed to be adequate disclosure of CD19 x CD3 antibodies (they are not), as discussed above, there is nothing to distinguish CD19 x CD3 antibodies that satisfy the claimed functional requirements (e.g., causing non-specific release of cytokines) from those that do not. SUF-C ¶15; *see, e.g.,* Marasco Op. (Ex. 15) ¶358 ("[T]he specification provides no guidance about how to design a bispecific antibody that is immunostimulating versus immunosuppressive. Merely targeting a CD marker on a T cell does not necessarily result in immunostimulating activity."); *id.* ¶368 ("[T]he specification provides no guidance about how a POSA can identify whether a bispecific antibody has caused nonspecific cytokine release...."). Lindis's technical expert does not respond to this point. This is plainly inadequate under the case law because there are not "sufficient blaze marks to guide a reader through the forest of disclosed possibilities toward the claimed [antibody]." *See PureCircle*, 2024 WL 20567, at *2.

The Federal Circuit's opinion in *Novozymes A/S v. DuPont Nutrition Biosciences APS* is instructive. 723 F.3d 1336 (Fed. Cir. 2013). There, the Federal Circuit found a lack of written

description support for claims directed to enzyme variants that had (1) certain sequence identity to a BSG parent enzyme, (2) an amino acid substitution at position 239, and (3) increased thermostability under certain conditions.  *Id.* at 1348, 1351.  Similar to Lindis, Novozymes first sought those claims only after learning that the accused infringer had introduced variants of the BSG parent substituted at position 239 and nine years after filing the priority application.  *Id.* at 1341.  The specification listed BSG as one of seven disclosed parent enzymes, included position 239 among a group of thirty-three amino acid positions that could be modified, and stated that the disclosed variants should have increased thermostability.  *Id.* at 1348.  It also disclosed numerous examples of functioning variants with substitutions at positions other than 239.  *Id.* at 1349.  However, the specification did not disclose any variant that actually satisfied the claims, nor was the BSG parent or position 239 highlighted amongst the other disclosed options.  *Id.* at 1342, 1348.  In finding a lack of written description support, the Federal Circuit reasoned that although there was textual support for each individual limitation taken by itself, the specification "nowhere describes the actual functioning, thermostable [] variants that those limitations together define. Taking each claim—as we must—as an integrated whole rather than as a collection of independent limitations, one searches the 2000 application in vain for the disclosure of even a single species that falls within the claims or for any 'blaze marks' that would lead an ordinarily skilled investigator toward such a species among a slew of competing possibilities."  *Id.* at 1349.

The Court's reasoning in *Novozymes* applies equally here.  Although the '158 patent specification provides isolated textual predicates for targets to which bispecific antibodies might bind—namely, CD19 in a list of more than forty exemplary tumor antigens, CD3 as one of eight exemplary CD markers—and the other functional features such antibodies would have to possess —it nowhere puts them together to describe an actual functioning bispecific antibody, nor is there

any guidance towards any such sub-genus or species amongst the many options disclosed. There is simply no indication in the specification to a person of ordinary skill that Lindis had "actually invented" any method implicating even a single member of the genus of CD19 x CD3 bispecific antibodies recited in the claims. *Id.* at 1350 (quoting *In re Ruschig*, 379 F.2d 990, 995 (C.C.P.A. 1967)). The specification lacks any suggestion that the patentees had ever even considered co-administering dexamethasone with a CD19 x CD3 bispecific antibody, much less actually understood any of the structural features or physical properties that would comprise the recited genus of CD19 x CD3 bispecific antibodies that cause non-specific release of cytokines and satisfy the other functional features. This is confirmed by the admissions of the Lindis inventors that they never developed a CD19 x CD3 bispecific antibody. Thus, the asserted claims lack adequate written description support.

      d.    <u>Lindis's technical expert's attempt to read the antibodies out of the claim ignores both established case law and the law of this case and does not, in any event, raise a material issue of fact.</u>

In the written description section of her invalidity expert report, Lindis's technical expert says *nothing* about the patent's disclosure of an antibody that binds both tumor antigen CD19 and CD marker CD3. Oleksowicz Rebuttal (Ex. 19) at Section IX.A. In fact, the only reference to CD19 in her written description opinions is in the context of her discussion of Amgen's BLINCYTO product, not the '158 patent specification. Oleksowicz Rebuttal (Ex. 19) ¶102. Her silence on these topics speaks volumes about the dearth of disclosure in the '158 patent.

