# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDIS BIOTECH GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-35-GBW |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| AMGEN INC. | ) | |
| | ) | |
| Defendant. | ) | |

# FINAL JURY INSTRUCTIONS

1. GENERAL INSTRUCTIONS ...................................................................................................1

   1.1   INTRODUCTION ........................................................................................... 1

   1.2   JURORS' DUTIES ......................................................................................... 2

   1.3   EVIDENCE DEFINED.................................................................................. 3

   1.4   DIRECT AND CIRCUMSTANTIAL EVIDENCE ...................................... 5

   1.5   CONSIDERATION OF EVIDENCE ............................................................ 6

   1.6   STATEMENTS OF COUNSEL .................................................................... 7

   1.7   STIPULATIONS ............................................................................................ 8

   1.8   USE OF NOTES ............................................................................................ 9

   1.9   CREDIBILITY OF WITNESSES .............................................................. 10

   1.10  NUMBER OF WITNESSES ....................................................................... 12

   1.11  EXPERT WITNESSES ............................................................................... 13

   1.12  DEPOSITION TESTIMONY ..................................................................... 14

   1.13  USE OF RESPONSES TO INTERROGATORIES ................................... 15

   1.14  EXHIBITS AND DEMONSTRATIVE EXHIBITS ................................. 16

   1.15  CONFIDENTIAL LABELS AND REDACTIONS ................................... 17

   1.16  BURDENS OF PROOF ............................................................................... 18

2. THE PARTIES AND THEIR CONTENTIONS .................................................................21

   2.1   THE PARTIES............................................................................................. 21

   2.2   THE PARTIES' CONTENTIONS.............................................................. 22

3. THE PATENT CLAIMS .....................................................................................................25

   3.1   PATENT CLAIMS GENERALLY ............................................................ 25

   3.2   INDEPENDENT AND DEPENDENT CLAIMS ....................................... 27

   3.3   OPEN ENDED OR "COMPRISING" CLAIMS ........................................ 28

   3.4   CONSTRUCTION OF CLAIMS ................................................................ 29

4. PATENT INFRINGEMENT ...............................................................................................30

   4.1   INFRINGEMENT GENERALLY............................................................... 30

   4.2   DIRECT INFRINGEMENT ....................................................................... 32

   4.4   ACTIVELY INDUCED INFRINGEMENT .............................................. 33

5. PATENT INVALIDITY ......................................................................................................38

   5.1   PATENT INVALIDITY - GENERALLY ................................................. 38

ii

5.2    EFFECTIVE FILING OR PRIORITY DATE ................................................................ 40

5.3    PERSON OF ORDINARY SKILL IN THE ART ........................................................ 41

5.4    PRIOR ART GENERALLY .......................................................................................... 43

5.5    OBVIOUSNESS ............................................................................................................ 44

5.6    OBVIOUSNESS – THE FIRST FACTOR: SCOPE & CONTENT OF THE PRIOR ART 46

5.7    OBVIOUSNESS – THE SECOND FACTOR: LEVEL OF ORDINARY SKILL ......... 47

5.8    OBVIOUSNESS – THIRD FACTOR: DIFFERENCES BETWEEN THE [BY LINDIS: PATENTED INVENTION] [BY AMGEN: CLAIMED METHOD] AND THE PRIOR ART 48

5.9    OBVIOUSNESS – THE FOURTH FACTOR: OTHER CONSIDERATIONS ............. 53

5.10   LACK OF ENABLEMENT ........................................................................................... 55

5.11   LACK OF WRITTEN DESCRIPTION ........................................................................ 58

6.  DAMAGES ............................................................................................................................ 62

6.1    DAMAGES - GENERALLY ........................................................................................ 62

6.2    DAMAGES - REASONABLE ROYALTY .................................................................. 64

6.3    REASONABLE ROYALTY - FACTORS .................................................................... 66

6.4    REASONABLE ROYALTY - TIMING ....................................................................... 68

6.5    REASONABLE ROYALTY — USE OF COMPARABLE LICENSES ....................... 69

6.6    DAMAGES – REVENUES FROM OUTSIDE THE UNITED STATES ..................... 70

6.7    WILLFUL INFRINGEMENT ....................................................................................... 72

7.  DELIBERATION AND VERDICT ...................................................................................... 74

7.1    INTRODUCTION ......................................................................................................... 74

7.2    UNANIMOUS VERDICT ............................................................................................. 75

7.3    DUTY TO DELIBERATE ............................................................................................. 76

7.4    SOCIAL MEDIA ........................................................................................................... 77

7.5    COURT HAS NO OPINION ........................................................................................ 78

# 1. **GENERAL INSTRUCTIONS**

## 1.1 **INTRODUCTION**

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Please listen very carefully to everything I say. In following my instructions, you must follow all of them, including the ones I gave to you on Monday at the start of the case and the ones I have given during trial. You may not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case. We will go over that later.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

## 1.2    JURORS' DUTIES

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on each of the issues presented.  As I will explain in further detail shortly, there are different burdens of proof—the standard for deciding whether a party has proven its position on a specific issue—and you must apply those burdens of proof as you decide each issue.

It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes any instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important and you should consider them together as a whole.

Perform these duties fairly.  Do not guess or speculate, and do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

### 1.3    EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in the courtroom.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.  You should consider all of the evidence, no matter what form it takes, and no matter which party introduced it.

The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition testimony that has been played by video or read to you, the exhibits that I allowed into evidence, and any facts that the parties agreed to by stipulation, and any facts that I instruct you to accept as true.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The lawyers' questions and objections are not evidence.  My legal rulings are not evidence.  You should not be influenced by a lawyer's objection or by my ruling on that objection.  None of my comments and questions are evidence.  The notes taken by any juror are not evidence.  Demonstrative exhibits shown by the attorneys or witnesses (that is, graphics, animations, models, reproductions, charts, summaries, and the like) have been used to illustrate testimony from witnesses.  Unless I have specifically admitted them into evidence, these demonstrative exhibits are not themselves evidence even if they refer to, identify, or summarize evidence.

During the trial I may not have let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  Sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record.  You must completely ignore all of these things.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

During the course of the trial, if I instructed you that I admitted certain testimony and

certain exhibits for a limited purpose, you may consider such evidence only for the specific limited purposes for which it was admitted.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

### 1.4    DIRECT AND CIRCUMSTANTIAL EVIDENCE

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence." I will now remind you what each means.

Direct evidence is evidence like the testimony of any eyewitness which, if you believe it, directly proves a fact. If a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weights that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

### 1.5    CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

### 1.6    STATEMENTS OF COUNSEL

A further word about statements of counsel and arguments of counsel.  The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.  If you remember the evidence differently from the way it was described by the attorneys, you should rely on your own recollection.

### 1.7    STIPULATIONS

A stipulation is a fact that the parties have agreed on.  If the parties' stipulated facts were read to you during trial, you must treat these stipulated facts as having been proved for the purposes of this case.

### 1.8    USE OF NOTES

You may use notes taken during the trial to assist your memory.

However, you should use caution in consulting your notes.  There is generally a tendency to attach undue importance to matters which one has written down.  Some testimony that is considered unimportant at the time presented and, thus, not written down, may take on greater importance later on in the trial in light of all the evidence presented.

Remember that your notes are only a tool to aid your own individual memory.  They may not be given or read to anyone else.  Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors.  Your notes are not evidence, and they are by no means a complete outline of the proceedings or a list of the highlights of the trial.  Your notes are valuable only as a way to refresh your memory.

Above all, your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case.

### 1.9    CREDIBILITY OF WITNESSES

You, the jurors, are the sole judges of the credibility, or the believability, of the witnesses you have seen during the trial and the weight their testimony deserves.

You should carefully scrutinize all the testimony each witness has given and every matter of evidence that tends to show whether he or she is worthy of belief.  You may believe everything a witness says, or part of it, or none of it.

You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.  For example, consider the witness's ability to observe the matters as to which he or she has testified and whether he or she impresses you as having an accurate recollection of these matters.  Consider also any relation each witness may bear to each side of the case, the manner in which each witness might be affected by the verdict, the interest any witness may have in the verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Discrepancies in the testimony of different witnesses may, or may not, cause you to discredit such testimony.  Two or more persons witnessing an incident or transaction may see or hear it differently.  Likewise, in determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different, or inconsistent from the testimony that he or she gave during the trial.  You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility

as you may think it deserves.

You should remember that a simple mistake by a witness does not mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses and witnesses who provide testimony by deposition.

### 1.10    NUMBER OF WITNESSES

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.  Unless I instruct you otherwise, the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary if after all the other evidence you believe that single witness.

Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

## 1.11   EXPERT WITNESSES

During the trial, you heard expert testimony.  Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.  As with any other witness, it is up to you to judge the credentials and credibility of the expert witness and decide whether to rely upon his or her testimony.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts in whole or in part, just as with any other witness. For example, if you decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you conclude that the reasons given in support of the opinion are not sound, or if you feel that the opinion is outweighed by other evidence, you may disregard the opinion in whole or in part.

### 1.12   DEPOSITION TESTIMONY

During the trial, certain testimony was presented to you through depositions that were read into evidence or electronically played.  This testimony must be given the same consideration you would give it had the witness personally appeared in court.  Like the testimony of a live witness, the statements made in a deposition are made under oath and are considered evidence that may be used to prove particular facts.  The deposition testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with the evidence.  You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

## 1.13   USE OF RESPONSES TO INTERROGATORIES

You may have heard answers that the parties gave in response to written questions submitted by the other side.  The written questions are called "interrogatories."  The written answers were given in writing and under oath, before the trial.

You must consider the parties' answers to interrogatories in the same manner as if the answers were made from the witness stand.

### 1.14    EXHIBITS AND DEMONSTRATIVE EXHIBITS

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  You may have noticed the exhibits have been numbered.  The numbers assigned to the exhibits are for convenience and to ensure an orderly procedure.  You should draw no inference from the fact that a particular exhibit was assigned a particular number, or that there may be gaps in the number sequence.

