IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDIS BIOTECH, GMBH | ) | |
| | ) | C. A. No.:  22-00035-GBW |
| Plaintiff, | ) | |
| | ) | ▉▉▉▉▉▉▉▉▉▉▉ |
| v. | ) | |
| | ) | **REDACTED – PUBLIC VERSION** |
| AMGEN INC. | ) | **FILED JANUARY 21, 2025** |
| | ) | |
| Defendant. | ) | |

## AMGEN'S TRIAL BRIEF REGARDING INEQUITABLE CONDUCT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

PERKINS COIE LLP
Michael J. Wise
Joseph P. Hamilton
Lara J. Dueppen
Courtney M. Prochnow
Alisha C. Burgin
Doris Alvarez-Reyes
1888 Century Park East
Suite 1700
Los Angeles, CA  90067-1721
(310) 788-9900

Garmai Gorlorwulu
Blake A. Winn
11452 El Camino Real, Suite 300
San Diego, CA  92130-2080
(858) 720-5700

AMGEN INC.
Brian Kao
J. Drew Diamond
Blake Greene
Wendy A. Whiteford
One Amgen Center Drive
Thousand Oaks, CA  91320-1799
(805) 447-1000

O'MELVENY & MYERS LLP
Lisa B. Pensabene
Hassen Sayeed
Carolyn S. Wall
Jing Ying (Amy) Zhao
1301 Avenue of the Americas
Suite 1700
New York, NY  10019
(212) 326-2000

Luann L. Simmons
Sorin Zaharia
Two Embarcadero Center
28th Floor
San Francisco, CA  94111
(415) 984-8700

AUTZ IP LLC
Lindsay H. Autz
115 Lampwick Lane
Fairfield, CT  06824
(203) 526-1307

*Attorneys for Amgen Inc.*

Dated:  January 13, 2025

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................................... 1

II. STATEMENT OF FACTS .................................................................................... 3

    A.  The False Assertions on Which the Asserted Patents Were Premised .................. 3

    B.  Patent Specification Submitted Under Oath and Declaration ................................ 4

    C.  The Withheld Information ..................................................................................... 5

    D.  Lindis Continued Reciting the Same False Premises During Prosecution and Litigation ............................................................................................................. 9

        1.  Prosecution of the Asserted Patents ......................................................... 9

        2.  This Litigation ........................................................................................ 10

III. LEGAL STANDARD ......................................................................................... 11

IV. ARGUMENT ..................................................................................................... 13

    A.  The Repeated Pattern of Making Affirmative and Knowingly False Statements Is *Per Se* Material ................................................................................................ 14

    B.  The False Assertions Are But-For Material Because the Patent Office Relied Upon Them to Allow the Asserted Patents ......................................................... 15

    C.  Dr. Lindhofer's False Assertion of Invention Is But-For Material ...................... 15

    D.  Trion Report, Huhn, and EMA Assessment Are But-For Material to Obviousness and the Failure to Comply With § 112 ................................................................ 16

    E.  The Single Most Reasonable Inference From Dr. Lindhofer's Conduct Here Is the Intent to Deceive ............................................................................................... 17

V.  CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apotex Inc. v. UCB, Inc.*,
  763 F.3d 1354 (Fed. Cir. 2014) ..............................................................................11

*Aventis Pharma S.A. v. Hospira, Inc.*,
  675 F.3d 1324 (Fed. Cir. 2012) ......................................................................... 12, 17

*Avid Identification Sys., Inc. v. Crystal Imp. Corp.*,
  603 F.3d 967 (Fed. Cir. 2010) ................................................................................ 13

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*,
  267 F.3d 1370 (Fed. Cir. 2001) ......................................................................... 13, 20

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
  120 F.3d 1253 (Fed. Cir. 1997) .............................................................................. 12

*Dann v. Johnston*,
  425 U.S. 219 (1976) ............................................................................................ 12, 15

*eSpeed Inc. v. Brokertec USA L.L.C.*,
  417 F.Supp.2d 580 (D. Del. 2006), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007) ..............11

*Fox Indus., Inc. v. Structural Pres. Sys., Inc.*,
  922 F.2d 801, 804 (Fed. Cir. 1990) ........................................................................ 12

*Guardant Health, Inc. v. Found. Med., Inc.*,
  2020 WL 2477522 (D. Del. Jan. 7, 2020) .............................................................. 12

*In re Rembrandt Techs. LP Pat. Litig.*,
  899 F.3d 1254 (Fed. Cir. 2018) .............................................................................. 20

*Lambda Optical Sols., LLC v. Alcatel-Lucent USA Inc.*,
  2015 WL 4720575 (D. Del. Aug. 7, 2015), *report and recommendation adopted*, 2015 WL
  5458271 (D. Del. Sept. 17, 2015) ..................................................................... 13, 20

*Luv n' Care, Ltd. v. Laurain*,
  98 F.4th 1081 (Fed. Cir. 2024) ...........................................................................11, 14

*Monsanto Co v. Bayer Bioscience N.V.*,
  514 F.3d 1229 (Fed. Cir. 2008) .............................................................................. 19

*Ohio Willow Wood Co. v. Alps S., LLC*,
  735 F.3d 1333 (Fed. Cir. 2013) ..............................................................................11

*Paragon Podiatry Lab'y, Inc. v. KLM Lab'ys, Inc.*,
  984 F.2d 1182 (Fed. Cir. 1993) ......................................................................... 12, 19

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
  225 F.3d 1315 (Fed. Cir. 2000) ......................................................................... 12, 15

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ........................................................................ passim

*Truth Hardware Corp. v. Ashland Prods., Inc.*,
  2003 WL 22005839 (D. Del. Aug. 19, 2003) ......................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

**Regulations**

37 C.F.R. § 1.56 ................................................................................................................. 12

## I.    INTRODUCTION

For over a decade, named inventor Dr. Horst Lindhofer violated his oath to the Patent Office. Dr. Lindhofer submitted inaccurate and incomplete information to the Patent Office in his original patent application, relying in the application and prosecution on these falsities as bases for patentability of what would eventually issue as U.S. Patent Nos. 8,709,421 (the '421 Patent) and 10,071,158 (the '158 Patent) (collectively, the "Asserted Patents").