Though such a lack of disclosure was noted in detail by Amgen's expert, Lindis's expert stated that she need not opine about the '158 patent's disclosure of an antibody that binds both tumor antigen CD19 and CD marker CD3 because the claims are directed to methods of treatment with glucocorticoids and are not directed to antibodies:

> Further, because the claims do not recite a genus of bispecific immunostimulating antibody, trifunctional, bispecific immunostimulating antibody, or recombinant bispecific immunostimulatory scFv antibody, no genus needs to be described in order to describe the claimed method.

Oleksowicz Rebuttal (Ex. 19) ¶92; *see also, e.g.*, *id.* ¶¶61, 84; Oleksowicz Tr. (Ex. 21) 24:1–28:9. Indeed, when asked whether the specification disclosed sequences for antibodies that bind both CD19 and CD3, Lindis's expert repeated her mantra that the asserted patents are "not about an antibody per se." Oleksowicz Tr. (Ex. 21) 165:15–166:15.

Lindis's expert is incorrect as a matter of law. *See Univ. of Rochester*, 358 F.3d at 926 ("Regardless whether a compound is claimed *per se* or a method is claimed that entails the use of the compound, the inventor cannot lay claim to that subject matter unless he can provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods."). Moreover, her legal opinions cannot raise a genuine factual dispute. Rather, whether antibodies are a material limitation of the asserted claims is a claim construction issue and therefore a legal question.

This issue is governed by the language of the claims and controlling precedent, not the unsupported *ipse dixit* of Lindis's expert. The asserted claims make clear that antibodies, which are expressly recited, are a material limitation. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim"). Any other reading would improperly render the claim language meaningless. *See id.* at 951 (reading out claim limitations would be "contrary to the principle that claim language should not [be] treated as meaningless").

The Court has already construed terms relating to non-specific release of cytokines as requiring the release of certain cytokines "*caused by [a/the trifunctional, bispecific immunostimulating antibody/bispecific antibody/bispecific immunostimulating antibody]* binding

to the CD marker on a cell but independent of the antibody binding to the target antigen on a cell." SUF-C ¶6. That construction confirms that the antibodies are an essential part of the method claims. In particular, they are involved in the claimed function of reducing of non-specific release of cytokines because the antibody must first be capable of *causing* a non-specific release of cytokines that may ultimately be "reduced" by the glucocorticoid. Consistent with the critical role that the antibodies play in the asserted claims, the parties' *Markman* briefing and presentations to the Court centered around the recited antibodies being a key aspect of the Asserted Patents. *See, e.g.*, Joint Technology Tutorial (Ex. 5) at 2–9, 12–20; Joint Claim Construction Brief (Ex. 4) at 1–5, 7–37, 45–63.

That the antibodies are a material limitation of the claims is further confirmed by several dependent claims. For example, dependent claims 7, 9, 11, and 14–16 of the '158 patent recite specific ways of administering the bispecific antibody, such as intravenously. SUF-C ¶29. These dependent claims make clear that the "administration" of the bispecific antibody recited in the independent claims not only covers a broader scope but also is an active step in the claimed method. Moreover, if bispecific antibodies were not an essential component of the independent claims, these dependent claims would be rendered meaningless, contrary to settled law. *See, e.g.*, *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1368 (Fed. Cir. 2012) ("Where a particular construction of an independent claim would nullify claims that depend from it, the doctrine of claim differentiation creates a presumption that such a construction is improper.").

The specification also confirms that the antibodies are a key aspect of the asserted claims. The '158 patent is entitled "Combination of the Application of *Antibodies* for Immunostimulation Together with Glucocorticoids". SUF-C ¶30. And the Abstract indicates that "[t]he present invention relates to methods for reducing or eliminating the non-specific release of a cytokine

associated with a disease comprising administering at least one glucocorticoid *and an immunostimulating antibody*".  SUF-C ¶31; *see also* '158 patent (Ex. 2) at 1:25–31, 2:37–41.  The specification further discloses a variety of antibodies and immunostimulating antibodies "in the sense of the present invention."  SUF-C ¶32.