The remainder of the exhibits (including charts, PowerPoint presentations, and animations) were offered to help illustrate the testimony of the various witnesses.  These illustrative exhibits, called "demonstrative exhibits," have not been admitted, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been admitted into evidence to illustrate information brought out in the trial.  You may use these charts and summaries as evidence, even though the underlying documents and records are not here.  You should give them only such weight as you think they deserve.

### 1.15   CONFIDENTIAL LABELS AND REDACTIONS

The parties have entered into an agreement that would protect each respective party's confidential and sensitive business information from disclosure to the public or third parties. Under that agreement, the parties have added confidentiality labels to their documents, and have made redactions, which means that they have obscured or removed information from documents to protect the confidential nature of the information.

You may have seen documents with confidentiality labels or redactions during trial. The use of confidentiality labels and redactions has no bearing on the evidence and should not be construed in any way against either party.

### 1.16    BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." For every issue you must decide in this case, either Lindis or Amgen bears the burden of proof.  The party who bears the burden of proof on an issue bears the burden of persuading you to find in their favor, and if they do not meet the burden of proof, then you must find that they have not prevailed on that issue.  In a patent case such as this, there are two different burdens of proof.  The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

[**By Lindis**:  Lindis contends that Amgen infringes the '421 and '158 patents. Lindis seeks damages for Amgen's infringement in the form of a reasonable royalty.[1]]  [**By Amgen**: Lindis has accused Amgen of indirectly infringing the Asserted Claims of the '421 and '158 patents by actively inducing healthcare providers to prescribe and administer Blincyto in a way that directly infringes the Asserted Claims.  Lindis also alleges that it is entitled to damages for Amgen's alleged actively inducing infringement.  Amgen denies each of those allegations and contends that the Asserted Claims are invalid.[2]]

---

[1] Lindis Sources: *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, DI. 314, Final Jury Instructions, at 20 (D. Del. Jan. 29, 2024).

[2] **By Amgen:** Throughout these proposed instructions, the parties have a dispute concerning the use of "induced infringement" versus "actively induced infringement."  Amgen provides support for its proposal that "actively induced infringement" should be used in a footnote to Instruction 4.3 on actively induced infringement.  Contrary to Lindis' position, "actively" modifies "inducing" and does not suggest that Amgen employees "actively administer" Blincyto. **By Lindis:** Amgen's overemphasis, and repetition of the distinction between direct and indirect infringement is improper and confusing to the jury. Amgen seems to want to falsely suggest that Amgen employees have to "actively" administer Blincyto in order to be liable for infringement, or alternatively, that there is an element in addition to intent that must be proven.  Further, Lindis acknowledges that the AIPLA states "actively" in the heading, and has attempted a compromise by agreeing to one more "actively" induced infringement language in the body of the Instruction 4.4.  However,

Lindis has the burden of proving [**By Lindis**: infringement, willful infringement, and the amount of damages to compensate for that infringement,] [**By Amgen**: direct infringement, actively induced infringement, and damages[3]] by a preponderance of the evidence.  A preponderance of the evidence means that Lindis must produce evidence that, when considered in light of all of the facts, leads you to believe that what that party asserts is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Lindis's [**By Lindis**: assertion that Amgen infringed the Asserted Claims of the '421 and '158 patents would have to outweigh Amgen's evidence of non-infringement such that the scales tip somewhat in favor of Lindis[4]] [**By Amgen**: assertions of direct infringement, actively induced infringement, or damages would have to make the scale tip in its favor to find for Lindis on that issue].[5]  If the scale should remain equal or tip in favor of Amgen, you must find for Amgen.

---

Amgen's insistence on including the adverb "actively" each and every time the words "induced infringement" appear is improper and confusing to the jury. Anything more is overkill and inconsistent with similar practices.  For instance, the term "direct" does not appear before the term "infringement" every time infringement is discussed in jury instructions in general, and the same should be true for the adverb "actively" induced infringement (*i.e.,* once explained, "induced infringement" is sufficient).

[3] **By Amgen:** Amgen's proposal is neutral, whereas Lindis' proposal suggests that there is, in fact, some amount of damages that the jury should award.

[4] Lindis Sources: *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, DI. 314, Final Jury Instructions, at 20 (D. Del. Jan. 29, 2024).

[5] Amgen sources: *Victaulic Co. v. ASC Engineered Sols., LLC*, C.A. No. 20-887-GBW-JLH, D.I. 319 at 3 (D. Del. Jan. 17, 2023) ("To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting Victaulic's claims would make the scale tip slightly on Victaulic's side. If Victalic fails to meet this burden, there is no infringement and no damages."); *Cirba Inc. v. VMware Inc.*, C.A. No. 19-742-GBW, D.I. 1767, at 14 (D. Del. Apr. 28, 2023) ("To put it differently, if you put the evidence of Cirba and VMware concerning infringement on opposite sides of a scale, the evidence supporting Cirba's claims would have to make the scales tip somewhat on its side in each instance.").

In addition to denying Lindis's assertions that Amgen infringes, Amgen contends that the Asserted Claims of the '421 and '158 patents are invalid.  [**By Lindis**: The '421 and '158 patents, however, are presumed to be valid under the U.S. patent laws.[6]]  Amgen [**By Lindis**: therefore] has the burden of proving that the Asserted Claims of the '421 and '158 patents are invalid by clear and convincing evidence.  Clear and convincing evidence means that it is highly probable that the fact is true.  Proof by clear and convincing evidence is, thus, a higher burden of proof than a preponderance of the evidence.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases.  It does not apply in civil cases such as this. You should therefore not consider that burden of proof in this case.

---

[6] Lindis Sources: *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, at 20

## 2. <u>THE PARTIES AND THEIR CONTENTIONS</u>

### 2.1    THE PARTIES

I will now review for you the parties in this action and the positions of the parties that you will have to consider in reaching your verdict.

The plaintiff in this case is Lindis Biotech GmbH, which I may refer to as "Lindis" or "Plaintiff."

The defendant in this case is Amgen Inc., which I may refer to as "Amgen" or "Defendant."

## 2.2    THE PARTIES' CONTENTIONS

Lindis is the owner of the patents at issue in this case: U.S. Patent Number 8,709,421, which you have heard referred to as the '421 patent, and U.S. Patent Number 10,071,158, which you have heard referred to as the '158 patents or together as the "Asserted Patents."

Amgen manufactures and sells Blincyto, which is a medicine for the treatment of a particular type of cancer affecting the blood and bone marrow. Blinatumomab is the active ingredient found in Blincyto. Amgen began selling Blincyto in December 2014, after it was approved by the U.S. Food and Drug Administration, also known as the FDA. Amgen does not manufacture or sell the glucocorticoids mentioned in the FDA label for Blincyto.

Lindis accuses Amgen of instructing, recommending, or otherwise encouraging others to practice the patented methods of claims 3, 8, and 15 of the '421 Patent and claims 1, 12, and 20 of the '158 Patent, which we referred to as the "Asserted Claims." [**By Amgen**[7]: In particular, Lindis alleges that healthcare providers in the United States prescribe and administer Blincyto with a glucocorticoid in a way that directly infringes the Asserted Claims. Lindis also accuses Amgen of actively inducing healthcare providers to directly infringe the Asserted Claims.] [**By Lindis**: Specifically, Lindis accuses Amgen of instructing, recommending, or otherwise encouraging others to premedicate cancer patients with glucocorticoids to reduce non-specific release of cytokines, or to permit increased antibody administration, associated with cancer treatments with

---

[7] **By Amgen:** Amgen objects to Lindis' alternative proposal, below, because it includes contested facts concerning Amgen's state of mind, suggesting through the Court's instruction that premedication is used "to reduce non-specific release of cytokines, or to permit increased antibody administration." **By Lindis:** Lindis does not believe it includes contested facts, and Amgen has not identified what facts are actually contested within Lindis' proposed language. Further, the Court denied Amgen's *Daubert* motion (D.I. 314; D.I. 315) to preclude damages based on worldwide sales of Blincyto and therefore the jury instructions should not be limited to the United States.

Blincyto (blinatumomab). Blincyto is a bispecific immunostimulating antibody directed against the tumor antigen CD19 and the T-cell marker CD3, and is manufactured and sold by Amgen along with an FDA-approved label instructing, recommending, or otherwise encouraging others to premedicate with glucocorticoids before using it.] Amgen denies that healthcare providers directly infringe the Asserted Claims and denies that it [**By Amgen**: actively] induces direct infringement by healthcare providers. Lindis seeks damages in this case adequate to compensate Lindis for Amgen's alleged infringement. Amgen denies that Lindis is entitled to recover any damages.

Amgen also contends that the Asserted Claims are invalid because the Asserted Patents do not sufficiently describe or enable the [**By Lindis**: patented invention] [**By Amgen**: claimed method[8]]s. Amgen also asserts that the Asserted Claims are invalid because the Asserted Patents do not provide reasonable certainty to those skilled in the art about the scope of the [**By Lindis**: patented invention] [**By Amgen**: claimed method]s. Amgen also asserts that the Asserted Claims are invalid because the [**By Lindis**: patented invention] [**By Amgen**: claimed method]s were not new when compared to a prior art reference. Amgen further asserts that the Asserted Claims are invalid because they would have been obvious when compared to all that was known to a person of ordinary skill in the art at the time.

Lindis denies that the Asserted Claims of the '421 and '158 patents are invalid.

---

[8] **By Amgen**: Lindis' proposal unnecessarily refers to the claimed method as a "patented invention" throughout these instructions, which, if included in the Court's instructions, suggests that the Court agrees that the claimed method is in fact an invention and that Amgen's invalidity defenses are incorrect. Amgen's proposal is neutral and avoids having the Court repeatedly characterize Lindis' claimed method as an invention. **By Lindis**: Amgen wishes to minimize the protections afforded by an issued patent. The Patent Act refers to that which is protected by a patent as an "invention." 35 U.S.C. §§101, 102. Furthermore, the use of "patented invention" is consistent with the AIPLA Model Jury Instructions and the May 2020 Fed. Cir. Bar Assoc. Model Patent Jury Instructions, and therefore is regularly used before juries facing the same invalidity defenses without the issues that Amgen speaks of.