The patent specification says his invention "is based on" two premises:

1.  The "surprising finding that the combination of immunostimulating antibodies of defined specificity together with glucocorticoids results in a reduction of the non-specific release of cytokine by immunological cells without the action of the immunostimulating antibodies directed against the defined antigen(s) being impaired." Ex. A, JTX001 ('421 Patent) at 3:27–35.

2.  "[A]dministration of glucocorticoids in connection with the stimulation of the immune system of a patient by antibody therapies, for example with trifunctional antibodies (trAB), is totally unknown." *Id.* at 2:13–17.

Dr. Lindhofer knew both to be false at the time he signed his oath to the Patent Office. Dr. Lindhofer had commissioned his company Trion Pharma to generate "more reliable" experimental evidence than the "quick-and-dirty" experiment of the patent application. The Trion Report concluded the opposite of the representations in the filed patent application:

| PATENT SPECIFICATION (EX. A) | TRION REPORT (EX. B, DTX-335) |
|---|---|
| "Surprising finding" that non-specific cytokine release was reduced "**without the [antibody's killing] action . . . being impaired**."[1] Ex. A at 3:27–35. | Glucocorticoid premedication "showed **negative impact on [R]emovabs' [sic] killing abilities** even at high [R]emovab concentrations of 50ng/ml and 10ng/ml." Ex. B at 17. |
| Administration of glucocorticoids with immunostimulatory antibodies "is **totally unknown**." *Id.* at 2:13–17. | "[P]remedication with gl[u]cocorticoids like dexamethasone **was established successfully in clinics** [during treatment with immunostimulatory antibodies by others]." *Id.* at 6 (citing the Ex. C, DTX-199 (2001 Huhn reference ("Huhn"))). |

---

[1] Unless otherwise indicated, internal quotations and citations are omitted and emphasis is added.

Two weeks after signing the Trion Report, confirming its accuracy, Dr. Lindhofer filed the patent application under oath with the false assertions. The Trion Report, and its "more reliable" experiments and contrary conclusions, was never shared with the Patent Office. But the Trion Report did go to the European Medicines Agency ("EMA")—the European equivalent of the U.S. FDA. In its Assessment (Ex. D, DTX-201), the EMA confirmed the Trion Report's conclusions— that glucocorticoids inhibited tumor cell killing by Dr. Lindhofer's antibody Removab (catumaxomab). Neither false assertion in the patent specification was ever corrected. To the contrary, they were repeatedly relied upon during prosecution as a basis for patentability.

Inequitable conduct requires that the patent applicant be shown to have withheld material information from the Patent Office with the specific intent to deceive. Here, the patent applicant, Dr. Lindhofer, made the false assertions under oath and repeatedly relied on them to overcome the Patent Office's rejections. That conduct is *per se* material under Federal Circuit precedent. As an inventor, Dr. Lindhofer had an obligation to disclose to the Patent Office the information in the Trion Report, the prior art reference Huhn, and the EMA Assessment. Instead, Dr. Lindhofer intentionally withheld the material information on antibody killing action in the Trion Report (and the EMA's confirmation), in his words, to avoid "misleading" the Examiner. And, despite knowing that Huhn disclosed glucocorticoid pretreatment with immunostimulatory antibodies, Dr. Lindhofer argued the opposite in the patent specification and throughout prosecution. The Examiner would not have issued the asserted claims in view of the information in the Trion Report, Huhn, or the EMA Assessment. The single most reasonable inference is that this information was withheld with the intent to deceive. Based on Dr. Lindhofer's intentional and repeated misrepresentations about fundamental information relied upon for patentability, the Asserted Patents should be found unenforceable for inequitable conduct.

## II.    STATEMENT OF FACTS

### A.    The False Assertions on Which the Asserted Patents Were Premised

Dr. Lindhofer's patents disclose that the invention "is based on" the "surprising finding" that glucocorticoid premedication to reduce non-specific release of cytokines does not impair the killing action of immunostimulating antibodies. *See* Ex. A at 3:27–35; *see also* Day 3 Tr. at 557:25–558:9 (inventor Dr. Heiss saying the "surprising finding" is the "fundamental premise" of the invention).[2] The patent specification repeatedly touts the "surprising finding":

> This novel indication of glucocorticoids in connection with antibody therapy for immunostimulation in the case of diseases, particularly cancer, is based on the **surprising finding** that the combination of immunostimulating antibodies of defined specificity together with glucocorticoids results in a reduction of the non-specific release of cytokine by immunological cells **without the action of the immunostimulating antibodies directed against the defined antigen(s) being impaired**. (Ex. A at 3:27–35.)

> [T]he combination of the antibodies with glucocorticoids results in a modulation of the resulting immune activity; **the immune activity of the antibody or antibodies, directed against the defined antigen(s), remains largely unchanged**. . . . (*Id.* at 3:37–44.)

> Between a concentration of 0.1 µg/ml and 1 µg/ml dexamethasone the non-specific reaction is greatly reduced or completely eliminated. In contrast thereto, within this glucocorticoid-concentration range in vitro **the specific immune activity directed against the tumour-cell antigen EpCAM was not influenced significantly**. (*Id.* at 24:42–48 (discussing Examples 1–3); *see also id.* at 27:30–32 ("dexamethasone had no significant negative influence on the immunostimulating action of the antibody.")).