*         *         *

In conclusion, viewed in the light most favorable to Lindis, the '158 patent does not satisfy the *Ariad* test, as it fails to disclose either (1) any representative species (much less a representative number of species) falling within the scope of the genus of bispecific CD19 x CD3 antibodies recited in the claims; or (2) any structural features common to the genus of bispecific CD19 x CD3 antibodies recited in the claims.  The patent likewise provides no "blaze marks" that would guide a POSA to arrive at the claimed bispecific CD19 x CD3 antibodies.  Because there is no material factual dispute regarding the paucity of disclosures in the patent, the Court should grant summary judgment of invalidity of the asserted '158 patent claims for lack of written description.

### D.    Summary Judgment Motion No. 4: Amgen Does Not Induce Infringement of the Asserted Patents Because the U.S. Label for BLINCYTO Does Not Induce the Administration of a Glucocorticoid to Reduce the Non-Specific Release of a Cytokine.

Amgen requests summary judgment that it does not induce infringement of the '421 and '158 patents, because the U.S. Label for BLINCYTO does not encourage, recommend or promote the administration of a glucocorticoid to reduce the non-specific release of a cytokine as required by every asserted claim in this case.  Indeed, as Lindis's expert admits, there is no mention *at all* of non-specific release of a cytokine in the U.S. Label, much less how it could be reduced through the administration of a glucocorticoid.  Thus, summary judgment of no inducement should be granted in Amgen's favor.

1.    **Factual Background**

a.    <u>All asserted claims require administering a glucocorticoid to reduce the non-specific release of a cytokine caused by an antibody.</u>

The Court has construed all asserted claims to require administering a glucocorticoid to reduce the non-specific release of a cytokine caused by administration of an antibody.  SUF-D ¶¶1–4.  Independent claim 1 of the '421 patent is exemplary.  Claim 1 is "[a] method for reducing non-specific release of a cytokine in a subject," which is accomplished by "administering to the subject at least one glucocorticoid . . . which glucocorticoid reduces the non-specific release of the cytokine."  SUF-D ¶3.  The claimed antibody must cause non-specific release of a cytokine that is reduced by glucocorticoid administration.  SUF-D ¶¶2–4.  Thus, as a threshold matter, in order for Lindis to meet its burden of proof for its allegations of induced infringement, Lindis must prove that Amgen encourages, recommends, or promotes the administration of a glucocorticoid for reducing of non-specific release of a cytokine.  Lindis cannot.

b.    <u>The U.S. Label does not describe administration of a glucocorticoid to reduce non-specific release of a cytokine.</u>

As explained above in Section III.A.1.b., the U.S. Label for BLINCYTO describes the administration of glucocorticoid (*e.g.*, prednisone or dexamethasone) in the course of BLINCYTO treatment.  The U.S. Label explains that the glucocorticoid is administered to "help reduce infusion reactions."  SUF-D ¶5; *see, e.g.*, U.S. Label (Ex. 9) at 42 ("[b]efore you receive BLINCYTO, you will be given a corticosteroid medicine to help reduce infusion reactions.").  It also describes "administer[ing] corticosteroids for severe or life-threatening" cytokine release syndrome.  SUF-D ¶6.[8]  But, as admitted by Lindis's expert, the U.S. Label lacks any reference to non-specific

---

[8]    Cytokine release syndrome is caused by the over-production of cytokines, which is also known as a cytokine storm.  *See* Oleksowicz Op. (Ex. 18), ¶34.  As Lindis's expert explains, "CRS

release of a cytokine or reducing it through the administration of a glucocorticoid.  SUF-D ¶9.

> **2.  The U.S. Label Does Not Encourage, Recommend, or Promote Administering a Glucocorticoid to Reduce Non-Specific Release of a Cytokine.**

In its Final Infringement Contentions, Lindis alleges that Amgen has "specific intent to induce others to infringe directly" based solely on the U.S. Label for BLINCYTO.  SUF-D ¶8; *see, e.g.*, Lindis's Final Infringement Contentions (Ex. 3), at 2 (Amgen provides "prescribing informational materials" to its end users, which purportedly "demonstrate Amgen's specific intent to induce others to infringe directly.").  To induce infringement, a drug's "label must encourage, recommend, or promote infringement."  *Takeda*, 785 F.3d at 631.  Where a label "*fails to recite each and every claim limitation* . . . [the] label does not induce infringement because it does not encourage, recommend, or promote an infringing use."  *Biogen Inc. v. Sandoz Inc.*, C.A. No. 22-1190 (GBW), 2023 WL 7130655, at *9 (D. Del. June 29, 2023).