I will now summarize the issues that you must decide and for which I will provide instructions to guide your deliberations.  In general, the following are the issues you must decide: [PLACEHOLDER TO BE UPDATED WITH FINAL VERDICT LANGUAGE]

3.    **THE PATENT CLAIMS**

3.1    **PATENT CLAIMS GENERALLY**

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case.  I will now give you more detailed instructions about the patent laws that relate to this case.  If you would like to review my instructions at any time during your deliberations, you will have your copy available to you in the jury room.

Before you can decide many of the issues in this case, you will need to understand the role of the patent "claims."  The patent claims are the numbered sentences at the end of a patent.  The claims are important because the words of a claim define the scope of the patent right.  The figures and text in the rest of the patent provide a description or examples of the invention and provide a context for the claims, but it is the claims themselves that define the extent of the patent's coverage.

Here, you will need to understand what each of the Asserted Claims covers in order to decide whether or not that claim is infringed and to decide whether or not that claim is invalid. Each claim must be considered individually. There may be infringement as to one claim but not infringement as to another. You may find that one or more claims are infringed, or you may find that no claims are infringed.  Similarly, there may be invalidity as to one claim but no invalidity as to another. You may find that one or more claims are invalid, or you may find that no claims are invalid.

To know what a claim covers, you must consider what a claim sets forth, in words, as a set of requirements.  Each claim sets forth its requirements in a single sentence.  The requirements of a claim are often referred to as "claim elements" or "claim limitations." What a patent covers is assessed claim-by-claim.

The Asserted Claims in this case are method claims.  Method claims are said to "cover" a

method or a process that includes each and every one of the steps recited in the claim, which may be referred to as "claim steps."

### 3.2    INDEPENDENT AND DEPENDENT CLAIMS

Claims can be stated in two different ways in a patent.  The first way a patent claim can be stated is in the form of an "independent" claim.  An "independent" claim sets forth all of the requirements that must be met in order for an accused method to be covered by that claim, and thus infringe that claim.  An "independent" claim does not refer to any other claim of the patent.  An independent claim is read alone to determine its scope.

Claims 1 and 15 of the '421 Patent and claims 1, 12, and 20 of the '158 Patent are the asserted independent claims in this case.  Accordingly, the words of these claims are read by themselves in order to determine what the claim covers.

The second way a claim can be stated is in the form of a "dependent" claim.  A dependent claim does not itself recite all the requirements of the claim, but instead incorporates the requirements of another claim or claims and adds its own additional requirements.  In this way, the claim "depends" on another claim or claims.  Accordingly, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claims from which it depends.  Claims 3 and 8 of the '421 Patent are the dependent claims.  For example, if you look at claim 3 of the '421 Patent, it refers to claim 1, and as a result, claim 3 includes all of the requirements of claim 1 plus the additional requirements of claim 3.  Therefore, to determine what claim 3 of the '421 Patent covers, you must consider the words of claims 1 and 3 together.

Because a dependent claim incorporates all of the requirements of the independent claim from which it depends, if you find that the independent claim is not infringed, then the claims that depend from that independent claim cannot be infringed.

### 3.3    OPEN ENDED OR "COMPRISING" CLAIMS

The beginning portion, or preamble, of several of the Asserted Claims has the word "comprising." The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" is not limited to methods having only the steps that are recited in the claim, but also covers methods that have additional steps that are not recited in the claims.  The presence of additional steps does not take a method outside the scope of the claim.

### 3.4    CONSTRUCTION OF CLAIMS

The first step to understanding what a claim covers is to understand the meaning of the words used in the patent claim. It is my job as a judge to define what the terms of the Asserted Claims mean and to instruct you about these meanings. You must accept the meanings I give you and apply those meanings to the issues that you are asked to decide. You must ignore your own interpretation or any different interpretation given to these terms by the witnesses or by attorneys.

If I have not provided a specific definition for a given term, you are to use the ordinary meaning of that term. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

4.    **PATENT INFRINGEMENT**

4.1    **INFRINGEMENT GENERALLY**

I will now instruct you as to the rules you must follow when deciding whether Lindis has proven that Amgen has infringed any of the Asserted Claims.

United States patent law gives the owner of a valid patent the right to exclude others from [**By Lindis**: importing, making, using, selling, or offering to sell a patented product, or performing[9]] [**By Amgen**: using] a patented method within the United States during the term of the patent. Any person or company that [**By Amgen**: uses a patented method within the United States during the term of the patent] [**By Lindis**: has engaged in any of those acts[10]] without the patent owner's permission, infringes the patent.

A claim may be infringed by: (1) direct infringement; and/or (2) indirect infringement. Lindis alleges that Amgen indirectly infringes the Asserted Claims by [**By Amgen:** actively] inducing healthcare providers to prescribe and administer Blincyto in a way that directly infringes the Asserted Claims. This indirect infringement allegation by Lindis is also known as [**By Amgen:** actively] induced infringement. To prove that Amgen [**By Amgen**: actively] induced infringement, Lindis must first prove direct infringement by healthcare providers.

In order to prove infringement, Lindis must prove by a preponderance of the evidence [**By Amgen**: both direct infringement and actively induced infringement[11]] [**By Lindis**: that, through

---

[9] Lindis Sources: AIPLA Model Patent Jury Instructions, 3.0, at 11; *see* May 2020 Fed. Cir. Bar Assoc. Model Patent Jury Instructions B.1. Amgen's proposal short-changes the patent owner's statutory rights. *See* 35 U.S.C. § 271.

[10] Lindis Sources: AIPLA Model Patent Jury Instructions, 3.0, at 11.

[11] **By Amgen:** Amgen objects to Lindis' alternative proposal because it assumes the contested issue of whether health care providers use Blincyto in a manner that practices every step of the Asserted Claims, and thus suggests that Lindis does not have the burden of proving that. **By Lindis:** Amgen's overemphasis, and repetition of the distinction between direct and indirect

its Blincyto product and its label, Amgen instructs, recommends, or otherwise encourages healthcare providers to practice the patented methods practices each and every step of the Asserted Claims.  If Lindis has not proven by a preponderance of the evidence that Amgen's instructing, recommending, or otherwise encouraging others to practice the patented methods for Blincyto covers each and every step of the Asserted Claims, you must find that Amgen does not infringe.]

Infringement is assessed on a claim-by-claim basis for each of direct infringement and [**By Amgen**: actively] induced infringement.   Therefore, you, the jury, must determine direct infringement  for each claim separately and you must determine [**By Amgen:** actively] induced infringement for each claim separately.  For example, you may find that one or more claims are directly infringed, or you may find that no claims are directly infringed.  [**By Amgen**: And, you may find that there is direct infringement for one claim but not actively induced infringement for that same claim.[12]]

I will now explain each type of infringement in more detail.

infringement is improper and confusing to the jury. Amgen seems to want to falsely suggest that Amgen employees have to "actively" administer Blincyto in order to be liable for infringement.

[12] **By Amgen:** This proposal ensures that the jury will not believe that a finding of direct infringement by healthcare providers means that Amgen actively induces that infringement.  Lindis provides no argument that it would be prejudiced or that the jury would be somehow confused by this proposed language.  **By Lindis**: Amgen's proposed language attempts to highlight and suggest an avenue of non-infringement that is not warranted.  Amgen's continued emphasis on the word "actively" is intended to convey to the jury that Lindis must prove an additional element of proof in addition to intent in order to establish induced infringement.

## 4.2    DIRECT INFRINGEMENT

In order to prove direct infringement, Lindis must prove by a preponderance of the evidence that each and every requirement of an Asserted Claim has been performed.  Lindis contends that the [**By Lindis:** patented invention] [**By Amgen:** claimed method] is performed when healthcare providers prescribe and administer Blincyto.

When considering direct infringement, you must compare the steps performed by healthcare providers when prescribing and administering Blincyto, against the requirements of each Asserted Claim using my instructions as to the meaning of the patent claims, to determine whether each and every requirement of that claim is present in the steps performed by healthcare providers when prescribing and administering Blincyto.

If you do not find each and every requirement of an Asserted Claim in the steps performed by healthcare providers when prescribing and administering Blincyto, you must return a verdict of no direct infringement as to that claim.

If you find each and every requirement of an Asserted Claim is performed when a physician prescribes and administers Blincyto, you must return a verdict of direct infringement as to that claim.

## 4.4    ACTIVELY[13] INDUCED INFRINGEMENT[14]

In order to prove indirect infringement by inducement, Lindis must prove that Amgen purposefully encouraged, recommended, or promoted healthcare providers [**By Lindis**: to infringe its patents] [**By Amgen**: encouraged, recommended, or promoted healthcare providers to prescribe and administer Blincyto in a manner that Amgen knew would infringe the Asserted Claims][15].  [**By Amgen:** Actively] Induced infringement cannot occur unintentionally.  This is different from

---

[13] **By Amgen:** As discussed at the Pretrial Conference, Amgen's proposal throughout these instructions of the term "actively induced infringement" is directly based on the language of 35 U.S.C. § 271(b), which provides that "[w]hoever *actively* induces infringement of a patent shall be liable as an infringer." (emphasis added).  *See also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015) (explaining that "actively induce[d] infringement" "requires intent 'to bring about the desired result,' which is infringement"); 2024 AIPLA Model Patent Jury Instruction 3.8 ("Actively Inducing Patent Infringement"). Unlike cases where indirect infringement claims are additional theories of liability to direct infringement against a defendant, here Amgen is only alleged to be liable for indirect infringement so it is important that the jury instruction accurately captures Congress' intent in creating a source of liability for actively induced infringement. Contrary to Lindis' position below, "actively" modifies "inducing" and does not suggest that Amgen employees "actively administer" Blincyto.  **By Lindis:** Amgen's insistence on including the adverb "actively" each and every time the words "induced infringement" appear is improper and confusing to the jury. Amgen seems to want to falsely suggest that Amgen employees have to "actively" administer Blincyto in order to be liable for infringement.