The patent specification also propagates the falsehood that the claimed method is the first to use glucocorticoids in connection with any immunostimulatory antibody treatment, stating that "administration of glucocorticoids in connection with the stimulation of the immune system of a patient by antibody therapies, for example with trifunctional antibodies (trAB), is totally

---

[2] The Asserted Patents have substantially identical specifications. D.I. 287-1 (Joint Statement of Uncontested Facts) ¶ 19. Citations are made to the '421 Patent (Ex. A).

unknown." *Id.* at 2:13–17. Indeed, the patent specification identifies Dr. Lindhofer's invention as the "novel indication of glucocorticoids in connection with antibody therapy for immunostimulation." *Id.* at 3:27–28. The original claims even covered any immunostimulatory antibody, including commercially available antibody drugs Rituxan®, which is discussed in Huhn, and Herceptin®. *See* Ex. E, JTX104 ('421 Patent File History) at 1060–63 (10/26/07 Claims); Ex. F, JTX105 ('158 Patent File History) at 10365–68 (4/7/14 Claims).[3] Like the "surprising finding," the "totally unknown" assertion was critical to the patent specification's description of the invention and the asserted patentability—there would be no issued claims without it. *See, e.g.,* Ex. E at 453 (12/9/13 Notice of Allowance).

### B.    Patent Specification Submitted Under Oath and Declaration

The application for the Asserted Patents was submitted to the Patent Office under an oath and declaration signed by the named inventors, Drs. Horst Lindhofer and Markus Heiss. They acknowledged that each believed he was an inventor of the claimed invention and had "reviewed and underst[oo]d . . . the specification, including the claims." Ex. E at 780–85 (7/24/08 Oath and Declaration); Ex. F at 9116–21 (same). They also acknowledged their "duty to disclose material information" and that "[e]ach individual associated with the filing and prosecution of [the] patent application [including each inventor] has a duty of candor and good faith in dealing with the Office," including a duty to disclose "all information known to that individual to be material to patentability as defined in this section," as well as information inconsistent with statements made

---

[3] The patent specification says monospecific antibodies are immunostimulating by stimulating accessory cells with an Fc region. *See* Ex. A at 4:63–67, 5:14–18. It equates its method's effects on Herceptin (monospecific) with Removab (bispecific): "both antibodies, despite their different active mechanisms, showed substantially the same effects on the release of various cytokines. . . ." *Id.* at 21:1–12.

by the applicant in "[a]sserting an argument of patentability." *Id.* They further declared that all statements in the application were believed to be true, under penalty of fine or imprisonment. *Id.*

### C.    The Withheld Information

The facts, known to Dr. Lindhofer but not to the Patent Office, were that (1) the Asserted Patents' "surprising finding" was unsupported; (2) Dr. Lindhofer did not believe that the preliminary "quick-and-dirty" experiment of the specification's Examples 1-3 was sufficiently reliable, so he delayed filing the patent application to have Trion conduct more "reliable experiments"; (3) the Trion Report's conclusions with more "reliable experiments" contradicted the specification's "surprising finding"; (4) as acknowledged by the Trion Report, prior art (*e.g.*, Huhn) disclosed using glucocorticoid premedication with the administration of immunostimulatory antibodies; and (5) the conclusions of the Trion Report were confirmed by the EMA in its approval of Removab, which recommends against premedication with glucocorticoids.

The data in Examples 1–3 of the Asserted Patents was generated from a single experiment conducted by Dr. Stroehlein using Removab. Ex. G, Stroehlein Dep. at 150:18–21. Dr. Lindhofer understood this to be a "quick-and-dirty" experiment that needed to be confirmed before filing his patent application, which he began drafting in 2002. Ex. H, Lindhofer Dep. Vol. II at 493:19–494:20. Accordingly, Dr. Lindhofer commissioned Trion Pharma[4] to conduct more reliable testing to confirm the alleged "surprising finding." Day 2 Tr. at 278:19–279:7 (Trion Report data was "confirmatory data" and "much more reliable."); *see also id.* at 279:8–10 (Trion study was not a "quick-and-dirty" test); Ex. H (Lindhofer) at 493:19–494:20 (Trion study's purpose was to "reproduce data" that was "already integrated into a patent documentation").

---

[4] Dr. Lindhofer was CEO of TRION Pharma and is CEO and Head of IP for Lindis. Ex. I, Lindhofer Dep. Vol. I at 66:16–67:1, 80:15–18, 83:19–84:8; 358:14–21 ("I have the control [of Lindis]").

Trion's "confirmatory" testing took three years. During that time, Dr. Lindhofer did not file his patent application because "the *in vitro* experiments [in the patent specification that] we had at the beginning were not sufficient in our eyes." Ex. I (Lindhofer) at 269:20–271:19 (Lindhofer told his team: "we have to repeat here something before we--we--we apply or file this patent."). The Trion Report experiments used the same concentrations of dexamethasone (between 0.1 µg/ml and 1 µg/ml) and the same antibody (Removab) described in Examples 1–3 of the Asserted Patents, at antibody concentrations to be used in patients according to the patent specification. *See* Day 2 Tr. (Lindhofer) at 279:21–280:2, 281:10–13, 279:12–14. The Trion Report analyzes more experiments than the patent specification, including direct testing of the effect of glucocorticoid on the tumor cell. *See, e.g.,* Ex. B at 14, 16, 32 (Fig. 12), 33 (Fig. 13), 38 (Table 4).

The Trion Report's conclusions contradict the "surprising finding" asserted in the patent application as the basis for patentability. The patent specification summarizes the results of Examples 1–3 as: "[b]etween a concentration of 0.1µg/ml and 1µg/ml dexamethasone . . . the specific immune activity directed against the tumour-cell antigen EpCAM was not influenced significantly," *i.e.*, the glucocorticoid *does not* inhibit tumor cell killing. Ex. A at 24:42–48. The Trion Report concludes the opposite: "[d]examethasone inhibits killing of EpCAM+ tumor cells by [R]emovab at concentrations ≥ 0,1 µg/ml in vitro," *i.e.* glucocorticoid *does* inhibit tumor cell killing. Ex. B at 5, 14. The Trion Report determined that these same dexamethasone concentrations "showed negative impact on [R]emovabs' [sic] killing abilities even at high [R]emovab concentrations." *Id.* at 17; *see also id.* at 18.