Here, it is undisputed that the U.S. Label is bereft of any instruction, recommendation, or promotion to administer a glucocorticoid to reduce non-specific release of a cytokine.  Lindis's expert concedes that "in Blincyto's package insert there is no statement about nonspecific cytokine release.  There's no statement saying that steroids will mitigate against nonspecific cytokine release . . ."  SUF-D ¶9.

This case is similar to *Bayer Schering Pharma AG v. Lupin, Ltd.*, where the Federal Circuit affirmed the district court's judgment on the pleadings under Rule 12(c) that a generic drug label

---

or cytokine release syndrome can be defined as an acute systemic inflammatory syndrome characterized by fever and in severe cases, potential hemodynamic instability with possible organ dysfunction as a consequence of treatment with a T-cell stimulating construct."  *See* Oleksowicz Op. (Ex. 18), ¶126.  It is undisputed that cytokine release syndrome can be caused by *specific* release of cytokines and in the absence of non-specific release of cytokines. SUF-D7.

did not induce infringement.  676 F.3d 1316 (Fed. Cir. 2012).[9]  There, the defendant sought FDA approval for the drug at issue as a birth control medication, while the asserted patent claimed methods of administering a drug to achieve three effects simultaneously: a contraceptive effect (i.e., the birth control effect), an anti-androgenic effect, and an anti-aldosterone effect (also referred to as an anti-mineralocorticoid effect).  *Id*. at 1319–20.  In holding that the drug label did not induce health care providers to use the drug in an infringing manner, the Federal Circuit explained that, while the drug label discussed "anti-mineralocorticoid activity and [the drug's] potential for anti-androgenic activity based on animal studies," the drug label did "not do so in any way that recommends or suggests to physicians that the drug is safe and effective for administration to patients for the purposes of inducing these effects."  *Id*. at 1322.  That reasoning applies with even greater force here.

        In contrast to *Bayer Schering*, where there was at least some discussion of the claimed effects in the drug label, the U.S. Label for BLINCYTO here contains no discussion at all of administering a glucocorticoid to reduce the non-specific release of a cytokine.  Accordingly, there can be no genuine dispute that the U.S. Label does not induce healthcare professionals to perform the claimed method to achieve reduction of non-specific release of a cytokine, and summary

---

[9]        Although *Bayer Schering* is a case brought under § 271(e)(2) of the Hatch-Waxman statute, the analysis for induced infringement under § 271(b) is the same regardless of whether a party alleges infringement under 35 U.S.C. § 271(e)(2) or under a traditional infringement claim. Indeed, the Federal Circuit affirmed the district court's decision rejecting the claim that "the defendants were liable for inducement of infringement under 35 U.S.C. § 271(b)" because "there was nothing in the record to indicate that the defendants sought to promote their generic versions of Yasmin based on the [] properties claimed in the '652 patent."  676 F.3d at 1320.  When evaluating infringement under § 271(e)(2), "a court must employ a traditional infringement analysis, focusing on all of the elements of infringement" and "[t]he only difference in the analysis of a traditional infringement claim and a claim of infringement under section 271(e)(2) is the timeframe under which the elements of infringement are considered," because the Hatch-Waxman litigation typically occurs before the infringing product is approved and marketed.  *Allergan, Inc. v. Alcon Lab'ys, Inc*., 324 F.3d 1322, 1330 (Fed. Cir. 2003) (citation omitted).

judgment that Amgen does not induce infringement of the '421 and '158 patents is warranted.

## IV.   AMGEN'S MOTION TO PRECLUDE LINDIS'S DAMAGES EXPERT FROM OPINING THAT LINDIS SHOULD RECEIVE REASONABLE ROYALTY DAMAGES ON AMGEN'S EX-U.S. SALES OF BLINCYTO

Pursuant to Fed. R. Evid. 702, Amgen moves to exclude Lindis's damages expert, W. Todd Schoettelkotte, from opining about foreign sales of BLINCYTO and any inclusion of such foreign sales in his reasonable royalty damages analysis for the alleged infringement of the Asserted Patents.  Mr. Schoettelkotte's opinion is contrary to the Court's Order on Amgen's Motion to Dismiss, specifically that "Lindis cannot rely on foreign uses of the patented method to prove infringement[.]"  (D.I. 155 at 15.)  The opinion is thus unreliable, unhelpful to the jury, and contrary to well-settled law.  *See generally Koninklijke Philips N.V. v. Telit IoT Sols., Inc.*, C.A. No. 20-1703 (CFC), 2023 WL 8600662, at *1 (D. Del. Dec. 12, 2023) ("Testimony that is contrary to the law is not admissible under Rule 702.").