[14] Lindis relied on the following sources for Section 4.4: *Natera, Inc. v. ArcherDX, Inc. et al.*, C.A. No. 20-125-GBW, D.I. 605, Final Jury Instructions at 24-25 (D. Del. May 12, 2023); adapted from *PacBio v. Oxford Nanopore*, C.A. 17-275-LPS, D.I. 476, Final Jury Instructions (Mar. 17, 2020); 35 U.S.C. § 271(b); AIPLA's Model Patent Jury Instructions, No. 3.10 (Rev. Mar. 15, 2017) (and authorities cited therein); *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920 (2015); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014); *Global-Tech Appliances, Inc. v. SEB, S.A.*, 131 S. Ct. 2060 (2011); *Takeda Pharms., USA v. West-Ward Pharm. Group*, 785 F.3d 625, 630-631 (Fed. Cir. 2015); *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1304-05 (Fed. Cir. 2006) (en banc) (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1342 (Fed. Cir. 2003).

[15] Amgen sources: *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) ("When a plaintiff relies on a drug's label accompanying the marketing of a drug to prove intent, '[t]he label must encourage, recommend, or promote infringement.'") (quoting *Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015).

direct infringement, which can occur unintentionally.  As with direct infringement, you must determine whether there has been [**By Amgen:** actively] induced infringement on a claim-by-claim basis.

Here, [**By Lindis**: Lindis alleges that Amgen induced healthcare providers who prescribe Blincyto for patients, healthcare providers to administer Blincyto to patients, and healthcare providers who supervise the administration of Blincyto to patients by others, such as oncology nurses, to infringe the Asserted Claims] [**By Amgen**: Lindis accuses Amgen of indirectly infringing the Asserted Claims of the '421 patent by actively inducing healthcare providers to prescribe and administer Blincyto to adult patients in a way that directly infringes those claims. Lindis does not accuse Amgen of indirectly infringing the Asserted Claims of the '421 patent by actively inducing healthcare providers to prescribe and administer Blincyto to pediatric patients.  Lindis accuses Amgen of indirectly infringing the Asserted Claims of the '158  patent by actively inducing healthcare providers to prescribe and administer Blincyto to adult and pediatric patients in a way that directly infringes those claims].  In order to be liable for [**By Amgen**: actively] inducing infringement, Lindis must prove by a preponderance of the evidence that

Amgen:

1. [**By Lindis**: intentionally took action that encouraged acts by another] [**By Amgen**: acted with the intent to cause directly infringing acts by healthcare providers];

2. knew of the Asserted Patent or showed willful blindness to the existence of the Asserted Patent at that time; and

3. knew or [**By Lindis**: should have known that the acts it was encouraging] [**By Amgen**:

showed willful blindness that the actions of healthcare providers[16]] would constitute

4.  infringement of the Asserted Claim

[**By Amgen**:  In addition, to prevail under a theory of actively induced infringement, you must

find that Amgen's acts, as opposed to other factors, actually caused healthcare providers to perform

each and every step of the Asserted Claims.[17]  Willful blindness may be found where one takes

deliberate actions to avoid confirming a high probability of wrongdoing and can almost be said to

have actually known the critical facts.[18]"

If you find that Amgen was aware of the '421 and '158 patents, but Amgen believed that

the acts it encouraged did not infringe the Asserted Claims, Amgen cannot be liable for actively

induced infringement.[19]]

---

[16] Amgen source: 2024 AIPLA Model Patent Jury Instruction 3.8.  **By Lindis**: the form AIPLA instruction was significantly modified to create instruction 4.4 herein.

[17] Amgen source: *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016) (finding that jury instruction that direct infringement "need not have been actually caused by the [defendant's] actions" and "[a]ll that is required is that the party took steps to encourage or assist that infringement, regardless of whether that encouragement succeeded, or was even raised" to be misstatements of the law, and that to prevail on an actively induced infringement claim the plaintiff "must first prove that the defendants' actions led to direct infringement of the [patent-in-suit]") (quoting *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004)).

[18] Amgen source: *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  **By Amgen:** Lindis provides no argument that it would be prejudiced or that the jury would be somehow confused by this proposed language.  **By Lindis**: the modified instruction fails to accurately state or incorporate applicable law.  Indeed, there is no support in any jury instruction that Lindis could locate that supports the three paragraphs after the 4 bullet points above.  Lindis questions their existence, especially given Amgen only cites to case law.

[19] *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009) (upholding jury's verdict of no actively induced infringement where evidence was presented "from which the jury could have reasonably concluded that [defendant's] personnel reasonably believed that [plaintiff's claims] did not cover the use of [defendant's product]"); *see also Board of Regents v. Boston Sci. Corp.*, C.A. No. 18-392-GBW, Final Jury Instructions Phase 2, D.I. 329 (D. Del. Feb. 1, 2023).  Lindis provides

[**By Amgen:** In order to establish actively induced infringement, it is not sufficient that others directly infringe the claim.  Nor is it sufficient that Amgen was aware of the acts by others that directly infringe.[20]  Rather, in order to find actively induced infringement, you must find that Amgen specifically intended and caused healthcare providers to perform each and every requirement of the claimed method using Blincyto, knowing that the healthcare providers' performance of the method would directly infringe the Asserted Claim.[21]

To show actively induced infringement, it is not sufficient to show that the drug Blincyto label permits the infringing use; permission is different from encouragement.[22]]

no argument that it would be prejudiced or that the jury would be somehow confused by this proposed language.  **By Lindis**: the modified instruction fails to accurately state or incorporate applicable law.

[20] Amgen sources: *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005) ("[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.").  **By Lindis:**  No jury instruction that Lindis could locate includes this instruction or clarification as to Amgen's knowledge requirement, which is already sufficiently outlined in prior instructions, including bullet point 3 above.  Overemphasis by the Court on this point would only serve to prejudice the jury.

[21] Amgen sources: *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) ("A finding of inducement requires establishing 'that the defendant possessed specific intent to encourage another's infringement.'") (quoting *DSU Med. Corp.*, 471 F.3d at 1306).  Lindis provides no argument that it would be prejudiced or that the jury would be somehow confused by the proposed language in this paragraph.  **By Lindis**: the modified instruction fails to accurately state or incorporate applicable law.  Lindis also incorporates its arguments in footnote 21 above.

[22] Amgen sources:  *Ferring Pharms. v. Lupin Inc.*, C.A. No. 19-913 (RGA), 2020 WL 3414750, at *4 (D. Del. June 22, 2020) ("The mere fact that the label may permit an infringing use is insufficient to show inducement, regardless of whether that fact is alleged in the complaint or stated later by an expert."); *HZNP Meds. LLC v. Actavis Lab'ys UT, Inc.*, 940 F.3d 680, 701-02 (Fed. Cir. 2019) ("[A drug label] [m]erely describing the infringing use, or knowing of the possibility of infringement, will not suffice; specific intent and action to induce infringement must be shown.").  Amgen's proposal does not, as Lindis suggests below, "affirmatively state that the

Blincyto label cannot induce infringement" or that the label cannot be "a consideration and potential evidence of induced infringement." Rather, it appropriately instructs the jury that the fact that a label includes information that could potentially lead to direct infringement is not sufficient to establish liability for actively induced infringement without evidence that the defendant purposefully through the label intended to induce, *i.e.* encouraged, that direct infringement. **By Lindis:** The cases that Amgen cites are not jury instructions, but rather excerpts of case law where ***jury instructions were not at issue.*** *Ferring* was a Motion for Judgment on the Pleadings, while *HZNP Meds.* addressed the Federal Circuit's appellate review of a patent infringement case where the issues on appeal did not include jury instructions. Neither case therefore supports Amgen's novel jury instruction which would have this Court affirmatively state that the Blincyto label cannot induce infringement.

This is also contrary to jury instructions numerous courts have given, including the District Court of Delaware, which include the label as a consideration and potential evidence of induced infringement. *See Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, No. 1:07-cv-00190-SLR, 2008 WL 9897942 (D. Del. 2008) (jury instruction on induced infringement which provided "For you to find that [defendant] induced another, such as [a third-party], to infringe the [Asserted Patents], [plaintiff] must prove four things by a preponderance of the evidence, that is [defendant] intended to encourage, instruct, or aid and abet a person in the act(s) that infringe the patent. Such encouragement, instruction, or aid may come through direct communications, such as phone calls, meetings, or emails, or the encouragement, instruction, or aid may be indirect, such as by providing [a] label [for the accused infringing drug]."; *Checkpoint Systems, Inc. v. All-Tag Security S.A.*, No. 2:01-cv-02223, 2006 WL 5503007 (E.D. Pa. 2006) (jury instructions on induced infringement based on drug label which stated ""[plaintiff] has the burden of proving by a preponderance of the evidence that the defendants have infringed the [Asserted Patents]. That means that [plaintiff] must show that it is more likely than not ***that the defendants' [drug] labels infringe the [Asserted Patents].*** To determine infringement, you must ***compare the defendant['s] [Blincyto] labels with each claim from the [Asserted Patents]*** that [Lindis] asserts is infringed. . . . A patent claim is infringed ***only if the defendant['s] [Blincyto] labels include each and every element*** in that patent claim. []"); *see also Tristrata Technology, Inc. v. Mary Kay, Inc.,* No. 01-cv-00127, 2001 WL 36237883 (D. Del. 2001) ("For example, an accused inducer may be liable for inducing infringement if it provided instructions or directions to perform the infringing act ***through labels***, advertising or other materials."