Additionally, the Trion Report cited Huhn to demonstrate that it was "established" that glucocorticoids had been used successfully in the clinic with immunostimulatory antibodies to reduce cytokine secretion. *Id.* at 6 ("To minimize the side effects of overwhelming cytokine

secretion in the patients, premedication with gl[u]cocorticoids like dexamethasone was established successfully in clinics."), 19 n.7. Huhn discloses the use of glucocorticoids as premedication to reduce cytokines with Rituxan, an immunostimulatory antibody. Ex. C at 2, 4; Day 5 Tr. at 1179:12–17. The Trion Report statement is the opposite of the patent specification statement that "administration of glucocorticoids in connection with the stimulation of the immune system of a patient by antibody therapies . . . is totally unknown." Ex. A at 2:13–17.

Dr. Lindhofer signed the Trion Report on April 12, 2005, confirming that the "report accurately reflects the results of the study." Ex. B at 3. He was aware of the Trion Report when he filed his patent application two weeks later, Ex. H (Lindhofer) at 551:19–552:15, 554:21–555:16, 484:8–486:1, and admitted that the Trion Report's conclusion is inconsistent with statements made during prosecution, Day 2 Tr. at 279:21–280:2, 282:15–19 (admitting that the Trion Report states "[i]n summary, dexamethasone, at concentrations from 1 mcg/mL, to 0.1 mcg/mL [inhibited] in vitro experiments the Removab-induced cytokine/granzyme B secretion and tumor cell killing" and that it was "not the data that's in [the] specification"). Dr. Lindhofer purposefully omitted the long-awaited Trion Report data and conclusions from the patent specification. Dr. Lindhofer said he withheld the Trion Report's contradictory results and conclusions to avoid "misleading the [E]xaminer." Ex. H (Lindhofer) at 553:13–22. Dr. Lindhofer also continued to argue that use of glucocorticoids with immunostimulatory antibodies was "totally unknown" and withheld Huhn from the Patent Office. *See* D.I. 287-1 (Joint Uncontested Facts) ¶ 51; Ex. H (Lindhofer) at 489:15–490:4 (admitting he was "familiar with" Huhn).

Lindis **did** submit the "more reliable" Trion Report to the EMA[5] when seeking marketing approval for Removab. Day 3 Tr. at 544:17–25 (inventor Dr. Heiss admitting that Trion results were submitted to the EMA indicating that "glucocorticoid[s] interfered with the antitumor activity of [Removab]"). In 2009, during prosecution of the '421 Patent (and before prosecution of the '158 Patent), the EMA released an "Assessment Report for Removab" (the "EMA Assessment") related to approval in Europe. Ex. D. Just like the Trion Report, the EMA Assessment concluded that "[d]examethasone dose-dependently and markedly inhibited Removab-induced cytokine release and granzyme B release" and that "[Removab]-induced tumour cell killing was inhibited by dexamethasone at all tested concentrations in conditions of a low [Removab] concentration." *Id.* at 13; Ex. H (Lindhofer) at 533:13–22. The EMA Assessment also contradicted the fundamental premise of the Asserted Patents and arguments made to the Patent Office to secure allowance of the claims. Ex. H (Lindhofer) at 510:2–7; Day 2 Tr. at 523:20–524:6 (Lindis's technical expert agreeing to the "evident[]" contradiction). Just like the Trion Report, the EMA Assessment made clear there was no "surprising finding"; there was no invention. The EMA noted that Removab clinical trials had "prohibited" premedication with glucocorticoids, and said "[o]ther or additional standard pre-medication with analgesic/antipyretic/nonsteroidal antiphlogistic medicinal products is recommended."[6] Ex. D at 26, 45.

The EMA Assessment also **was not submitted** to the Patent Office during prosecution of the Asserted Patents, although Dr. Lindhofer knew about it because he controlled the clinical

---

[5] *See* Ex. J, DTX-510 (https://www.ema.europa.eu/en/about-us/what-we-do) at 4 ("The Agency's evaluations . . . provide the basis for the authorisation of medicines in Europe.").

[6] Lindis's repeated assertions in the jury trial that its patent is an "enabling technology" were untrue (*see, e.g.,* Day 3 Tr. (Brea-Krueger) at 615:9–10, 620:3–5; *id.* (Schoettelkotte) at 710:15–19, 720:18–22)—for Lindis's own antibody, the EMA recommended various other "standard pre-medications." *See, e.g.,* Ex. D at 45.

program for Removab. Ex. H (Lindhofer) at 415:5–18 (Dr. Lindhofer had a veto right that "means that no [clinical trial] protocol could be activated for treating patients without [his] agreement."). The EMA Assessment was submitted during prosecution of Dr. Lindhofer's other co-pending patent application, U.S. Patent Application 10/378,218. Ex. K, DTX-435 at 9, 11.

### D. Lindis Continued Reciting the Same False Premises During Prosecution and Litigation

#### 1. Prosecution of the Asserted Patents

Dr. Lindhofer was closely involved in the prosecution process and developed the prosecution strategy for the Asserted Patents. *See*, *e.g.*, Ex. I (Lindhofer) at 83:19–84:15 (he is Head of IP for Lindis and "ha[s] a lot to do with patent lawyers"), 189:14–16 ("I discussed with von Stosch the responses of [E]xaminer of course and I gave him advice.")