### A.    Factual Background

Lindis alleges indirect infringement against Amgen based on statements to healthcare providers appearing in the U.S. Label for BLINCYTO (*i.e.*, that Amgen, through the U.S. Label, either contributes to or induces direct infringement by healthcare providers who administer BLINCYTO to patients).  Ex. 3 (Plaintiff Lindis Biotech GmbH's Final Infringement Contentions, at Exhibit A).  Consistent with its Final Infringement Contentions, Lindis's infringement expert, Dr. Oleksowicz, focused her opinion on whether the U.S. Label instructed healthcare providers to administer BLINCYTO in a manner that infringes the asserted claims.  Ex. 18 (Oleksowicz Op. at ¶150).  Lindis's infringement allegations and analysis are grounded in conduct in the U.S.—Lindis has made no allegation, much less presented any evidence, of how BLINCYTO is used outside the U.S.  Moreover, Lindis does not even argue that *Amgen* engages in any foreign conduct that would meet all of the limitations of the asserted claims.  Lindis does not allege that Amgen's

manufacturing, sales, or offers for sale of BLINCYTO outside the U.S. infringe Lindis's method of treatment claims. Nor does Lindis allege that Amgen's use of BLINCYTO infringes Lindis's method of treatment claims, which is indisputably true because Amgen does not itself administer BLINCYTO to patients.

Lindis's damage expert, Mr. Schoettelkotte, submitted his expert report to support Lindis's contention that it is entitled to reasonable royalty damages for Amgen's alleged infringement of the Asserted Patents. He opines that the parties would have negotiated a reasonable royalty of no less than 3.0% through a hypothetical negotiation conducted just before Amgen launched BLINCYTO. Ex. 23 (Schoettelkotte Op. at ¶13). To calculate damages, he applied that royalty rate to total BLINCYTO sales of $1.7 billion in the United States. Ex. 24 (Schoettelkotte Reply at ¶9 and Schedule 3.0). In the alternative, he inflated the sales base with an additional $1.1 billion in foreign sales and applied the same 3.0% rate to a base of $2.8 billion that included both domestic *and* foreign sales. *See, e.g.*, Ex. 24 (Schoettelkotte Reply at ¶9 and Schedule 3.0). Mr. Schoettelkotte's expert report provides no basis for including foreign sales in the damages base. During deposition, however, Mr. Schoettelkotte clarified that he included the foreign sales based on an assumption that those sales would be found to be infringing:

> Q. Is it your understanding that the ex-U.S. sales become part of the royalty base in this case assuming infringement is proved with the trier of fact?
>
> A. That is the way that I've treated them. *To the extent that those sales are found to be infringing*, then there would be a royalty on whatever sales were found to be infringing that were made outside the United States.

Ex. 25 (Schoettelkotte Tr. at 76:16-24).

Notably, Mr. Schoettelkotte did not opine that during the hypothetical negotiation over a license to Lindis's U.S. patents, the parties would have considered potential foreign sales of BLINCYTO as impacting the royalty rate that Amgen would agree to pay related to any alleged

domestic infringement of Lindis's U.S. patents.  He also did not opine on the existence of any substantial relationship between foreign sales and any alleged domestic infringement by Amgen, or rely on any testimony by Lindis's infringement expert as to the same (as there was none).

    **B.**    **Argument**

        **1.**    **Lindis's Damages Expert Improperly Included Foreign Sales in the Royalty Base**

Mr. Schoettelkotte's opinion is premised on the legally erroneous assumption that foreign sales of BLINCYTO may infringe the Asserted Patents.  Regardless of where the sales occur, the act of selling BLINCYTO does not infringe the Asserted Patents as a matter of law.  That is because BLINCYTO, a standalone product, is not capable of practicing Lindis's method claims and thus cannot infringe.  *See, e.g.*, *Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *ArcherDX, LLC*, *v. QIAGEN Scis., LLC*, C.A. No. 18-1019 (MN), 2021 WL 3857460, at *1 (D. Del. Aug. 30, 2021) ("It is well-established (and undisputed) that the manufacture, sale and offer to sell a method is not an act of infringement.").  *See also Brumfield v. IBG, LLC*, 97 F.4th 854, 879 (Fed. Cir. 2024) ("There is no established recognition in patent law of direct infringement by 'making' a 'method'; and, indeed, we have indicated that direct infringement is limited to using the method[.]"); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009) (explaining that a "method claim is directly infringed only by one practicing the patented method") (citation omitted).