## 5.    PATENT INVALIDITY

### 5.1    PATENT INVALIDITY - GENERALLY

I will now instruct you on the rules you must follow in deciding whether or not Amgen has proven that the Asserted Claims of the '421 and '158 patents are invalid.  As I previously told you, to prove that a claim of a patent is invalid, the party challenging validity must persuade you by clear and convincing evidence.  The granting of a patent by the United States Patent and Trademark Office carries with it the presumption that the patent is valid.  [**By Lindis**: The law presumes that the Patent and Trademark Office acted correctly in issuing the patent. Each of the Asserted Claims is presumed valid independently of the validity of each other claim. Nevertheless, when the validity of a patent has been put at issue as part of patent litigation, it is the responsibility of the jury to review what the Patent Officed has done consistent with Court's instructions on the law.[23]][24] But the presumption of validity can be overcome if clear and convincing evidence is presented in court that proves the patent is invalid.

Like infringement, you must determine whether each Asserted Claim is invalid on a claim-by-claim basis.  For example, you may find that one or more claims are invalid, or you may find that no claims are invalid.  And, you may find that one claim is invalid under one legal concept, but that same claim is not invalid under another legal concept.

As I instructed you earlier, there are independent claims and dependent claims in a patent. Finding the broader independent claim to be invalid does not necessarily mean the narrower

---

[23] Lindis Sources: *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, DI. 314, Final Jury Instructions, at 31 (D. Del. Jan. 29, 2024).
[24] **By Amgen:** Amgen objects to the inclusion of this additional language as unnecessary, redundant, and biased. **By Lindis:** The language correctly states the law and presumption of validity afforded an issued patent.

dependent claims are also invalid.  However, if you find a narrower dependent claim to be invalid, you must find the broader independent claim that it depends from to also be invalid.

Claims are construed in the same way for determining infringement as for determining invalidity.  You must apply the claim language consistently and in the same manner for issues of infringement and for issues of invalidity.

In considering invalidity, you may consider whether the evidence before you is materially new compared to the evidence before the Patent Office during prosecution.  If the evidence is materially new, you should consider that fact when determining whether an invalidity defense has been proved by clear and convincing evidence.  When new evidence touching on validity of the patent not considered by the Patent Office is relied on, you may find that the evidence carries more weight and goes further toward sustaining the burden of proving invalidity by clear and convincing evidence.

## 5.2    EFFECTIVE FILING OR PRIORITY DATE

Some of the instructions about invalidity that I am about to give you require you to know the effective filing date, also referred to as the priority date for the Asserted Patents.  In this case, the parties agree that the effective filing date of the Asserted Patents is April 26, 2005. Therefore, this date is presumably the effective filing date of the Asserted Patents for purposes of invalidity.

### 5.3    PERSON OF ORDINARY SKILL IN THE ART

The question of invalidity of the Asserted Claims is determined from the perspective of a person of ordinary skill in the art [**By Lindis**: in the field of the asserted invention as of the time of invention[25]] [**By Amgen**: as of the effective filing date of the Asserted Claims – here, April 26, 2005].

The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant.  When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also look to any available prior art to help solve the problem.  You must determine the level of ordinary skill in the art for the field of invention related to the Asserted Patents.  In deciding the level of ordinary skill, you should consider all the evidence introduced at trial, including, but not limited to:

(1)    the levels of education and experience of persons working in the field;

(2)    the types of problems encountered in the field;

(3)    prior art solutions to those problems;

(4)    prior art patents and publications; and

(5)    the sophistication of the technology in the field at the time of the invention, including how rapidly innovations were made in the art at the time of the invention.

The level of skill possessed by an inventor is not a proper measure of the level of skill possessed by a person of ordinary skill in the art.  An inventor is not necessarily a person of ordinary skill in the art and may have more or less knowledge than the hypothetical person of ordinary skill in the art.

The parties have different view of a person of ordinary skill in the art.  Lindis contends a

---

[25] Lindis Sources: AIPLA Model Jury Instructions 5.3, at 26; *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, at 34.

person of ordinary skill in the art relating to the subject matter of the '421 and '158 patents would be a person with (1) an M.D. with postdoctoral training in medical oncology with experience treating cancer patients with targeted immunotherapeutic agents and/or a Ph.D. degree in biology, biochemistry, immunology, molecular biology, or a related discipline and (2) experience with or knowledge about the use of glucocorticoids to deplete B-cells or T-cells and/or to reduce cytokine-related adverse reactions (e.g., infusion reactions) caused by targeted immunotherapeutic agents. To the extent necessary, a POSA may have collaborated with one or more other ordinarily skilled artisans, e.g., a medical doctor or research scientist, for one or more aspects with which such other person may have had expertise, experience, or knowledge.

Amgen contends a person of ordinary skill in the art would have had (1) an M.D. with postdoctoral training in medical oncology with experience treating cancer patients with targeted immunotherapeutic agents and/or a Ph.D. degree in biology, biochemistry, immunology, molecular biology, or a related discipline with at least two years of experience with the development and design of targeted immunotherapeutic agents for treating cancer or tumors; and (2) experience with or knowledge about the use of glucocorticoids to deplete B cells or T cells and/or to reduce cytokine-related adverse reactions caused by targeted immunotherapeutic agents. To the extent necessary, a person of ordinary skill in the art may have collaborated with one or more other ordinarily skilled artisans, e.g., a medical doctor or research scientist, for one or more aspects with which such other person may have had expertise, experience, or knowledge.

### 5.4    PRIOR ART GENERALLY

Under the patent laws, in order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before.  That which came before is referred to as "prior art."  Prior art may include information and things that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the [**By Lindis:** patented invention] [**By Amgen**: claimed method], elements of the [**By Lindis**: patented invention] [**By Amgen**: claimed method], or information relating to the [**By Lindis:** patented invention] [**By Amgen**: claimed method].

### 5.5    OBVIOUSNESS

Amgen contends that each of the Asserted Patents is invalid because the [**By Lindis**: patented invention] [**By Amgen**: claimed method] would have been "obvious."

A [**By Lindis:** patented invention] [**By Amgen**: claimed method] is invalid as "obvious" if it would have been obvious to persons of ordinary skill in the art in the field of the invention as of the effective filing date - here, April 26, 2005. Obviousness may be shown by considering one or more items of prior art.

[**By Lindis:** In deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art as of the effective filing date of the patents.[26]] [**By Amgen**: delete[27].]

The following factors must be evaluated to determine whether Amgen has established that the [**By Lindis:** patented invention] [**By Amgen:** claimed method] is obvious:

1. The scope and content of the prior art relied upon by Amgen;

2. The level of ordinary skill in the art as of the effective filing date;

2. The differences, if any, between each Asserted Claim and the prior art; and

---

[26] Lindis Sources: AIPLA Model Jury Instructions 7.0, at 37. **By Amgen**: Amgen does not dispute that this language is appropriate in final jury instructions. As indicated in the footnote below, Amgen objects to it being included twice in the final jury instructions.

[27] **By Amgen**: This paragraph appears in both Instruction 5.6 and 5.8. Amgen requested that Lindis remove it from one or the other but Lindis refused. It should not be read twice. **By Lindis**: Amgen has insisted on such lengthy instructions that it is necessary to make this point twice in order for it to not be lost on the jury. Further, it is not an identical paragraph but instead provides a reference to the instruction.

4. Additional considerations, if any, that indicate that the claims were obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and you must perform a separate analysis for each of the claims.  Amgen must prove by clear and convincing evidence that the [**By Lindis**: patented invention] [**By Amgen**: claimed method] would have been obvious.

I will now explain each of the four factors in more detail.

### 5.6    OBVIOUSNESS – THE FIRST FACTOR: SCOPE & CONTENT OF THE PRIOR ART

To determine the scope and content of the prior art, you should determine what prior art was reasonably pertinent to the particular problems the inventors faced.  For obviousness, Amgen asserts the prior art that has been received into evidence during the trial.

### 5.7    OBVIOUSNESS – THE SECOND FACTOR: LEVEL OF ORDINARY SKILL

To determine the obviousness of the invention, you must determine the level of ordinary skill in the field of the invention at the time of the effective filing date. As mentioned earlier, you must consider and assess this factor before reaching your conclusion in this case.

I have already instructed you on the level of ordinary skill in the art and read you the parties' differing views of the level of ordinary skill in the art.  You are to decide what the level of ordinary skill in the art is and apply that definition when deciding whether the Asserted Claims would have been obvious.  The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

### 5.8    OBVIOUSNESS – THIRD FACTOR: DIFFERENCES BETWEEN THE [BY LINDIS: PATENTED INVENTION] [BY AMGEN: CLAIMED METHOD] AND THE PRIOR ART

You should analyze whether there are any relevant differences between the prior art and the [**By Lindis**: patented invention] [**By Amgen**: claimed method] from the view of a person of ordinary skill in the art as of the effective filing date. Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the [**By Lindis**: patented invention] [**By Amgen**: claimed method] as a whole, and not merely some portion of it.

In analyzing the relevance of the differences between the [**By Lindis**: patented invention] [**By Amgen**: claimed method] and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the [By Lindis: patented invention] [**By Amgen**: claimed method]. You may consider the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art as of the effective filing date. For example, if the [**By Lindis**: patented invention] [**By Amgen:** claimed method] combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art as of the effective filing date, then this evidence would make it more likely that the claim was obvious. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, [**By Lindis**: or if the prior art teaches away from combining the known elements[28]] [**By Amgen**: delete[29]] then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

---

[28] Lindis Sources: AIPLA Model Jury Instructions 7.2, at 39.  **By Amgen**:  Amgen's objection is not based on the instruction being improper in any case, it is that it is improper in this case for the reason addressed in the next footnote.  The same goes for the last paragraph of this instruction.

[29] **By Amgen:** Amgen opposes the inclusion of this language because Lindis's expert did not address teaching away in her expert reports. **By Lindis:** Lindis's expert need not utter the words "teaching away" in order to make the concept relevant and applicable.