Dr. Lindhofer's strategy included repeated reliance upon the false assertions to overcome the Patent Office's rejections during prosecution of the Asserted Patents. For example, during prosecution of the '421 Patent, the Examiner rejected the claims as obvious because "the combination of an antibody including a bispecific antibody and [the glucocorticoid] prednisone was used in the prior art for treating cancer." Ex. E, at 562 (9/9/10 Office Action). To overcome that rejection, the Applicants argued "[o]ne skilled in the art would predict that immunosuppressive glucocorticoids will impair the ability of immunostimulating antibodies to kill tumor cells, **the opposite of what is claimed** in Applicant's instant invention." *See id.* at 536 (3/9/11 Amend.); *see also id.* at 537. The Applicants further identified this as a "key advantage" that was a "discovery" by the named inventors: "[a]ccordingly, the negative side effects are abolished, while the **potential of tumor cell damage is not negatively influenced**." *Id.* at 537–38. Meanwhile, the Applicants knew and withheld that (1) the Trion Report already found that use of glucocorticoids with the antibody from the patent examples, Removab, actually demonstrated

the "opposite of what is claimed" and (2) Huhn disclosed the use of glucocorticoids as premedication in connection with an immunostimulatory antibody treatment.

When the Examiner maintained the rejection, the Applicants amended exemplary claim 1 to include the "treatment of a cancer or tumor" (*i.e.*, requiring cancer cell killing ability) and similar limitations to each independent claim. *Id.* at 472–75 (11/1/11 Amend.). The Applicants again argued non-obviousness because the claimed method worked "without impairing the ability of the bispecific immunostimulating antibody to recruit and activate various immune cells to destroy tumor cells." *Id.* at 480; *see also id.* at 483–84. The Examiner allowed the claims, citing Dr. Lindhofer's false assertions as the reason for allowance. *Id.* at 453 (12/9/13 Notice of Allowance).

The later '158 Patent relied on the same specification despite being filed after the EMA Assessment and after the EMA did not recommend use of glucocorticoid premedication based on the Trion Report data. *See* D.I. 287-1 (Joint Statement of Uncontested Facts) ¶ 18 ('158 patent application filed in 2014); Ex. D at 1 (EMA Assessment dated 2009); Day 1 Tr. at 160:11–14 (EMA approved Removab in 2009). During prosecution, the Applicants again misled the Examiner, arguing that the method of the Asserted Patents was previously "totally unknown" and "solves a major problem in immunotherapy," all the while withholding that glucocorticoids impaired the killing activity of the antibody in the patent examples and that glucocorticoids had been used as premedication in the clinic with the immunostimulatory antibody Rituxan, per Huhn. Ex. F at 8084–85 (1/29/18 Amend.).

### 2. This Litigation

At trial, Dr. Lindhofer, Lindis's other witnesses, and Lindis's counsel repeated the false assertions of the patent specification to support patentability. For example, Dr. Lindhofer testified that the "decisive finding" was that glucocorticoids would reduce non-specific release of cytokines "without reducing the antitumor killing activity." Day 2 Tr. at 275:23–276:7; *see also id.* at 311:6–

24; Day 1 Tr. at 169:20–170:1, 179:21–180:8 ("[W]e were able to find here a balance . . . -- between the danger to kill the antitumor efficacy by the glucocorticoid -- this was state of art, you know -- and on the other side, we saw that the tumor cells will still be killed. . . .").

## III.    LEGAL STANDARD

"[I]nequitable conduct renders an entire patent (or even a patent family) unenforceable." *Therasense, Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276, 1292 (Fed. Cir. 2011); *see also eSpeed Inc. v. Brokertec USA L.L.C.*, 417 F.Supp.2d 580, 595 (D. Del. 2006) (inequitable conduct during the prosecution of a patent application "can therefore render unenforceable . . . claims that issue from related applications as well"), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007). In determining inequitable conduct, the pattern of deceptive conduct must be considered in the aggregate. *See Luv n' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1098 (Fed. Cir. 2024) ("When a person having a duty of candor and good faith has engaged in serial misconduct during the prosecution of the same or related patents, it is not enough for a court to consider each individual act of misconduct without also considering the collective whole."); *see also Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013); *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014).

Proof of inequitable conduct requires that the applicant withheld material information from the Patent Office with the specific intent to deceive. *Therasense,* 649 F.3d at 1290–91. To assess whether information is material, courts "determine whether the [Patent Office] would have allowed the claim if it had been aware of" the information. *Id.* at 1291. "[I]nformation is material" to patentability when "(1) [i]t establishes, by itself, or in combination with other information, a prima facie case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a position the applicant takes in: (i) [o]pposing an argument of unpatentability relied on by the [Patent Office], or (ii) [a]sserting an argument of patentability." *Id.* at 1294 (quoting 37 C.F.R. § 1.56).

11

"[T]he standard for establishing but-for materiality in the inequitable conduct context only requires a preponderance of the evidence, giv[ing] claims their broadest reasonable construction." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012). But-for materiality is presumed where "the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit." *Therasense*, 649 F.3d at 1292–93; *see also Aventis*, 675 F.3d at 1334. A misrepresentation about inventorship is but-for material. *Dann v. Johnston*, 425 U.S. 219, 225 (1976) ("As a judicial test, invention [i].e., an exercise of the inventive faculty, has long been regarded as an absolute prerequisite to patentability."); *see also PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000) ("inventorship is material.").

Intent to deceive is established by a showing of clear and convincing evidence that the applicant (1) knew of the reference or information, (2) knew that it was material, and (3) made a deliberate decision to withhold it. *See Therasense*, 649 F.3d at 1290. "[T]he specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* "Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997); *see also Paragon Podiatry Lab'y, Inc. v. KLM Lab'ys, Inc.*, 984 F.2d 1182, 1189-91 (Fed. Cir. 1993).