And while foreign sales may lead to administration of BLINCYTO abroad, that too would not infringe the Asserted Patents.  As the Court's Memorandum Order on Amgen's Motion to Dismiss explained, "to prove its infringement claims, Lindis must show that *each step of the*

*Asserted Patents was practiced in the U.S.*" D.I. 155 at 15.[10]  Accordingly, Mr. Schoettelkotte's assumption that foreign sales could be included in the damages base because they are infringing should be excluded. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) (affirming district court's order excluding expert's opinion seeking damages on sales of product that were not used in an infringing manner); *Koninklijke Philips N.V.*, 2023 WL 8600662, at *1 (*citing Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.")).

### 2. Lindis's Expert Has Not Relied Upon the Narrow Exception Permitting Consideration of Foreign Sales to Assess Reasonable Royalty Damages for Domestic Infringement

In its Memorandum Order, the Court recognized that "foreign uses or sales may be relevant to a royalty rate calculation," D.I. 155 at 16, but neither Lindis nor its damages expert has availed itself of this narrow exception. As the Federal Circuit recently explained, to assess the reasonable royalty damages that Lindis seeks, "the hypothetical negotiation must turn on the amount the hypothetical infringer would agree to pay to be permitted to engage in the *domestic acts constituting 'the infringement.'*" *Brumfield*, 97 F.4th at 877. "If the patentee seeks to increase th[e] amount by pointing to foreign conduct that is not itself infringing, the patentee must, at the least, show why that foreign conduct increases the value of the domestic infringement itself[.]" *Id.*

---

[10]     There is also no evidence of how BLINCYTO is administered outside the United States, how the U.S. Label may differ from country to country, how local healthcare providers interpret the applicable label in countries where it is administered, or their general practices of administrating BLINCYTO. As just one point of differentiation, while Lindis's expert's licensure is limited to the U.S., she noted that the prevalence of different glucocorticoids administered abroad may differ as compared to the U.S. *See* Ex. 21 (Oleksowicz Tr. at 83:14–16 ("And I would just like to say that in the EU and also in Asia different steroids are used frequently than in the United States.") and 88:20–89:13 (expert is licensed to practice medicine in Ohio and New York only)).

This can be shown by establishing that "the domestic infringement enables and is needed to enable otherwise-unavailable profits from conduct abroad[.]"  *Id.*  In so ruling, *Brumfield* relied on principles expressed in earlier Federal Circuit opinions involving extraterritorial application of the patent laws, like *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, where the Federal Circuit held that foreign sales could also be used in calculating the royalty base of a damages award where the patentee demonstrates (1) an infringing act occurred within the U.S., and (2) a substantial connection exists between that domestic infringing act and the foreign sale. *See* D.I. 155 at 16 (*citing Carnegie Mellon Univ. v. Marvell Tech. Grp.*, *Ltd.,* 807 F.3d 1283, 1306-08 (Fed. Cir. 2015).[11]

As explained, though, there is no allegation here (unlike the situation in *Carnegie Mellon*) that Amgen infringes within the U.S. by making, using, or selling a product that itself practices a claimed method.  And neither Lindis nor Mr. Schoettelkotte offers any evidence or opinion concerning how there could exist any substantial connection between the foreign sales of BLINCYTO and Amgen's purported inducement or contribution to the administration of BLINCYTO to patients in the U.S. with a glucocorticoid to reduce the non-specific release of cytokines (*i.e.*, the alleged domestic infringing act).  Mr. Schoettelkotte also does not provide any opinion that the hypothetical negotiators would have imputed any value to the foreign sales of