A claim is not proven obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long-known, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the teachings in the way the [**By Lindis**: patented invention] [**By Amgen:** claimed method] does. This "motivation to combine" could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of any problem or need to be addressed, market demand, or common sense. If you find that a reason existed as of the effective filing date to combine the elements of the prior art to arrive at the [**By Lindis:** patented invention] [**By Amgen:** claimed method], and there would have been a reasonable expectation of success for doing so, this evidence would make it more likely that the [**By Lindis**: patented invention] [**By Amgen**: claimed method] was obvious. The motivation to modify the prior art to arrive at the [**By Lindis**: patented invention] [**By Amgen**: claimed method] need not be the same motivation that the inventors had.

[**By Lindis**: Similarly, you may consider the possibility that a reference teaches away from the claimed invention. A reference teaches away from the invention when it would have discouraged a person of ordinary skill in the art as of the effective filing date from practicing the claimed invention, or when such a person would be led in a different direction than practicing the

claimed invention. You must undertake this analysis separately for each claim that Amgen contends would have been obvious.[30] ] [**By Amgen**: delete[31].]

In comparing the scope and content of the prior art to a patent claim, you may find that inherency may supply a claim element that is otherwise missing from the explicit disclosure of a prior art reference. The inherent presence of an element so found by you may be used in your evaluation of whether the [**By Lindis**: patented invention] [**By Amgen**: claimed method] would have been obvious in view of the prior art. But, to rely on inherency to establish the existence of a claim element in the prior art in an obviousness analysis, that element necessarily must be present in, or the natural result of, the combination of elements explicitly disclosed by the prior art. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from an explicit disclosure is not sufficient to find inherency. However, if the disclosure is sufficient to show that the natural result flowing from the explicit disclosure would result in the claim element in question, inherency may be found. [**By Lindis**: An important consideration when determining whether a reference inherently discloses a previously unknown property of something is whether that property is unexpected. Although all properties of something are inherently part of that thing, if a property is found to be unexpectedly present, then the property may be nonobvious.[32]] [**By Amgen**: delete[33].]

---

[30] Lindis Sources: AIPLA Model Jury Instructions 7.2, at 39

[31] Amgen opposes the inclusion of this language because Lindis's expert did not address teaching away in her expert reports.

[32] Lindis Sources: AIPLA Model Jury Instructions 7.2, at 40

[33] Amgen objects to the inclusion of this language because it misstates the law and Lindis has provided no source material to support it.

[**By Amgen:** Ultimately, in arriving at your decision on the issue of whether the Asserted Claims would have been obvious to the person of ordinary skill in the art, you may take into account such factors as:

(1)    Whether the claimed method was merely the predictable result of using prior art elements according to their known functions[34];

(2)    Whether the claimed method provides an obvious solution to a known problem in the relevant field[35];

(3)    Whether the prior art teaches or suggests the desirability of combining elements in the claimed method[36];

(4)    Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions[37]; and

---

[34] Amgen source: *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[A] combination of familiar elements according to known methods is likely to be obvious when it does not more than yield predictable results.").

[35] Amgen source: *KSR Int'l Co.*, 550 U.S. at 419-20 ("One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims.").

[36] Amgen source: *KSR Int'l Co.*, 550 U.S. at 419 ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, for patents combining previously known elements, deprive prior inventions of their value or utility.").

[37] Amgen source: *KSR Int'l Co.*, 550 U.S. at 421 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.").

(5)    Whether the change resulted more from design incentives or other market forces. [38]]

---

[38] Amgen sources: *KSR Int'l Co.*, 550 U.S. at 417 ("When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."); *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) ("A 'motivation to combine may be found explicitly or implicitly in market forces; design incentives; . . . and the background knowledge, creativity, and common sense of the person of ordinary skill in the art.'") (quoting *Plantronics, Inc. v. Aliph, Inc*., 724 F.3d 1343, 1354 (Fed. Cir. 2013)).

### 5.9    OBVIOUSNESS – THE FOURTH FACTOR: OTHER CONSIDERATIONS

As part of deciding the issue of obviousness for each [By Lindis: patented invention] [By Amgen: claimed method], you must also consider certain factors, which may help to determine whether the invention would have been obvious. These factors are sometimes referred to as secondary considerations of non-obviousness. Lindis bears the burden of introducing any evidence of secondary considerations of non-obviousness. No factor alone is dispositive, and you must consider the obviousness or non-obviousness of the invention as a whole. Certain of these factors include:

1.    Were products that use the claimed method commercially successful due to the merits of the [By Lindis: patented invention] [By Amgen: claimed method] rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claimed method?

2.    [**By Lindis:** Was there a long-felt need for a solution to the problem facing the inventors, which was satisfied by the claimed invention?[39] ] [**By Amgen**: delete[40] ]

3.    Did others try, but fail, to solve the problem that was solved by the [**By Lindis:** patented invention] [**By Amgen**: claimed method]?

4.    Did others copy the [**By Lindis**: patented invention] [**By Amgen**: claimed method]?

5.    Did the [**By Lindis**: patented invention] [**By Amgen**: claimed method] achieve unexpectedly superior results over the closest prior art?

Answering all, or some, of these questions "yes" may suggest that the claimed method was not obvious. But these factors are relevant only if there is a direct connection, or nexus, between the factor and the invention covered by the patent claim. [**By Amgen:** You should therefore consider whether the secondary considerations were attributable to the features of the Asserted

---

[39] Lindis Sources: AIPLA Model Jury Instructions 7.4, at 41

[40] Amgen opposes the inclusion of this language because Lindis's expert did not address long-felt need in her expert reports.

Claims as opposed to something else.  For example, if the commercial success is the result of innovative marketing or features found in the prior art, and not of features of the Asserted Claims, then you should not consider commercial success to be an indication of non-obviousness.  Further, the secondary considerations must be related to the advantages of the claimed method, and the secondary considerations must be commensurate in scope to the full range of the claimed method.] Even if you conclude that some of the above factors have been established, those factors should be considered along with all the other evidence in the case  in  determining  whether  Amgen  has proven that the [**By Lindis:** patented invention] [**By Amgen**: claimed method] would have been obvious.

There are also factors that, if established, may suggest that the claim was obvious. One such factor is whether the [**By Lindis:** patented invention] [**By Amgen:** claimed method] was independently and simultaneously invented within a comparatively short amount of time. If you answer "yes" to that question, it may suggest that the claim was obvious.

## 5.10    LACK OF ENABLEMENT

The patent laws contain certain requirements for the part of the patent called the specification, which is the entirety of the patent before the claims.  One requirement is that the specification must disclose sufficient information to enable or teach a person of ordinary skill in the art to make and use the full scope of the [**By Lindis:** patented invention] [**By Amgen:** claimed method] without undue experimentation.  This requirement is known as the enablement requirement.  If a patent is not enabled, it is invalid.

Amgen contends that each of the Asserted Claims is invalid for lack of enablement.  To succeed in its defense, Amgen must show by clear and convincing evidence, on a claim-by-claim basis, that the specification of the Asserted Patents fails to meet the enablement requirement for the [**By Lindis:** patented invention] [**By Amgen:** claimed method being evaluated by you].

[**By Lindis:** delete. **By Amgen**[41]: To meet the enablement requirement, the specification must contain a sufficiently full and clear description to have allowed the person of ordinary skill in the art to make and use the full scope of the claimed method without undue experimentation as of the effective filing date (April 26, 2005).[42]  The issue of enablement is decided on a claim-by-claim basis.

---

[41] Amgen objects to ending the instruction on enablement as Lindis proposes.  Without these additional instructions proposed by Amgen the jury will have essentially no guidance as to how to determine whether the enablement requirement is met.  Lindis has also not explained why it objects to the inclusion of these instructions.  **By Lindis**: this lengthy instruction goes well beyond the form instruction provided by AIPLA.  *See* AIPLA Model Patent Jury Instructions 2024 Instruction No. 8.

[42] Amgen source: *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1375 (Fed. Cir. 2017) (a patent specification "must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.") (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)).

The question of undue experimentation is a matter of degree, and what is required is that the amount of experimentation not be "unduly extensive."[43]  Some amount of experimentation to make and use the claimed method is allowable.  However, a specification that leaves the person of ordinary skill in the art to engage in random trial-and-error discovery to make and use the full scope of the claimed method or to engage in painstaking experimentation to see what works does not satisfy the enablement requirement.[44]  In deciding whether the person having ordinary skill would have to experiment unduly in order to make and use the claimed method, you may consider several factors, including:

1) The time and cost of any necessary experimentation;

2) How routine any necessary experimentation is in the field;

3) The presence or absence of working examples in the patent;

4) The amount and sufficiency of guidance presented in the patent;

5) The nature and predictability of the field;

6) The level of ordinary skill in the field; and

7) The breadth of the claims.[45]

The above list of factors is neither mandatory nor exclusive, and no one or more of the

[43] Amgen source: *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013) ("The question of undue experimentation is a matter of degree, and what is required is that the amount of experimentation not be 'unduly extensive.'").

[44] Amgen source: *Sanofi*, 872 F.3d at 615-16 (explaining that "random trial-and-error discovery" does not satisfy the enablement requirement).

[45] Amgen sources: 2024 AIPLA Model Patent Jury Instructions § 8; *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) ("Factors to be considered in determining whether a disclosure would require undue experimentation . . . include (1) the quantity of the experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.").

above factors is alone conclusive.[46]   Rather, you must make your decision about whether the

degree of any required experimentation is undue based upon all of the evidence presented to you.

You should weigh these factors, and any other evidence related to this issue, and determine

whether, in the context of the claimed methods and the state of the art at the time of the effective

filing date (April 26, 2005), the person of ordinary skill the art would need to experiment unduly

to make and use the full scope of the claimed method of each of the Asserted Claims.]

---

[46] Amgen source: *Cephalon, Inc.*, 707 F.3d at 1338 ("Whether undue experimentation is required 'is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations.'") (quoting *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010)).