"[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990); *see also Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2477522, at *4 (D. Del. Jan. 7, 2020) (inequitable conduct can also "render unenforceable other related patents and applications in the same technology family."). Specifically,

"a patent that issues from a divisional or continuation application may be held unenforceable where (i) there is inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (ii) the inequitable conduct relates to the asserted claims of that patent." *Truth Hardware Corp. v. Ashland Prods., Inc.,* 2003 WL 22005839, at *1 (D. Del. Aug. 19, 2003).

Inventors have an independent "duty of candor and good faith to the [Patent Office], one that include[s] a duty to disclose material information thereto." *Lambda Optical Sols., LLC v. Alcatel-Lucent USA Inc*., 2015 WL 4720575, at *3 (D. Del. Aug. 7, 2015), *report and recommendation adopted*, 2015 WL 5458271 (D. Del. Sept. 17, 2015). An inventor may not discharge that duty by merely disclosing material information to his prosecution attorney. *See Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010) ("Individuals other than the attorney, agent, or inventor, who are 'substantively involved in the preparation or prosecution of the application,' may comply with their duty of candor by disclosing known material information to one of the attorney, agent, or inventor."); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp*., 267 F.3d 1370, 1383 (Fed. Cir. 2001) ("Once an attorney, or an applicant, has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her duty to disclose.").

## IV.    ARGUMENT

The Asserted Patents are unenforceable due to inequitable conduct because the premises of the invention asserted in the sworn patent specification were false—having been directly contradicted by the Trion Report, Huhn, and the EMA Assessment, all of which were withheld from the Patent Office. But-for the false assertions made in the patent application, repeated throughout prosecution, and the withheld information, together or individually, Lindis could not have obtained the Asserted Patents. The single most reasonable inference here is intent to deceive.

A.    **The Repeated Pattern of Making Affirmative and Knowingly False Statements Is *Per Se* Material**

The patent specification, submitted under oath by Dr. Lindhofer says, without qualification, that the claimed invention is "based on" the "surprising finding" that the killing ability of the bispecific antibody Removab was not impaired and use of glucocorticoids with immunostimulatory antibodies was "totally unknown." Ex. A at 2:13–17, 3:27–35. These statements are directly contradicted by the Trion Report and Huhn, and the falsity of the "surprising finding" is further confirmed by the EMA both in its assessment and the approval of Removab. A false statement in the application submitted by a signed oath is *per se* material. *Therasense*, 649 F.3d at 1292 ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.").[7]

Moreover, the repeated pattern of making misrepresentations to the Patent Office about the very premises of the supposed invention are the type of affirmative egregious acts that *Therasense* held are *per se* material. The Patent Office would have no way to learn about the Trion Report's testing and opposite conclusions or the EMA's agreement with the Trion Report. Dr. Lindhofer knew that the state of the art was the opposite of the Applicant's representations in the patent specification, and the opposite of the "teaching away" argued during prosecution to overcome the Examiner's rejections. This pattern of repeated affirmative, knowingly false statements about the very premises of the invention are not the "mere nondisclosure of prior art references to the [Patent Office]" that the Federal Circuit cited in *Therasense* as needing proof of but-for materiality, but rather the "affirmative egregious misconduct" that *Therasense* held would be *per se* material. *Therasense,* 649 F.3d at 1292–93.

---

[7] Recently, the Federal Circuit in *Luv n' Care*, 98 F.4th at 1097, remanded the materiality analysis because the district court had failed to consider as a separate finding if the applicant had engaged in "affirmative egregious misconduct" based on its mischaracterization of the prior art product.

### B.    The False Assertions Are But-For Material Because the Patent Office Relied Upon Them to Allow the Asserted Patents

Regardless, had the Examiner known the very premises of invention were false, Lindis could not have obtained the Asserted Patents, so these misrepresentations are also but-for material. The false assertions were repeatedly relied upon throughout prosecution of both patents as the answer to nearly all of the Examiner's challenges to patentability. *See supra* Section II.D.1. As just one example, to overcome obviousness, the Applicants argued that "[o]ne skilled in the art would predict that immunosuppressive glucocorticoids will impair the ability of immunostimulating antibodies to kill tumor cells, **the opposite of what is claimed** in Applicant's instant invention" and identified this supposed "discovery" by the Applicants as a "key advantage." Ex. E at 536–38 (3/9/11 Amend.). Similarly, the Applicants argued the prior art taught that "glucocorticoids should be generally withheld from cancer patients receiving immunotherapy" while knowing that Huhn described clinical work on premedicating patients with glucocorticoids before administering the immunostimulatory antibody Rituxan to treat lymphoma, a type of cancer. *Id.; see also id.* at 480, 483–84 (11/1/11 Amend.); Ex. F at 8084–85 (1/29/18 Amend.). These falsities misled the Patent Office into allowing the Asserted Patents. Breaches of candor during the prosecution of the '421 patent infect the '158 patent as well. *See, e.g., Fox*, 922 F.2d at 804.

### C.    Dr. Lindhofer's False Assertion of Invention Is But-For Material

Misrepresenting the very premises of invention is but-for material. The Trion Report (with its contrary conclusions and admission about Huhn) and EMA Assessment revealed that Dr. Lindhofer had not made the invention he represented in the patent specification. Asserting a false invention is but-for material: "[a]s a judicial test, invention [i].e., an exercise of the inventive faculty, has long been regarded as an absolute prerequisite to patentability." *Dann*, 425 U.S. at 225; *see also PerSeptive*, 225 F.3d at 1321 (Fed. Cir. 2000).