---

[11] Despite Lindis's knowledge of *Carnegie Mellon* since at least May 2022 when Lindis relied on the case to oppose Amgen's motion to dismiss Lindis's claim for damages based on foreign sales, Lindis has not articulated any basis in its discovery responses detailing any substantial connection between BLINCYTO's foreign sales and use and Amgen's alleged domestic indirect infringement. The only theory Lindis has disclosed for including foreign sales in the damages base is Lindis's speculation that "[a]ll of the sales are believed to have taken place from Amgen's manufacturing facility in Puerto Rico, and would all therefore be considered U.S. Sales."  *See* Ex. 14 (Response to Amgen's Interrogatory No. 7 regarding the factual and legal bases for Lindis's damages claims); Ex. 10 (Lindis's Suppl. ¶6(b) Disc.).  Lindis should be limited to that lone theory disclosed in its discovery responses in responding to this motion, and should not be permitted to disclose new theories after both fact and expert discovery have closed.

BLINCYTO for administration to patients abroad, or whether or how that might have influenced the hypothetical negotiated reasonable royalty on U.S. sales. Because Mr. Schoettelkotte has not availed himself of even the limited relevance foreign uses or sales may have in other contexts on reasonable royalty damages, Mr. Schoettelkotte's use of foreign sales to inflate the royalty base by $1.1 billion in ex-U.S. sales revenue should be precluded.

## V.    CONCLUSION

For the reasons set forth above, Amgen respectfully requests that the Court grant its:

(i)    Motion for Summary Judgment No. 1 for no induced infringement of the asserted claims of the '421 patent under 35 U.S.C. § 271(b) for failing to encourage, recommend, or promote the timing limitations for glucocorticoid administration;

(ii)    Motion for Summary Judgment No. 2 for no contributory infringement of the asserted claims of the'421 patent under 35 U.S.C. § 271(c);

(iii)    Motion for Summary Judgment No. 3 for invalidity of the asserted claims of the '158 patent for lack of written description under 35 U.S.C. § 112;

(iv)    Motion for Summary Judgment No. 4 for failing to encourage, recommend, or promote the administration of a glucocorticoid to reduce the non-specific release of a cytokine as required by all asserted claims of the Asserted Patents; and

(v)    Motion to Exclude Lindis's damages expert from providing any opinion that Lindis should receive reasonable royalty damages on Amgen's Ex-U.S. Sales Revenue of BLINCYTO.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ James L. Higgins*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

PERKINS COIE LLP
Michael J. Wise
Joseph P. Hamilton
Lara J. Dueppen
Courtney M. Prochnow
Alisha C. Burgin
Doris Alvarez-Reyes
1888 Century Park East
Suite 1700
Los Angeles, CA  90067-1721
(310) 788-9900

*Attorneys for Amgen Inc.*

Garmai Gorlorwulu
Blake A. Winn
11452 El Camino Real, Suite 300
San Diego, CA  92130-2080
(858) 720-5700

AMGEN INC.
Brian Kao
J. Drew Diamond
Wendy A. Whiteford
One Amgen Center Drive
Thousand Oaks, CA  91320-1799
(805) 447-1000

WALSH PIZZI O'REILLY
FALANGA LLP
Liza M. Walsh
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ  07102
(973) 757-1100

Dated:  May 24, 2024

31686909.1

## CERTIFICATE OF SERVICE

I, James L. Higgins, Esquire, hereby certify that on May 24, 2024, I caused to be electronically filed a true and correct copy of Defendant Amgen Inc.'s Opening Brief in Support of its Motions for Summary Judgment and to Exclude Expert Testimony with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

James D. Taylor, Jr.
Jessica M. Jones
Michelle C. Streifthau-Livizos
Patrick A. Lockwood
Saul Ewing LLP
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com
Patrick.lockwood@saul.com

I further certify that on May 24, 2024 I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Henry A. Platt
Robert C. Gill
Matthew J. Antonelli
Alireza Behrooz
Dennis Ostrovsky
Madeline Jenkins
Saul Ewing LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, DC 20006
henry.platt@saul.com
robert.gill@saul.com
matt.antonelli@saul.com
alireza.behrooz@saul.com
dennis.ostrovsky@saul.com
madeline.jenkins@saul.com

Courtland C. Merrill
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
courtland.merrill@saul.com

Indira K. Sharma
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-4359
indira.sharma@saul.com

Andrew Schwerin
Center Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
andrew.schwerin@saul.com

  */s/ James L. Higgins*
James L. Higgins (No. 5021)