### 5.11  LACK OF WRITTEN DESCRIPTION

The patent laws also require a patent's specification to contain a written description of the [**By Lindis**: patented invention] [**By Amgen**: claimed method].  The "written description" requirement is designed to ensure that the inventor invented the claimed subject matter and was in possession of the full scope of the [**By Lindis**: patented invention] [**By Amgen**: claimed method] as of the effective filing date - which is April 26, 2005.  The written description requirement exists because patents are part of a bargain between the American people and inventors.  In exchange for a specification that fully informs the public of what the inventor claims as his or her invention, the inventor gets a monopoly on the [**By Lindis**: patented invention] [**By Amgen**: claimed method] for the life of the patent.

Amgen contends that the Asserted Claims are invalid because the specification does not contain an adequate written description of the methods claimed in the Asserted Claims.  Amgen bears the burden of proving lack of adequate written description for each Asserted Claim by clear and convincing evidence.  The issue of written description is decided on a claim-by-claim basis.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person of ordinary skill in the art as of the effective filing date (here, April 26, 2005).  The written description requirement is satisfied if a person of ordinary skill in the art, as of the effective filing date, would have recognized that the specification describes the full scope of the [**By Lindis**: patented invention] [**By Amgen**: claimed method]s, and that the inventors possessed the full scope of the [**By Lindis**: patented invention] [**By Amgen**: claimed method]s.  It is not sufficient that the specification discloses only enough to make the [**By Lindis**: patented invention] [**By Amgen**: claimed method]s obvious to a person of ordinary skill in the art.

The written description requirement may be satisfied by descriptive means through the

words, structures, figures, diagrams, formulas, etc. set forth in the specification. It does not need to contain the exact words found in the claim, but the specification must contain an equivalent description of the claimed subject matter. The specification is not required to expressly include what is well-known to a person of ordinary skill in the art as of the effective filing date. The level of required disclosure depends on a variety of factors, such as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and the predictability of the aspect at issue. Specific examples are not required. However, a mere wish or plan for obtaining the [**By Lindis**: patented invention] [**By Amgen**: claimed method] is not adequate written description.[47] [**By Amgen:** Moreover, actual possession or reduction to practice outside of the specification is not enough. It is the specification itself that must demonstrate possession.[48] **By Lindis:** delete]

[**By Lindis:** delete entire remaining passage.][**By Amgen**[49]**:** In this case, the Asserted Claims recite, among other requirements, use of a specific class of bispecific antibodies, which can be referred to as a "genus." One way to consider whether the specification provides adequate written description for the required genus of bispecific antibodies is to assess whether the specification discloses either a representative number of bispecific antibodies falling within the

---

[47] Amgen source: *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997) (holding that written description requires more than a "mere wish or plan for obtaining the claimed chemical invention").

[48] Amgen source: *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) ("'[P]ossession' or reduction to practice outside of the specification is not enough. Rather, as stated above, it is the specification itself that must demonstrate possession.").

[49] Lindis has not articulated why it objects to these proposals. **By Lindis**: Amgen seeks to tailor make an instruction that buttresses its written description defense and which mischaracterizes the Asserted Patents as antibody patents.

scope of the genus or structural features common to the members of the genus so that a person of ordinary skill in the art can "visualize or recognize" the full scope of the members of the required genus of bispecific antibodies.[50]

With respect to disclosing a representative number of bispecific antibodies falling within the scope of the required genus of bispecific antibodies, there are no hard and fast rules concerning the number that constitutes a "representative number."[51] The specification need not describe every bispecific antibody in the required genus of bispecific antibodies in order to meet the written description requirement. Instead, the specification needs to show that the inventors have truly invented the full scope of the required genus of bispecific antibodies, that is, that the inventors have conceived and described sufficient representative bispecific antibodies encompassing the breadth of the genus of bispecific antibodies required by the claims.

With respect to disclosing structural features common to the members of the required genus of bispecific antibodies, the written description requirement is met when there is an established correlation between structure of the bispecific antibodies and the claimed function.

The specification must also provide sufficient "blaze marks" to guide a reader through the

---

[50] Amgen source: *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) ("[A] sufficient description of a genus instead requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus."). Lindis has not articulated why it disagrees with this statement of the law and Amgen requests an opportunity to brief the issue if the Court would find it helpful.

[51] Amgen source: *Ariad Pharms.*, 598 F.3d at 1352; *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1073 (Fed. Cir. 2005) (holding the written description requirement satisfied by a representative number of sequences of the claimed genus of enzymes). Lindis has not articulated why it disagrees with this statement of the law and Amgen requests an opportunity to brief the issue if the Court would find it helpful.

forest of disclosed possibilities toward the claimed method.[52]  One cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my claimed method.[53]  When assessing whether the specification contains adequate blaze marks, it is improper to work backward from the knowledge of the claims.  The proper inquiry is whether the written description that was filed in the Patent Office as of the effective filing date contains sufficient blaze marks that points the reader toward the claimed method, not whether one can read the claims and work backward to search the specification for possible references to those claim requirements.]

---

[52] Amgen source: *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346-47 (Fed. Cir. 2013); *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1571 (Fed. Cir. 1996) ("In the absence of such blazemarks, simply describing a large genus of compounds is not sufficient to satisfy the written description requirement as to particular species or sub-genuses.").  Lindis has not articulated why it disagrees with this statement of the law and Amgen requests an opportunity to brief the issue if the Court would find it helpful.

[53] Amgen source: *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000) ("[O]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention.").  Lindis has not articulated why it disagrees with this statement of the law and Amgen requests an opportunity to brief the issue if the Court would find it helpful.

6. **DAMAGES**

    6.1    **DAMAGES - GENERALLY**

    I will now give you some instructions related to patent damages.  By instructing you on damages, I am not suggesting which party should win this case on any issue.  These instructions are only to guide you in case you find that Amgen [**By Amgen:** actively] induced infringement of a claim of the '421 or the '158 patents that you do not find to be invalid.

    If you find that Amgen [**By Amgen:** actively] induced healthcare providers to administer Blincyto using a method that infringes any of the Asserted Claims, and that that claim is not invalid, you must determine the amount of damages to be awarded to Lindis for that infringement. On the other hand, if you find that there is no Asserted Claim that is both indirectly infringed by Amgen and not invalid, then you should not consider patent damages in your deliberations.

    The damages you award must be adequate to compensate Lindis for the infringement you determine to have occurred.  Damages are not meant to punish an infringer or to set an example. You also may not add interest to any damages award.

    Lindis has the burden to prove each element of its damages—including the amount of the damages—by a preponderance of the evidence.  While Lindis is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork. [**By Lindis:** And, if the reason Lindis has difficulty proving the amount of its damages is that Amgen did not maintain adequate records, then you should resolve any doubts as to the

amount of damages in Lindis's favor.][54] [**By Amgen:** delete][55]

---

[54] Lindis Sources: AIPLA Model Jury Instructions 10.3, at 56; *See SSI Technologies LLC v. Dongguan Zhengyang Electronic Mechanical Ltd.,* C.A. No. 20-cv-19-JDP, D.I. 329 (W.D. Wis. Oct. 4, 2024) (final jury instructions for damages in patent infringement matter where the accuracy of the amount of damages contested, and the amount of damages that should be excluded from the damages base, were contested in part due to lack of financial documents regarding calculation and breakdown of damages base per product and part). As with *SSI*, the parties here contest the amount of damages in the damages base and as part of Mr. Schoettelkotte's damages analysis based in part on an alleged lack of documents from Amgen. This instruction is thus required to put that lack of documentation into context and to inform the jury as to how they should weigh this evidence.

[55] Amgen objects to the inclusion of Lindis' proposal because it serves as little more than innuendo to suggest that Amgen did not comply with its discovery obligations in this case. If Lindis was concerned about its damages analysis in light of its election to withdraw its assertion of infringement as to certain patient populations, it was free to seek to reopen discovery to obtain documents and information that it had not previously sought in discovery, but it did not do so. In addition, Lindis could have obtained the information from third-party sources, but it chose not to do so. Lindis should not be permitted to cure that oversight through its proposed jury instruction. **By Lindis**: This is instruction comes directly from the AIPLA Model Jury Instructions and is not intended to act as "an innuendo" but instead to educate the jury as to the acceptable remedy in the event that they are faced with how to resolve doubts.

### 6.2     DAMAGES - REASONABLE ROYALTY

Lindis is seeking damages in the amount of a reasonable royalty.

If you find that a patent claim is infringed and not invalid, Lindis is entitled to at least a reasonable royalty to compensate it for that infringement.

A royalty is a payment made to a patent holder in exchange for the right to use the [**By Lindis**: patented invention] [**By Amgen**: claimed method].  A reasonable royalty is the royalty payment that would have resulted from a hypothetical negotiation between the patent owner and the alleged infringer just before the infringement began.  Of course, we know that Lindis and Amgen did not agree to a license and royalty payment. But, in order to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license before any infringement began.  This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement began.

The reasonable royalty award must be based on the incremental value that the [**By Lindis:** patented invention] [**By Amgen:** claimed method] adds to the end product.  [**By Lindis**: When the infringing methods use both patented and unpatented steps, measuring this value requires a determination of the value added by the patented steps[56]] [**By Amgen**: When the product sold is used in both ways that make use of the [**By Lindis**: patented invention] [**By Amgen:** claimed method] and ways that do not use the [**By Lindis:** patented invention] [**By Amgen**: claimed method], measuring this value requires a determination of the value added by the [**By Lindis**: patented invention] [**By Amgen:** claimed method]].   The royalty rate must reflect the value

---

[56] Lindis Sources: *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC and Neapco Drivelines LLC*, C.A. No. 15-1168-GBW, DI. 314, Final Jury Instructions, at 50 (D. Del. Jan. 29, 2024).

attributable to the use of the [By Lindis: patented invention] [**By Amgen**: claimed method], and no more.  A reasonable royalty amount may be calculated by multiplying the reasonable royalty rate by the appropriate royalty base (for example, the amount of sales to which the royalty rate applies).