15

### D.    Trion Report, Huhn, and EMA Assessment Are But-For Material to Obviousness and the Failure to Comply With § 112

Dr. Lindhofer's misrepresentations and the information he withheld were but-for material as to obviousness and compliance with § 112. First, as to obviousness, during prosecution of the '421 Patent, Lindis overcame the Examiner's obviousness rejection by (i) amending the claims to require that the claimed antibody be able to treat cancer, *i.e.*, by destroying or killing cancer cells, and (ii) relying on the "surprising finding" to argue that "the combination of the cited references does not provide guidance or predictability on how a glucocorticoid (which is immunosuppressive) can be used together with a bispecific immunostimulating antibody to reduce the non-specific release of cytokine **without impairing the ability of the bispecific immunostimulatory antibody . . . to destroy tumor cells**." Ex. E at 472–75, 480 (11/1/11 Amend.). The Trion Report and EMA Assessment directly contradict this. But for Dr. Lindhofer withholding the information in the Trion Report and EMA Assessment, the Patent Office would not have allowed the '421 Patent. Similarly, the Patent Office would not have allowed the claims in view of Huhn as it contradicted the oft-repeated premise in the prosecution that glucocorticoids were contraindicated for immunotherapy before the application. Further, during the prosecution of the '158 Patent, the Examiner rejected the claims as obvious over Kufer '440 and other references about cancer treatments with immunostimulatory antibodies because it "would have been . . . obvious" to premedicate with glucocorticoids on the same day to reduce side effects. Ex. F at 8289 (7/28/17 Office Action). Lindis overcame that rejection by arguing a "teaching away" based on a supposed "prior art teaching that glucocorticoids, which are potent immunosuppressive drugs, should be generally withheld from cancer patients receiving immunotherapy. . . ." *Id.* at 8085 (1/29/18 Amend.). The Examiner was not aware of Huhn or the Trion Report, where the Applicants admitted that, far from teaching away, Huhn had "established" same day premedication with glucocorticoids

16

with the immunostimulating antibody Rituxan for treating cancer. Had the Examiner known that, he would have maintained the rejection.

Second, as to § 112, the Trion Report and EMA Assessment demonstrate that the claimed invention was not enabled because the Trion Report and EMA Assessment found that with Removab, at concentrations of dexamethasone in the patent specification, the claimed method of treatment would not work. Day 4 Tr. (Marasco) at 1071:21–1072:22 (Trion results "contradicted the data in the patent application" and would require a person of skill in the art to conduct "much more experimentation"), 1073:5–1074:21 (the EMA Assessment concluded that "[Removab]-induced tumor cell killing was inhibited by dexamethasone at all concentrations tested" and therefore the "asserted claims are not enabled."). Logically, if the premises of the invention asserted in the patent specification are false, the written description requirement is not met either.

Lindis may argue that the jury verdict on invalidity determines materiality with regard to obviousness and § 112. It does not. As *Therasense* explained, "even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the [Patent Office]'s different evidentiary standards." *Therasense*, 649 F.3d at 1292. The but-for materiality analysis is evaluated "under the preponderance of the evidence, giv[ing] claims their broadest reasonable construction." *Aventis Pharma S.A.*, 675 F.3d at 1334. There is no presumption of validity, and all of Lindis's and Dr. Lindhofer's misrepresentations can be considered in context.

### E.      The Single Most Reasonable Inference From Dr. Lindhofer's Conduct Here Is the Intent to Deceive

Intent to deceive is established when the applicant (1) knew of information, (2) knew it was material, and (3) made a deliberate decision to withhold it. *See Therasense*, 649 F.3d at 1290.

Dr. Lindhofer admitted he knew of the Trion Report information, knew it was material, and deliberately decided to withhold it. Having waited three years for "more reliable" testing from the Trion Report, Dr. Lindhofer buried that information, and went ahead with his misrepresentations, filing his patent application two weeks later. Dr. Lindhofer admitted that he **purposefully** did not provide the information of the Trion Report to the Patent Office because the more reliable data would "mislead" the Examiner, presumably away from issuing a patent. Ex. H (Lindhofer) at 553:13–22 ("[I]f this report has a wrong interpretation, you know, or not a totally correct interpretation, this was misleading to the [E]xaminer and we do not do such things."). Under his direction, Lindis provided the information to the EMA, which reached the same conclusion as the Trion Report, but Dr. Lindhofer knowingly withheld the EMA Assessment from the Patent Office.

The Trion Report also explained that Huhn's clinical use of premedication with glucocorticoids for the immunostimulatory antibody Rituxan was the very basis for the idea of premedication for Dr. Lindhofer's Removab. Yet, the patent specification states that such a use was "totally unknown." The motivation to deceive at the time of filing the application was clear— Dr. Lindhofer had included claims covering the use of glucocorticoids with the same type of antibody described in Huhn. Ex. A at 2:13–17; Ex. E at 1060–63 (10/26/07 Claims); Ex. F at 10365–68 (4/7/14 Claims). And, even as to claims limited to bispecific antibodies, the Applicants continued to rely through prosecution on the false "totally unknown" premise to argue that it was they who had "solve[d] a major problem in immunotherapy" with glucocorticoid premedication, when Huhn had done it successfully years before with Rituxan, and Dr. Lindhofer later failed with Removab. Ex. F at 8085 (1/29/18 Amend.).

The timing and circumstances support a purposeful decision to misrepresent the invention and withhold the information from the Trion Report, the conclusions of the EMA, and Huhn. The

intent to deceive is the "single most reasonable inference able to be drawn from the evidence." *Therasense,* 649 F.3d at 1290. Coupled with the circumstances of the timing of the patent application's filing (two weeks after the Trion Report), the importance of the misrepresentations (the fundamental bases of the invention), and the pervasiveness of the misrepresentations, this conduct can be nothing but intentional. *See Paragon*, 984 F.2d at 1189–90 ("[S]moking gun evidence is not required in order to establish an intent to deceive. . . . [T]his . . . must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct.").