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in their negotiations.  For this analysis, only the novel or non-obvious features of the [**By Lindis:** patented invention] [**By Amgen**: claimed method] should be considered, and not the features that were known or used in the prior art (e.g., administration of bispecific antibodies more generally or their use in a non-infringing manner).

In determining this, you must assume that both parties to the hypothetical negotiation believed the patent was valid and infringed and that both parties were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

### 6.3    REASONABLE ROYALTY - FACTORS

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

(1)    Any royalties received by Lindis for licensing others under the '421 and '158 patents, proving or tending to prove an established royalty.

(2)    The rates paid by Amgen to license other patents comparable to the '421 and '158 patents.

(3)    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

(4)    The licensor's established policy and marketing program to maintain its right to exclude others from using the [**By Lindis**: patented invention] [**By Amgen**: claimed method] by not licensing others to use the [**By Lindis:** patented invention] [**By Amgen**: claimed method], or by granting licenses under special conditions designed to preserve that exclusivity.

(5)    The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

(6)    The effect of selling the product made by the [**By Lindis**: patented invention] [**By Amgen**: claimed method] in promoting sales of other products of the licensee; the existing value of the [**By Lindis:** patented invention] [**By Amgen**: claimed method] to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

(7)    The duration of the '421 and '158 patents and the term of the license.

(8)    The established profitability of the product administered under the '421 and '158 patents; its commercial success; and its current popularity.

(9)    The utility and advantages of the [**By Lindis**: patented invention] [**By Amgen**: claimed method] over the old modes or devices, if any, that had been used for achieving similar results.

(10)    The nature of the [**By Lindis**: patented invention] [**By Amgen**: claimed method]; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the [**By Lindis**: patented invention] [**By Amgen**: claimed method].

(11) The extent to which Amgen has administered the [**By Lindis**: patented invention] [**By Amgen**: claimed method]; and any evidence that shows the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the [**By Lindis**: patented invention] [**By Amgen**: claimed method] or analogous patented methods.

(13) The portion of the profit that arises from the [**By Lindis**: patented invention] [**By Amgen**: claimed method] itself as opposed to profit arising from unpatented features, such as unpatented steps in the administering process, business risks, or significant features or improvements added by the accused infringer.

(14) The opinion testimony of qualified experts.

(15) The amount that a licensor and a licensee (such as Amgen) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to promote a particular patented use of an otherwise unpatented article—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

(16) Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Amgen would have been willing to pay and Lindis would have been willing to accept.

### 6.4    REASONABLE ROYALTY - TIMING

The relevant date for the hypothetical reasonable royalty negotiation is December 2014. However, the damages period may not coincide with the date of the first infringement.  If you find that the '421 patent is infringed, or that both the '421 patent and the '158 patent are infringed, the earliest the damages period can begin is January 10, 2016, because patent law limits damages to a six-year period before the filing of the complaint for infringement.  However, if you find that only the '158 patent is infringed, the earliest that the damages period can begin is September 11, 2018 (the date the '158 patent issued), because damages can only begin after a patent issues.

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon.  Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation.  You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

### 6.5    REASONABLE ROYALTY — USE OF COMPARABLE LICENSES

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to Lindis's [**By Lindis**: patented invention] [**By Amgen**: claimed method], or for rights to similar technologies.   An agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Lindis and Amgen in order for you to consider it.   However, if you choose to rely upon evidence from any other agreements, you must account for any differences between those agreements and the hypothetically negotiated license between Lindis and Amgen, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

### 6.6    DAMAGES – REVENUES FROM OUTSIDE THE UNITED STATES[57]

Damages may be awarded based on the administration of Blincyto in the United States if you find that Amgen [**By Amgen:** actively] induced healthcare providers to administer Blincyto in the United States in a way that infringes the Asserted Claims.

[**By Lindis**: The use and sale of Blincyto to parties outside of the United States is relevant to patent damages.  If Lindis proves infringement in the United States, you may also award damages based on Blincyto revenues from outside the United States, if you find that Lindis has proven by a preponderance of the evidence that Amgen manufactures the Blincyto antibody in the United States, or that Amgen sells the Blincyto antibody from the United States to one or more locations outside of the United States.] [**By Amgen**: Damages may also be awarded based on Blincyto revenues from outside the United States, if you find that Lindis has proven by a preponderance of the evidence that Amgen actively induced healthcare providers to administer Blincyto in a way that infringes any of the Asserted Claims in the United States and that active inducement was the proximate cause for Amgen's Blincyto revenues outside of the United States. To be the proximate cause, Lindis must prove by a preponderance of evidence (1) that Amgen actively inducing infringement in the United States was the actual cause for Amgen's Blincyto

---

[57] As discussed in Amgen's *Daubert* motion briefing, including the supplemental submission, Lindis' proposal misstates the law and ignores that here, neither the manufacture nor the sale of Blincyto itself in the U.S. is an act of infringement of the Asserted Patents' method of treatment claims.  *See Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 879 (Fed. Cir. 2024) ("There is no established recognition in patent law of direct infringement by 'making' a 'method'[.]").  *See also* 35 U.S.C. § 284 (damages awarded to compensate "for the infringement"); *Brumfield*, 97 F.4th at 878 ("'[T]he infringement]'—the focus of § 284, as the Court in *WesternGeco* repeatedly stressed—[must] have the needed causal relationship to the foreign conduct for which recovery is sought."); *Microsoft Corp. v. SynKloud Techs., LLC*, 484 F. Supp. 3d 171, 184 (D. Del. 2020) ("[A] party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent[.]") (quoting *Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008)).

revenues outside of the United States and (2) that Amgen actively inducing infringement was a direct and necessary cause of Amgen's Blincyto revenues outside of the United States.]

### 6.7    WILLFUL INFRINGEMENT[58]

If you find that it is more likely than not that Amgen [**By Amgen**: actively] induced infringement of a valid claim of the Asserted Patents, then you must also determine whether or not Amgen's [**By Amgen**: actively] induced infringement was willful.

To show willful infringement, Lindis must prove by a preponderance of the evidence that Amgen knew of the Asserted Patents and intentionally [**By Lindis**: infringed] [**By Amgen:** and purposefully [By Amgen: actively] induced infringement of] at least one Asserted Claim. [**By Lindis**: You may consider whether Amgen's behavior was deliberate or intentional.] However, you may not find that Amgen's [By Amgen: actively] induced infringement was willful merely because Amgen knew about the patent [**By Lindis**:, without deliberate or intentional infringement] [**By Amgen**:.  Amgen must have deliberately or intentionally actively induced infringement]. In determining whether Lindis has proven that Amgen's [By Amgen: actively] induced infringement was willful, you [**By Lindis**: must consider all of the circumstances and assess Amgen's knowledge at the time the challenged conduct occurred.] [**By Amgen**: may consider:

1.    Whether Amgen acted consistently with the standards of behavior for its industry;

2.    Whether Amgen copied a method that it knew was covered by an Asserted Claim;

3.    Whether Amgen reasonably believed that administering Blincyto did not infringe

---

[58] Lindis sources: 2024 AIPLA Model Patent Jury Instructions § 11.0 (modified to reflect case-specific facts); *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1300 (Fed. Cir. 2023) (affirming jury finding of willful infringement based on "deliberate or reckless disregard of plaintiff's patent rights"); *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367 (Fed. Cir. 2020) (deliberate and intentional requirement); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016) (burden of proof and deliberate and intentional requirement).

the Asserted Claims, or reasonably believed that the Asserted Claims were invalid;

4. Whether Amgen made a good faith effort to avoid infringing the Asserted Claims, for example, whether Amgen attempted to design around the Asserted Claims; and

5. Whether Amgen tried to cover up any actively induced infringement.

The above list of factors is neither mandatory nor exclusive, and no one or more of the above factors is alone conclusive.  Rather, you must make your decision based upon all of the evidence presented to you.[59]]

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement.

---

[59] Amgen source: *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 2019 WL 3290369, at *6 (D. Del. July 22, 2019) (the jury was instructed to consider "(1) whether [the defendant] acted consistently with the standard of behavior for its industry, (2) whether [the defendant] reasonably believed it did not infringe, (3) whether [the defendant] made a good-faith effort to avoid infringement, (4) whether [the defendant] tried to cover up its infringement, and (5) whether [the defendant] intentionally copied [the plaintiff's] products.").

7. **<u>DELIBERATION AND VERDICT</u>**

**7.1    INTRODUCTION**

I have completed my instructions on the law.  All of the instructions I gave you previously today—as well as earlier in this trial—still apply, and you will have a copy of the instructions with you in the jury room.

Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is Juror No.  1.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

## 7.2    UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you.  I will review that document with you in a moment.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  You will then return to the courtroom and my deputy will read aloud your verdict.

And I will remind you that nothing said in these instructions, and nothing in the verdict form, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

### 7.3    DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.  But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

If any member of the jury took notes, let me remind you that notes are not given any greater weight than the memory or impression of each juror as to what the testimony may have been.  Whether you took notes or not, each of you must form and express your own opinion as to the facts of the case.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.  Listen carefully to what the other jurors have to say, and then decide for yourself.

I am going to remind you now if you go home this evening and resume your deliberations on the next business day, you are not to talk about the case among yourselves or with anyone else during the evening recess.  You may not read or listen to any news about the case in a newspaper, online, through any news apps, on the radio, through any social media, in blogs, or on television during the evening recess.

### 7.4    SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, iPad, blackberry, tablet or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog or website such as Facebook, LinkedIn, YouTube, Instagram, Snapchat or X (formerly known as Twitter) to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 7.5    COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide this case yourselves based on the evidence presented.

Finally, if I have read any of these instructions inconsistently with the written text, you are to rely on the written instructions in your deliberations.