On the other hand, there is no credible reason for the misrepresentations and nondisclosures, so an inference of intent to deceive can be drawn. *Monsanto Co v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1240–42 (Fed. Cir. 2008) (holding that an inference of intent to deceive can be drawn where patent applicant lacks a credible reason for nondisclosure). Dr. Lindhofer alluded to an excuse at the jury trial, that the Trion Report's conclusion was not correct; it was akin to a typo. Day 2 Tr. at 309:18–310:3 ("the author [of the Trion Report] made a mistake" and Dr. Lindhofer "relied on [his] employee"). Far from an isolated typo, the Trion Report says more than ten times that glucocorticoids **do** inhibit Removab's killing of tumor cells. *See, e.g.,* Ex. B at 13–18, 26 (Fig. 6), 27 (Fig. 7), 28 (Fig. 8), 29 (Fig. 9), 30 (Fig. 10), 31 (Fig. 11), 32 (Fig. 12), 33 (Fig. 13), 38 (Table 4). Dr. Lindhofer signed the Trion Report confirming "that this report accurately reflects the results of the study." *Id.* at 3. And, the EMA, reviewing the data on Removab, came to the same conclusion, that "[d]examethasone dose-dependently and markedly inhibited Removab-induced cytokine release and granzyme B release" and that "[Removab]-induced tumour cell killing was inhibited by dexamethasone at all tested concentrations in conditions of a low [Removab] concentration." Ex. D at 13. Dr. Lindhofer's latest excuse that the

19

Trion Report's conclusion was a "mistake" and that his signature is on the report because he has "to sign a lot of documents and [is] a scientist" rings hollow. Day 2 Tr. at 309:18–310:3.

Dr. Lindhofer cannot shift the blame to his foreign counsel Dr. von Stosch. Lindis did not waive privilege and repeatedly refused to provide discovery on communications with both US patent counsel and foreign counsel. Regardless, as a named inventor, Dr. Lindhofer had an independent duty to disclose material information. *Lambda*, 2015 WL 4720575 at *3; *see also Brasseler*, 267 F.3d at 1383. And, Dr. Lindhofer himself submitted signed oaths to the Patent Office attesting to the veracity of the patent specification for both Asserted Patents.

Dr. Lindhofer continued his misrepresentations at trial, which further supports intent to deceive. *In re Rembrandt*, 899 F.3d 1254, 1274 (Fed. Cir. 2018) (affirming reliance on later litigation misconduct in "assessing the key players' trustworthiness and the likelihood that they had deceptive intent"). During the jury trial, he advanced the false idea that he and Dr. Heiss had discovered a previously unknown way to reduce side effects with glucocorticoids that did not impair tumor cell killing. *See, e.g.*, Day 1 Tr. (Lindhofer) at 179:21–180:8 ("[W]e were able to find here a balance . . . between the danger to kill the antitumor efficacy by the glucocorticoid--this was state of art, you know--and on the other side, we saw that the tumor cells will still be killed. . . ."). In closing, Lindis advanced the false premises again: "us[ing] an immunostimulating antibody together with an immunosuppressant was not something that was believed it would be, you know, workable, and Dr. Heiss, Dr. Lindhofer figured out that it would work. So it was a change in medical opinion." Day 6 Tr. (Lindis's Closing) at 1422:10–15.

The only reasonable conclusion from this pattern of behavior is an intent to deceive.

## V.    CONCLUSION

For the foregoing reasons, the Asserted Patents are unenforceable due to inequitable conduct.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ James L. Higgins*

_____

PERKINS COIE LLP
Michael J. Wise
Joseph P. Hamilton
Lara J. Dueppen
Courtney M. Prochnow
Alisha C. Burgin
Doris Alvarez-Reyes
1888 Century Park East
Suite 1700
Los Angeles, CA  90067-1721
(310) 788-9900

Garmai Gorlorwulu
Blake A. Winn
11452 El Camino Real, Suite 300
San Diego, CA  92130-2080
(858) 720-5700

AMGEN INC.
Brian Kao
J. Drew Diamond
Blake Greene
Wendy A. Whiteford
One Amgen Center Drive
Thousand Oaks, CA  91320-1799
(805) 447-1000

O'MELVENY & MYERS LLP
Lisa B. Pensabene
Hassen Sayeed
Carolyn S. Wall
Jing Ying (Amy) Zhao
1301 Avenue of the Americas
Suite 1700
New York, NY  10019
(212) 326-2000

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Stephanie N. Vangellow (No. 7277)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
svangellow@ycst.com

*Attorneys for Amgen Inc.*

Luann L. Simmons
Sorin Zaharia
Two Embarcadero Center
28th Floor
San Francisco, CA  94111
(415) 984-8700

AUTZ IP LLC
Lindsay H. Autz
115 Lampwick Lane
Fairfield, CT  06824
(203) 526-1307


Dated: January 13, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, James L. Higgins, Esquire, hereby certify that on January 13, 2025, I caused to be electronically filed a true and correct copy of Amgen's Trial Brief Regarding Inequitable Conduct with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

James D. Taylor, Jr.
Jessica M. Jones
Michelle C. Streifthau-Livizos
Saul Ewing LLP
1201 N. Market Street, Suite 2300
Wilmington, DE  19801
james.taylor@saul.com
jessica.jones@saul.com
michelle.streifthau-livizos@saul.com

I further certify that on January 13, 2025, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

Henry A. Platt
Robert C. Gill
Matthew J. Antonelli
Alireza Behrooz
Dennis Ostrovsky
Madeline Jenkins
Saul Ewing LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, DC  20006
henry.platt@saul.com
robert.gill@saul.com
matt.antonelli@saul.com
alireza.behrooz@saul.com
dennis.ostrovsky@saul.com
madeline.jenkins@saul.com

Courtland C. Merrill
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
courtland.merrill@saul.com

Andrew Schwerin
Center Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
andrew.schwerin@saul.com

_____/s/ James L. Higgins_____
James L. Higgins (No. 5021)